**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE: HEARTLAND PAYMENT** | § | **4:09MD02046** |
| **SYSTEMS, INC. CUSTOMER DATA** | § | |
| **SECURITY BREACH LITIGATION** | § | **MDL NO. 2046** |
| | § | |
| | § | **HON. LEE H. ROSENTHAL** |
| | § | |
| **THIS DOCUMENT RELATES TO:** | § | |
| **FINANCIAL INSTITUTION TRACK** | § | **CLASS ACTION** |
| **ACTIONS** | § | |
| | § | **JURY TRIAL DEMANDED** |

---

**FINANCIAL INSTITUTION PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT HEARTLAND PAYMENT SYSTEMS, INC.'S
MOTION TO DISMISS THE MASTER COMPLAINT**

---

Richard L. Coffman, Esq.
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans St., Ste. 505
Beaumont TX 77701
(409) 833-7700
(866) 835-8250 FAX

Michael A. Caddell, Esq.
Cynthia B. Chapman, Esq.
Cory S. Fein, Esq.
**CADDELL & CHAPMAN**
1331 Lamar, Ste. 1070
Houston TX 77010
(713) 751-0400
(713) 751-0906 FAX

Joseph G. Sauder, Esq.
Matthew D. Schelkopf, Esq.
Benjamin F. Johns, Esq.
**CHIMICLES & TIKELLIS, LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford PA 19041
(610) 645-4717
(610) 649-3633 FAX

**CO-LEAD COUNSEL FOR FINANCIAL INSTITUTION PLAINTIFFS**

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ v

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL OVERVIEW .................................................................................................... 2

      A.     Heartland's Payment Card Processing Services .................................... 2

      B.     The Heartland Data Breach .................................................................... 2

      C.     Heartland's Affirmative Misrepresentations and Omissions ................. 3

      D.     Heartland Failed to Comply with Minimal Data Security
            Standards .................................................................................................. 3

      E.     Heartland's Conduct After the Data Breach .......................................... 4

SUMMARY OF ARGUMENT ........................................................................................... 5

ARGUMENTS .................................................................................................................... 7

I.      THE FIs STATE PLAUSIBLE CLAIMS UNDER *TWOMBLY* AND *IQBAL* ................. 7

II.     THE FIs' CLAIMS EASILY SURVIVE SCRUTINY UNDER NEW
        JERSEY LAW ........................................................................................................ 11

      A.     Not Only Do the FIs' Allegations Require Application of New Jersey Law,
            But A Fact Intensive Choice-of-Law Analysis Cannot Be Conducted
            On the Pleadings Alone ........................................................................ 11

            1.     Federal courts routinely refuse to conduct a choice-of-law analysis
                 when it requires consideration of materials beyond the pleadings ........... 11

            2.     A choice-of-law inquiry cannot be conducted on the pleadings alone ...... 12

            3.     The FIs' allegations require the application of New Jersey law. .............. 14

            4.     The FIs' pleadings support the existence of a duty owed by
                 Heartland to them ................................................................................ 16

                 a.     The question of duty under New Jersey law requires
                     development of a factual record and cannot be decided
                     on the pleadings .......................................................... 16

b.      The FIs' factual allegations amply support a finding that the Data Breach was a reasonably foreseeable result of Heartland's woefully inadequate system security ........................ 17

c.      Fairness and policy considerations create a duty of care here ........................................................................................ 20

B.      The Economic Loss Doctrine Does Not bar the FIs' Negligence Claims Under New Jersey Law ...................................................................................... 23

III.    THE FIs PROPERLY ALLEGE CLAIMS FOR INTENTIONAL AND NEGLIGENT MISREPRESENTATION ......................................................................... 25

A.      The FIs' Pleadings Comply with Rule 9(b) .......................................................... 25

B.      The FIs Properly Allege Negligent Misrepresentation ......................................... 27

C.      The FIs Properly Allege Material Falsity .............................................................. 29

D.      The FIs Are the Intended Recipients of Heartland's Statements .......................... 30

E.      The FIs Properly Allege Heartland's Duty To Them ............................................ 32

F.      The FIs Properly Allege Reliance ......................................................................... 33

G.      The FIs Properly Allege Scienter .......................................................................... 34

IV.     THE FIs STATE CLAIMS FOR VIOLATIONS OF THE ASSERTED UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACTS ............................... 35

A.      By Its Plain Language, the NJCFA Is Applicable To the FIs .............................. 36

B.      The Compromised Data, Parties and Claims Relate To Consumer-Oriented Transactions ............................................................................ 36

C.      The FIs state a claim under the NJCFA ................................................................ 38

        1.      The FIs properly allege actionable misstatements ................................... 38

        2.      The FIs properly allege knowing omissions ............................................ 39

        3.      The FIs properly allege causation and damages ...................................... 41

D.      The FIs state claims under the statutes asserted in Counts VIII-X ....................... 41

V.      THE FIs PROPERLY ALLEGE BREACH OF CONTRACT CLAIMS ....................... 42

A. The Master Complaint Properly States a Claim for Breach of the Contracts to Which the FIs Are Intended Third Party Beneficiaries ....................42

    1. Heartland's contracts with its Acquiring Banks........................................42

        a. The FIs are intended third party beneficiaries of Heartland's contracts with its Acquiring Banks ................................43

        b. The ACs do not disclaim the FIs' status as intended third party beneficiaries ........................................................................43

        c. The ACs do not preclude the damages sought by the FIs .............44

    2. Heartland's contracts with its Merchants ................................................45

        a. The FIs are intended third party beneficiaries of the MPAs .........45

        b. The MPAs do not disclaim the FIs' claims .................................46

        c. The MPA's limitation of liability provisions are inapplicable ......46

    3. The MC alleges that Heartland breached the ACs and MPAs, which inflicted financial injury on the FIs ................................................47

B. The FIs Properly Allege A Claim for Breach of Implied Contract ......................47

VI. CONCLUSION ..........................................................................................................50

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Alexander v. CIGNA Corp.*,
    991 F. Supp. 427 (D.N.J. 1998) .....................................................................27

*Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*,
    115 F. App'x. 662, 2004 WL 2297150, at *1 (5th Cir. 2004) ...................25, 27

*Am. Realty Trust, Inc. v. Travelers Cas. & Surety Co. of Am.*,
    362 F. Supp. 2d 744 (N.D. Tex. 2005) ..........................................................27

*Aronsohn v. Mandara*,
    484 A.2d 675 (N.J. 1984).................................................................................20

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009).......................................................................................7

*Asp v. Toshiba Am. Consumer Prods., LLC*,
    616 F. Supp. 2d 721 (S.D. Ohio 2008) ..........................................................40

*Bahrle v. Exxon Corp.*,
    652 A.2d 178 (N.J. Super. Ct. App. Div. 1995).............................................18

*Barner v. Sheldon*,
    678 A.2d 767 (N.J. Super. Ct. Law Div. 1995).............................................20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................7

*Berry v. Indianapolis Life Ins. Co.*,
    608 F. Supp. 2d 785 (N.D. Tex. 2009) ..........................................................27

*BOC Group, Inc. v. Lummus Crest, Inc.*,
    597 A.2d 1109 (N.J. Super. Ct. App. Div. 1990)...........................................36

*Borneo Energy Sendirian Berhad v. Sustainable Power Corp.*,
    No. H-09-0612, 2009 WL 2498596, at *1 (S.D. Tex. Aug. 12, 2009)........8, 10

*Brunson v. Affinity Fed. Credit Union*,
    972 A.2d 1112 (N.J. 2009)...............................................................................17

*Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Group, Inc.*,
    638 A.2d 1288 (N.J. 1994)...............................................................................20

v

*Carvalho v. Toll Bros. & Developers*,
    675 A.2d 209 (N.J. 1996)........................................................................*passim*

*Christidis v. First Penn. Mortg. Trust*,
    717 F.2d 96 (3d Cir. 1983).................................................................26

*Clohesy v. Food Circus Supermarkets, Inc.*,
    694 A.2d 1017 (N.J. 1997).................................................................22

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000)..............................................................11

*CUMIS Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*,
    23 Mass. L. Rep. 550 (Mass. Super. Ct. 2005) .............................................44

*CUMIS Ins. Soc'y, Inc. v. BJ's Wholesale Club*,
    No. 05-1158, 2008 WL 2345865, at *1 (Mass. Super. Ct. June 4, 2008) .......................44

*Cuvillier v. Sullivan*,
    503 F.3d 397 (5th Cir. 2007)...............................................................8

*Deangelo v. Exxon Corp.*,
    No. A-791-98T3, 1999 WL 34014043, at *1
    (N.J. Super. Ct. App. Div. Oct. 15, 1999)..................................................30

*Debrah F. Fink, D.M.D., MS, PC v. Ricoh Corp.*,
    365 N.J. Super. 520 (N.J. Super. Ct. Law Div. 2003) ......................................41

*Dewey v. Volkswagen AG*,
    558 F. Supp. 2d 505 (D.N.J. 2008)....................................................*passim*

*Directv, Inc. v. Marino*,
    No. 03-5606, 2005 WL 1367232, at *1 (D.N.J. June 8, 2005) .............................38

*Duffy v. Charles Schwab & Co.*,
    No. 98-4595, 2001 WL 1104689, at *1 (D.N.J. Sept. 4, 2001) ..........................47

*Duncan v. Cessna Aircraft Co.*,
    665 S.W.2d 414 (Tex. 1984).............................................................14

*Elias v.  Prods., Inc.*,
     06-2448 (KSH), 2008 U.S. Dist. LEXIS 49726 (D.N.J. June 30, 2008) .................15

*First Marblehead Corp. v. House*,
    473 F.3d 1 (1st Cir. 2006)...............................................................34

*Fox & Lazo Realtors*,
    132 N.J. A.2d 1110 (1993)........................................................................17

*Gen. Dev. Corp. v. Binstein*,
    743 F. Supp. 1115, 1130 (D.N.J. 1990) ......................................................41

*Grauer v. Norman Chevrolet GEO*,
    729 A.2d 522 (N.J. Super. Ct. App. Div. 1998)...........................................38

*Green v. Gen. Motors Corp.*,
    No. 2831-01T-5, 2003 WL 21730592, at *1
    (N.J. Super. Ct. App. Div. July 10, 2003).....................................................32

*H. Rosenblum, Inc. v. Adler*,
    461 A.2d 138 (N.J. 1983)......................................................................21, 27

*Harper v. LG Elec. USA, Inc.*,
    595 F. Supp. 2d 486 (D.N.J. 2009)......................................................11, 39

*Highlands Ins. Co. v. Hobbs Group, LLC*,
    373 F.3d 347 (3rd Cir. 2004) .......................................................................32

*Homa v. Am. Express Co.*,
    558 F.3d 225 (3d Cir. 2009).........................................................................37

*In re Ford Motor Co. E-350 Van Prod. Liability Litig.*,
    No. 03-4558 (HAA), 2008 WL 4126264, at *1 (D. N.J. September 2, 2008)................33

*In re Hannaford Bros. Co. Customer Data Security Breach Litig.*,
    613 F. Supp. 2d 108 (D.Me. 2009) .............................................................49

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004)..............................................................12

*In re Mercedes-Benz Teleaid Contract Litig.*,
    257 F.R.D. 46 (D.N.J. 2009).......................................................................12

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    975 F. Supp. 584 (D.N.J. 1997) ..................................................................26

*In re TJX Co. Retail Sec. Breach Litig.*,
    524 F. Supp. 2d 83 (D. Mass. 2007)............................................................11

*In re TJX Co. Retail Sec. Breach Litig.*,
    564 F.3d 489 (1st Cir. 2009).................................................11, 29, 38, 40, 44

*In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.*,
   No. 08-939, 2009 WL 2940081, at *1 (D.N.J. Sept. 11, 2009) ......................................40

*In re Vioxx Prods. Liab. Litig.*,
   239 F.R.D. 450 (E.D.La. 2006)......................................................................................12

*Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*,
   894 A.2d 1136 (N.J. Super. Ct. App. Div. 2006)...........................................................15

*J&R Ice Cream Corp. v. California Smoothie Licensing Corp.*,
   31 F.3d 1259 (3d Cir. 1994).............................................................................................37

*J.S. v. R.T.H.*,
   693 A.2d 1191 (N.J.Super. Ct. App. Div. 1997)............................................................17

*Judson v. Peoples Bank & Trust Co.*,
   134 A.2d 761 (1957)..........................................................................................................30

*Karu v. Feldman*,
   119 N.J. 135 (N.J. 1990)...................................................................................................27

*Kovach v. Lazzano*,
   No. 1082, 1983 WL 6080, at *1 (Ohio Ct. App. August 5, 1983) ...................................45

*Lehman Bros.*,
   No. H-09-0672, 2009 WL 2900740, at *6 (S.D. Tex. Aug. 31, 2009)............................10

*Maertin v. Armstrong World Indus., Inc.*,
   241 F. Supp. 2d 434 (D. N.J. 2002).................................................................................32

*Melder v. Morris*,
   27 F.3d 1097 (8th Cir. 1994)............................................................................................35

*Moreland v. Columbia Mut. Ins. Co.*,
   842 S.W.2d 215 (Mo. Ct. App. 1992) ..............................................................................45

*Metric Investment, Inc. v. Patterson, 101 N.J.Super.*,
   244 A.2d 311 (N.J. Super. App. Div.1968) .....................................................................30

*Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*,
   394 F. Supp. 2d 762 (M.D.N.C. 2005) ............................................................................12

*Olivo v. Owens-Illinois, Inc.*,
   895 A.2d 1143 (N.J. 2006)................................................................................................18

*Overseas Dev. Disc Corp. v. Sangamo Constr. Co.*,
   840 F.2d 1319 (7th Cir. 1988)..........................................................................................49

*P.V. ex rel. T.V. v. Camp Jaycee*,
    962 A.2d 453 (N.J. 2008) ........................................................................ 13, 14

*Parker v. Howmedica Osteonics Corp.*,
    No. 07-02400, 2008 WL 141628, at *1 (D.N.J. Jan. 14, 2008) ...................... 38

*People Exp. Airlines, Inc. v. Consolidated Rail Corp.*,
    495 A.2d 107 (N.J. 1985) ........................................................................ 23, 30

*Perth Amboy Iron Works v. Am. Home*,
    543 A.2d 1020 (N.J. Super. Ct. App. Div. 1988), *aff'd,* 571 A.2d 294 (N.J. 1990) ......... 36

*Port Liberte Homeowners Ass'n, Inc. v. Sordoni Constr. Corp.*,
    924 A.2d 592 (N.J. Super. Ct. App. Div. 2007) ............................................ 31

*Rakes v. Life Investors Ins. Co. of Am.*,
    No. 06-CV-99-LRR, 2007 WL 2122195, at *1 (N.D. Iowa Jul. 20, 2007) ...................... 15

*Richardson v. DSW, Inc.*,
    No. 05-4599, 2006 WL 163167, at *1 (N.D. Ill. Jan. 18, 2006) ............................... 40, 48

*Roll v. Singh*,
    No. 07-cv-04136 (FLW), 2008 WL 3413863, at *1 (D.N.J. June 26, 2008) .................... 29

*Rolo v. City Investing Co. Liquidating Trust*,
    155 F.3d 644 (3d Cir. 1998) ...................................................................... 26

*Russell-Stanley Corp. v. Plant Indus., Inc.*,
    595 A.2d 534 (N.J. Super. Ct. Ch. Div. 1991) ............................................... 29

*S. Jersey Hosp., Inc. v. Corr. Med. Servs.*,
    No. 02-2619, 2005 WL 1410860, at *1 (D.N.J. June 15, 2005) ...................... 47

*Saint Barnabas Med. Ctr. v. Essex County*,
    543 A.2d 34 (N.J. 1988) .......................................................................... 49

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
    742 F.2d 786 (3d Cir. 1984) ...................................................................... 25

*Shu v. Butensky*,
    No. L-3167-07, 2009 WL 417265, at *1 (N.J. Super. Ct. App. Div. Feb. 23, 2009) ......... 17

*Shushany v. Allwaste, Inc.*,
    992 F.2d 517 (5th Cir. 1993) .................................................................... 35

*Sioux Biochemical, Inc. v. Cargill, Inc.*,
    410 F. Supp. 2d 785 (N.D.Iowa 2005) ........................................................................11

*Strzakowlski v. Gen. Motors Corp.*,
    No. Civ.A. 04-4740, 2005 WL 2001912, at *1 (D.N.J. Aug. 16, 2005) .........................26

*Torrington Co. v. Stutzman*,
    46 S.W.3d 829 (Tex. 2000)...........................................................................................13

*True v. Am. Honda Motor Co., Inc.*,
    520 F. Supp. 2d 1175 (C.D.Cal. 2007) .........................................................................26

*Troy v. Rutgers*,
    168 N.J. 354 (N.J. 2001) .........................................................................................48, 49

*U.S. ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009)........................................................................................25

*U.S. ex rel. Russell v. Epic Healthcare Mgmt. Group*,
    193 F.3d 304 (5th Cir. 1999)........................................................................................26

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
    355 F.3d 370 (5th Cir. 2004) .......................................................................................26

*Viking Yacht Co. v. Composites One LLC*,
    496 F. Supp. 2d 462 (D.N.J. 2007)...............................................................................37

*Wanaque Borough Sewerage Auth. v. Twp. of W. Milford*,
    144 N.J. 564 (N.J. 1996)..............................................................................................47

*Wang v. Allstate Ins. Co.*,
    592 A.2d 527 (N.J. 1991).............................................................................................17

*Zepf v. Hilton Hotel & Casino*,
    786 A.2d 154 (N.J. Super. Ct. App. Div. 2001)............................................................22

## <u>RULES</u>

FED. R. CIV. P. 8(a)(2)...........................................................................................................7

FED. R. CIV. P. 8(d)(2).........................................................................................................35

FED. R. CIV. P. 9(b) .............................................................................................................25

FED. R. CIV. P. 12(b)(6)....................................................................................................8, 11

FED. R. CIV. P. 12(d) ...........................................................................................................43

## STATUTES

N.J. STAT. ANN. § 56:8-1(c) ..................................................................37

N.J. STAT. ANN § 56:8-1(d) ..................................................................36

N.J. STAT. ANN § 56:8-19..................................................................36

## OTHER AUTHORITIES

JAMES W. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 9.03 (3d ed.2003) ........................26

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 6........................................................ 13, 14

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145.................................................... 13, 14

RESTATEMENT (SECOND) OF CONTRACTS § 4 cmt. a ..............................................................48

RESTATEMENT (SECOND) OF CONTRACTS § 302......................................................42

## PRELIMINARY STATEMENT

This extraordinary case involves the largest security lapse in the history of credit card and debit card processing in the United States.  The lapse occurred because the management of Defendant Heartland Payment Systems, Inc. ("Heartland"), through cost-cutting and an unbridled desire to grow profits as quickly as possible, made conscious business decisions that effectively provided anyone with a computer and minimal technical savvy easy access to the confidential data stored on consumer credit and debit cards (collectively, "Payment Cards") with which Heartland was entrusted.  Not surprisingly, Heartland's security lapse was quickly exploited by those who troll for such vulnerable systems.

Heartland did little to determine what the hackers were actually doing.  Remarkably, the hackers went undetected for over a year.  During that time, Heartland's lack of internal security, its desire to use a "lowest bidder" system of selecting its outsourced IT auditors, its reliance on a "snapshot" purportedly telling it that at one identifiable point in time its system complied with the bare minimum industry standards, and its startlingly poor IT and system security oversight allowed the hackers to repeatedly breach the Heartland system.  Heartland's failure to find and expel the hackers, let alone its failure to ensure that it had adequate security measures in the first place, ultimately resulted in the theft of confidential personal and financial information from over *one hundred thirty million* Payment Cards (hereafter, the "Data Breach").

Heartland, however, did not suffer the *billions* of dollars in expenses associated with canceling and re-issuing the Payment Cards compromised by the Data Breach.  Rather, these expenses fell on the issuers of the Payment Cards, the financial institutions which brought this case (collectively, the "FIs").  In its motion to dismiss ("Def. Mem."), Heartland argues that it is not responsible for any of the imminently foreseeable financial havoc that it wreaked on the FIs. Heartland is wrong.  Its motion should be denied.

1

## FACTUAL OVERVIEW

### A.     Heartland's Payment Card Processing Services

Heartland describes itself as "one of the nation's largest payment processors delivering credit/debit/prepaid card processing, payroll, check management and payments solutions." Master Complaint ("MC") ¶ 24.  A typical Payment Card transaction made on the Visa and/or MasterCard network is processed through a merchant (where the initial purchase is made), an acquiring bank (typically, a financial institution which contracts with a merchant to process its Payment Card transactions), a processor (an entity—such as Heartland—which contracts with the acquiring bank and/or merchant to process the transactions), and an issuer (a financial institution—like the FIs—which issues Payment Cards to consumers).  *Id.* ¶ 28.  In connection with its Payment Card processing, Heartland is entrusted with the confidential personal and financial information of millions of customers whose Payment Cards were issued by the FIs.  *Id.* ¶ 31.

### B.     The Heartland Data Breach

At least as early as December 2007, Heartland's Payment Card transaction processing system was initially breached.  *Id.* ¶ 35.  The breach was discovered by Visa, which alerted Heartland about "suspicious activity surrounding certain cardholder accounts" in late October 2008.  *Id*.  In its motion, Heartland indicates that the Data Breach occurred in the "Exchange" portion of its system.  Def. Mem. at 3.  The MC specifically alleges that Heartland made several affirmative statements prior to the Data Breach about the "reliability" and "security" of this "state-of-the-art" Exchange platform.  *See* MC ¶¶ 46, 47.

Heartland first publicly disclosed the breach on January 20, 2009.  *Id.* ¶ 38.  In its SEC filings, Heartland claims that the Data Breach "involved malicious software ("malware") that appears to have been used to collect in-transit, unencrypted payment card data while it was being

processed by Heartland during the transaction authorization process." *Id.* ¶ 39.  Malware is computer software that can be programmed to, *inter alia*, identify, store, and export information (including Payment Card information) on hacked computers. *Id.*  Heartland also acknowledged that the information compromised in the Data Breach "included card numbers, expiration dates, and certain other information from the magnetic strip on the back of the payment card (including, for a small percentage of transactions, the cardholder's name)." *Id.* ¶ 44.

C.    **Heartland's Affirmative Misrepresentations and Omissions**

Both before and after the Data Breach, Heartland assured the FIs that the sensitive financial information entrusted to Heartland was secure. *Id.* ¶ 45.  For example, in its last Form 10-K filed with the SEC prior to the Data Breach, Heartland made numerous, affirmative representations concerning its security measures, including that (1) its internal network configuration provides multiple layers of security to isolate its databases from unauthorized access; (2) it places significant emphasis on maintaining a high level of security in order to protect the information of its merchants and their customers; (3) it engaged a third party to regularly test its systems for vulnerability, and (4) it protected the cardholder numbers stored in its databases pursuant to the highest commercially available standard.  *Id.* ¶ 45. Similarly, Heartland's website also touted its security measures prior to the Data Breach. *Id.* ¶¶ 46-47. Even following the Data Breach, Heartland continued to assure the FIs that it was adequately protecting the confidential information with which it was entrusted. *Id.* ¶ 50.  Heartland willfully omitted from these statements any indication that the sensitive information with which it was entrusted was extremely vulnerable to being compromised.  *See e.g., id.* ¶¶ 122, 135.

D.    **Heartland Failed to Comply with Minimal Data Security Standards**

The Payment Card Industry Data Security Standards ("PCI-DSS") consists of a set of minimum requirements for enhancing Payment Card account data security designed to reduce the

likelihood of a data breach. *Id.* ¶ 53. Heartland executives made various statements demonstrating that Heartland was well aware—prior to the Data Breach—that the bare minimum PCI-DSS standards were insufficient to protect it from an attack by sophisticated hackers. *Id.* ¶ 56. Yet it appears that Heartland failed to even maintain compliance with (and ensure proper oversight of) these minimum standards. Indeed, following the Data Breach, Visa and MasterCard both found Heartland's security insufficient and fined Heartland's sponsoring bank (Key Bank). *Id.* ¶ 57-59. Moreover, in a speech following the Data Breach, Visa's Chief Enterprise Risk Officer reportedly said that:

> I'm sure everyone in this room has read the headlines questioning how an event of this magnitude could still happen today. The fact is: *it never should have*. As we've all read, [Heartland] had validated PCI compliance. But it was the lack of ongoing vigilance in maintaining compliance that left the company vulnerable to attack. . . . As we've said before, *no compromised entity has yet been found to be in compliance with PCI DSS at the time of a breach*.

*Id.* ¶ 61 (emphasis added). Richey further stated that "cost-cutting" to "shortchange security measures" is both "short-sighted and dangerous." *Id.* Yet, that is precisely what Heartland did by instead focusing on rapidly growing transaction volumes through the use of its "proprietary" Exchange processing system. *See e.g., id.* ¶ 99.

## E.    Heartland's Conduct After the Data Breach

For what has been described as potentially the "largest data breach ever," Heartland has publicly assumed a cavalier attitude toward the Data Breach. MC ¶ 70. Indeed, Robert Baldwin, Heartland President and CFO, casually claimed that the prospect of thieves using the stolen data to rack up massive amounts of fraud at online merchants was possible. *See id.*

Many states have laws requiring entities like Heartland to promptly notify affected consumers when their confidential information is compromised by a data breach. MC ¶ 71. Upon information and belief, Heartland has not provided *any* individualized notice to *any*

consumers affected by the Data Breach.  *Id.*  Instead, Heartland shifted this obligation to the FIs, which have, at considerable expense, re-issued compromised Payment Cards to consumers and absorbed millions of dollars of unauthorized charges.  *Id.*

As Baldwin himself acknowledged, it is clear that there are several steps that Heartland should have (and could have) taken that would have prevented the Data Breach.  MC ¶ 73. Moreover, on its website related to the Data Breach, Heartland states that it is only now taking several new precautions going forward that could have been taken prior to the Data Breach.  MC ¶ 74.  For example, Heartland is now engaged in the process of implementing an end-to-end encryption process called "E3," which is designed to encrypt Payment Card data from the moment a card is swiped by the merchant until it finally arrives at the issuer for authorization and settlement.  MC ¶ 75.  Heartland admits this new software "will significantly enhance the security of payment card information throughout the processing life cycle." *Id.*  This and other precautions were not in place at Heartland when the Data Breach occurred.  *Id.* ¶ 76.  Heartland saved (or avoided spending) a considerable sum of money by not having these security measures in place.  *See id.* ¶ 99.

As a direct and proximate result of the Data Breach and Heartland's wrongful acts, the FIs suffered (and continue to suffer) actual financial injuries in the form of, *inter alia*, the costs to cancel, destroy, and re-issue their customers' Payment Cards compromised by the Data Breach and the absorption of fraudulent charges made on the compromised Payment Cards.

## SUMMARY OF ARGUMENT

The MC amply states plausible claims for relief under the applicable pleading standard. Reaching well beyond the mere recitation of each claim's elements, the MC contains detailed factual allegations demonstrating that Heartland made material misstatements and omissions, and failed to take appropriate measures to protect the confidential information at issue.  In short, the

MC includes sufficient factual content from which this Court can draw the reasonable inference that Heartland is liable for the injuries suffered by the FIs. *Twombly* and *Iqbal* require no more.

Heartland's cursory invitation to engage in a premature choice-of-law analysis should be rejected. Indeed, Heartland requests that this Court consider unchecked "facts" outside of the MC to resolve what is clearly a fact-driven inquiry that should not be undertaken pre-discovery on a Rule 12 motion. Moreover, at this preliminary stage, the Court should apply New Jersey law, which not only has the strongest connection to the *conduct* at issue, but is the law pursuant to which the FIs expressly pled the majority of their claims.

Concerning the FIs' negligence claim, while Heartland's duty argument is also premature, the FIs' allegations regarding the foreseeability of the Data Breach are more than sufficient. Heartland itself made numerous statements (albeit inaccurate) about the security measures it had in place to prevent the very type of data breach that occurred. Further, Heartland's attempt to seek refuge in the economic loss doctrine is unavailing given that the FIs fall within an identifiable class that Heartland knew (or should have known) would be injured as a result of its negligence.

The FIs also state viable claims for intentional and negligent misrepresentation. The MC expressly details Heartland's numerous, affirmative misstatements, the information that it willfully omitted, and precisely how this conduct injured the FIs.

The FIs further state a plausible claim for violations of various unfair trade practice statutes. Not only does Heartland fail to address the merits of the statutes asserted in Counts VIII-X, but as to the NJCFA claim, Heartland overlooks the reality that this case arises out of consumer-oriented transactions. Heartland also ignores the false statements and omissions alleged in the MC.

Ironically, the contracts Heartland attaches to its motion (to the extent such evidence can even be considered without converting Heartland's dismissal effort into a summary judgment motion) actually support the FIs' third-party beneficiary claims.  Both sets of agreements (which were designed, above all, to ensure that the sensitive information at issue remain secure) contain language pointedly demonstrating that the FIs are in fact, intended third-party beneficiaries.  Heartland cannot emphasize select passages in these contracts while simultaneously disclaiming the FIs' injuries as intended third-party beneficiaries.

Finally, the MC adequately alleges both the existence and breach of an implied contract between the FIs and Heartland.  Heartland fails to address two closely analogous data breach cases that recognize the existence of such an implied contractual duty where a party, like Heartland, is entrusted with sensitive information.  Moreover, whether such an implied contract was created is a question to be resolved by the trier of fact.

## ARGUMENT

## I.      THE FIs STATE PLAUSIBLE CLAIMS UNDER *TWOMBLY* AND *IQBAL*

Heartland contends that the FIs' Master Complaint ("MC") fails to state a claim for relief under *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) because the FIs simply "urge the Court to accept their *ipse dixit* assertion that, because the Intrusion occurred, Heartland must have done something wrong that makes Heartland liable for Plaintiffs' alleged losses."   Def. Mem. at 4.   This argument evidences Heartland's fundamental misunderstanding of the *Twombly* and *Iqbal* pleading standard, and overlooks the detailed factual allegations in the MC.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."   In *Twombly,* the Supreme Court reiterated that Rule 8 does "not require heightened fact pleading of

specifics." *Twombly,* 550 U.S. at 570.   While *Iqbal* elaborated on the *Twombly* pleading standards, it *did not* heighten the standard of review for a motion to dismiss. *Iqbal,* 129 S. Ct. at 1953.

Instead, under both *Twombly* and *Iqbal,* "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 129 S. Ct. at 1949 (quoting *Twombly,* 127 S. Ct. at 1974). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Fifth Circuit has cited *Twombly* for the proposition that "a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1964-65).

As this Court recently explained, *Twombly* and *Iqbal* require a district court addressing a Rule 12(b)(6) motion to engage in a two-step analysis. *See Borneo Energy Sendirian Berhad v. Sustainable Power Corp.*, No. H-09-0612, 2009 WL 2498596, at *3 (S.D. Tex. Aug. 12, 2009). First, the district court should examine the complaint and determine which statements are factual allegations, and which are legal conclusions. *Id.* Second, the district court "must assume the truth of all factual allegations and determine whether those factual allegations allege a plausible claim." *Id.* (citing *Iqbal*, 129 S. Ct. at 1949).

Heartland does not address either part of this two-part test. Instead, it cherry-picks certain factual averments in the MC to argue that it is not responsible for the Data Breach because it is only a "victim." Def. Mem. at 5. The MC, however, explains that Heartland is liable because it failed to take adequate measures to prevent the breach from occurring. *See, e.g.,*

MC ¶¶ 57, 59, 73-77.  The MC supports this claim by highlighting (1) the statement by Visa's Chief Enterprise Risk Officer that the Data Breach would not have occurred had Heartland vigilantly maintained its compliance with the applicable security standards (MC ¶¶ 61-62), (2) an acknowledgement by Heartland's president following the breach that it could have done more to prevent the breach (*id.* ¶ 7), (3) the removal of Heartland from Visa's list of PCI-DSS compliant entities after Visa found that Heartland violated its operating regulations,[1] (4) fines assessed to one of Heartland's acquiring banks due to Heartland's failure to take appropriate security measures (*id.* ¶ 59), and (5) security measures that Heartland failed to employ until after the Data Breach (*id.* ¶¶ 73-76).  The MC also alleges numerous pre-Data Breach material misstatements (and omissions) by Heartland regarding its security measures.  *See, e.g.,* MC ¶¶ 45-52.

Heartland challenges *some*[2] of these factual allegations on the basis that they are wrong, irrelevant, and amount to "an unadorned, the defendant-unlawfully-harmed-me accusation."  *See* Def. Mem. at 4 (citing *Iqbal*, 129 S. Ct. at 1949).  But both *Twombly* and *Iqbal* re-affirm that such factual averments are to be taken as *true* for purposes of deciding whether a complaint states a plausible claim.[3]  *See Twombly,* 550 U.S. at 557; *Iqbal*, 127 S. Ct. at 1951.  Nor is the MC limited to "naked assertion[s] devoid of further factual enhancement," which was the type of

---

[1]  *Id.*  ¶ 57.  Heartland argues that the FIs do not allege that Visa's de-listing was in any way premised "on factual findings that the company's system was non-compliant at the time of the Intrusion," nor "which particular standards Visa supposedly alleged Heartland had violated."  Def. Mem. at 5-6.  The FIs allege otherwise, and for the purpose of Rule 12(b)(6), the Court must take such well-plead allegations as true.  Moreover, Heartland has strenuously argued that the FIs should not even have access to such information until its motion to dismiss is resolved.  *See* Dkt. Entry No. 15.  This further illustrates why its request to stay discovery should be denied.

[2]  Heartland does not address the allegations in the MC concerning several statements by its officers following the Data Breach, nor the allegations concerning the improved security measures it took in the aftermath.  And, of course, Heartland does not dispute that the Data Breach occurred, nor challenge the allegations that the FIs had to re-issue Payment Cards and absorb fraudulent charges as a result of the Data Breach.

[3]  In *Iqbal* and *Twombly*, the Supreme Court noted that conclusory allegations and "bare assertions" that "amount to nothing more than a 'formulaic recitation of the elements'" of a cause of action are not entitled to an assumption of truth.  *Iqbal*, 129 S.Ct. at 1951 (quoting *Twombly*, 550 U.S. at 555).  Notably, Heartland does not contend that the factual allegations in the MC are limited to a recitation of the elements of a cause of action.

pleading with which *Iqbal* and *Twombly* were concerned.[4]  *See Iqbal*, 127 S. Ct. at 1949 (internal citations omitted).  The MC readily meets the plausibility standard because it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1950.

Heartland's heavy reliance on *Lehman Bros.*, No. H-09-0672, 2009 WL 2900740 (S.D. Tex. Aug. 31, 2009), is misplaced.  *See* Def. Mem. at 4, 5, 8.  The defendant in that case asserted a counterclaim for attorneys' fees under a statute making fees available to the prevailing party on a breach of contract claim.  *Id.* at *7.  Significantly, the defendant did not actually assert an independent counterclaim for breach of contract.[5]  *Id.* at *7-8.  This Court concluded that the defendant's counterclaim was deficient because it "simply alleged that a contract was breached by a failure to properly service the loans and to give notice," and dismissed it with leave to amend.  *Id.* at *16, *20.  These ambiguous, "bare-bones," and "scant" allegations at issue in *Lehman Bros.* hardly provide Heartland with a basis to argue that the MC is deficient under the *Twombly* and *Iqbal* standard.[6]  *See id.* at *16.  And, noticeably absent from Heartland's brief is any reference to the closely-analogous decision in *Borneo Energy*, 2009 WL 2498596, where this Court, applying the two-step analysis under *Twombly* and *Iqbal,* refused to dismiss a complaint  alleging "facts that, if proven, would show these elements [of the cause of action]."

---

[4]  In sharp contrast, the plaintiff in *Iqbal,* who was detained in the wake of the September 11 attacks, filed a *Bivens* action against the Attorney General and the Director of the FBI.  *Iqbal*, 127 S. Ct. at 1942-44.  His complaint contained vague conclusory allegations that these high-level officials "each knew of, condoned, and willfully and maliciously agreed to subject" the plaintiff to the harsh conditions of his confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."  *Id.* at 1951.  Similarly, the complaint the Supreme Court found deficient in *Twombly* contained conclusory allegations that the defendants had unlawfully conspired in violation of the antitrust laws, and pointed to parallel conduct that was just as consistent with lawful behavior.  *Twombly*, 550 U.S. at 551, 567.

[5]  As the Court observed, this was fatal to the defendant's counterclaim for attorney's fees because the Texas fee-shift statute "does not provide an independent cause of action for attorney's fees."  *Lehman Bros.*, 2009 WL 2900740, at *6 (citations omitted).

[6]  Indeed, this Court remarked that the allegations in the counterclaim were insufficient "under the standards that applied even before *Twombly* and *Iqbal*."  *Lehman Bros.*, 2009 WL 2900740, at *5.

*Id.* at *22.

In sum, the MC contains well-pleaded factual allegations which this Court should assume are true at this juncture, and which plausibly give rise to an entitlement to relief.  FIs therefore meet the *Iqbal* and *Twombly* pleading standards.  *See Iqbal,* 129 S. Ct. at 1950.[7]

## II.    THE FIs' CLAIMS EASILY SURVIVE SCRUTINY UNDER NEW JERSEY LAW

### A.    Not Only do the FIs' Allegations Require Application of New Jersey Law, But A Fact Intensive Choice-of-Law Analysis Cannot Be Conducted on the Pleadings Alone

#### 1.    Federal courts routinely refuse to conduct a choice-of-law analysis when it requires consideration of materials beyond the pleadings

In considering a motion to dismiss, a district court is limited to the contents of the pleadings and attachments thereto.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing Rule 12(b)(6)).  As such, courts routinely refuse to entertain choice-of-law questions on a motion to dismiss when (as here) doing so would require the consideration of materials beyond the pleadings.  *See, e.g.*, *Harper v. LG Elec. USA*, 595 F. Supp. 2d 486, 490-91 (D.N.J. 2009) (observing that choice-of-law determinations require a full factual record and refusing to rule on choice-of-law at the 12(b)(6) stage); *Sioux Biochemical, Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785, 800 (N.D. Iowa 2005) (refusing to conduct choice-of-law analysis on 12(b)(6) because the most significant relationship test could not be conducted without reference to matters outside the pleadings); *see also*, *Mercedes-Benz USA, LLC v. ATX Group, Inc.,* No. 08-3529, 2009 WL 2255727, at *8 (D.N.J. Jul. 27, 2009) (refusing to conduct choice-of-law analysis on 12(b)(6) "since the parties have yet to conduct any meaningful discovery").

Moreover, in the multidistrict litigation context, conducting a choice-of-law analysis on

---

[7] *See also In re TJX Co. Retail Sec. Breach Litig.*, 524 F. Supp. 2d 83, 87-88 (D. Mass. 2007), *aff'd in part, vacated in part, In re TJX Co. Retail Sec. Breach Litig.*, 564 F.3d 489 (1st Cir. 2009) (applying the *Twombly* plausibility standard in denying a motion to dismiss certain claims asserted by financial institutions against a defendant targeted by the same alleged hacker involved in this case).

the pleadings alone is particularly inappropriate given that a Master Complaint is generally viewed as a procedural device rather than a substantive pleading with the power to alter the choice-of-law rules applicable to the plaintiffs' claims. *See In re Mercedes-Benz Teleaid Contract Litig.*, 257 F.R.D. 46, 56 (D.N.J. 2009) (conducting a choice-of-law analysis at the class certification stage); *see also In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 454 (E.D. La. 2006) (stating that "[A] master complaint is only an administrative device used to aid efficiency and economy and, thus, should not be given the status of an ordinary complaint"); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 541 (D.N.J. 2004) (finding it premature to determine, prior to class certification, which law to apply to various claims in an MDL proceeding.).

Accordingly, when information beyond the complaint is necessary to determine the law applicable to a plaintiff's claims, courts either: (1) refuse to entertain a motion to dismiss the applicable claims (*see, e.g.*, *id.*, 338 F. Supp. 2d at 541); or (2) consider the motion to dismiss under the law that plaintiffs claim should apply (*see, e.g., Nakell v. Liner Yankelevitz Sunshine & Regenstreif, LLP*, 394 F. Supp. 2d 762, 768 (M.D.N.C. 2005)).  Either alternative precludes dismissal here.

### 2.    A choice-of-law inquiry cannot be conducted on the pleadings alone

Even assuming that the MC is the appropriate touchstone for a choice-of-law analysis *and* that the FIs did not allege their claims under New Jersey law (*see infra*), the Court need look no further than Heartland's motion to determine that additional information is necessary to make the choice-of-law determination.

As an initial matter, Heartland is correct that the Court should apply "most significant relationship test" set forth in the Restatement (Second) of Conflicts of Law.  *See* Def. Mem. at 9 n.7.  Under this test, the Court is instructed to consider:

(a) the place where the injury occurred, (b) the place where the conduct causing

the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) CONFLICTS OF LAW § 145.  In doing so, the Court is directed to look to the principles of the RESTATEMENT (SECOND) CONFLICTS OF LAW § 6 to measure the significance of the contacts.  *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000); *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 463 (N.J. 2008).  These factors to be considered include:  (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) the certainty, predictability and uniformity of result; and (7) the ease in the determination and application of the law to be applied.  RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 6.

Tacitly conceding that evidence from outside the pleadings is necessary to application of the test, Heartland cites to the Johnson Affidavit, its own 10-K Report filed with the SEC, and a litigation status report on the website of one of the FIs' counsel as "proof"—albeit unabashedly superficial—that Texas is "the place where the conduct causing the injury occurred."  Def. Mem. at 9.  According to Heartland, the "primary data center" for its payment processing platform is in Texas, and thus, Heartland claims, the injury and the conduct causing the injury occurred here. *See id.* at 9-10.

Even assuming that these materials can be considered part of the pleadings, far from deciding the issue, Heartland's perfunctory and self-serving treatment highlights the need for additional, detailed information.  Indeed, while Heartland's payment processing center may be located in Texas, there is no dispute that its corporate headquarters is located in New Jersey, and no doubt that decisions regarding security measures—and decisions regarding what statements

would be made regarding security measures—emanated from its corporate headquarters. Put another way, the negligent conduct on which the FIs' claims are based most likely occurred in New Jersey—not Texas.  Of course, only with further discovery will the Court be able to analyze the location of the tort (as well as the remaining factors necessary to perform the analysis) with the requisite precision.  Given the fact-intensive nature of the choice-of-law inquiry and its ultimate, and potentially dispositive, affect on the numerous consolidated proceedings, the choice-of-law determination should be made only with the benefit of a fully developed factual record and briefing exclusively devoted to the issue.

### 3.       The FIs' allegations require the application of New Jersey law

Should the Court nonetheless decide to make the choice-of-law determination on the pleadings alone, the FIs' allegations plainly favor the application of New Jersey law for at least three reasons.

*First,* most of the FIs' claims (breach of implied contract and contracts to which the FIs are intended third party beneficiaries, negligence, negligent and intentional misrepresentation, and violations of the NJCFA) are expressly pled under New Jersey law.  *See* MC ¶¶ 33, 35, 38, 39, 41, 42, 43.

*Second*, when weighing the four factors set forth in Restatement (Second) of Conflicts of Law § 145, it is not the number, but the *qualitative nature* of contacts that determines which state has the most significant relationship to the occurrence and the parties.  *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984); *P.V. ex rel. T.V.*, 962 A.2d at 460.  It is for precisely this reason that Texas, New Jersey, and Florida *all* view the contacts identified in RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145 through the prism of RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 6—a legal reality that Heartland strategically ignores.  Yet, without question, the *qualitative* contacts in the instant case plainly favor, if not mandate, the

14

application of New Jersey law to the FIs' claims.  Because Heartland is headquartered in New Jersey, the public statements concerning its data security measures and its decisions concerning those statements necessarily occurred there.  The conspiracy among the hackers indicted for the breach likewise occurred in New Jersey.  MC ¶¶ 7, 45-52, 64.

Not only is New Jersey the place where the conduct causing the injury occurred, but it is also the state which has a direct and important interest in the claim.  *See Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 894 A.2d 1136, 1148 (N.J. Super. Ct. App. Div. 2006), *rev'd on other grounds*, 929 A.2d 1076 (N.J. 2007) (holding that New Jersey had "extensive and weighty" contacts in nationwide consumer fraud class action such that New Jersey law applied when defendant's corporate home was in New Jersey and the allegedly fraudulent misrepresentations were conceived by defendant's senior level management in New Jersey); *Elias v.  Prods., Inc.*  06-2448 (KSH), 2008 U.S. Dist. LEXIS 49726 (D.N.J. June 30, 2008) (certifying a nationwide class for a NJCFA claim against a New Jersey defendant)*; see also Rakes v. Life Investors Ins. Co. of Am.*, NO. 06-CV-99-LRR, 2007 WL 2122195, *8-11 (N.D. Iowa Jul. 20, 2007) (applying Iowa substantive law to nationwide class action because defendant's headquarters was in Iowa and because "Defendant's fraudulent scheme originated from or was ratified by the highest levels of Defendant's organization; it [was] more reasonable to conclude that Defendant's actions occurred at Defendant's home office.").  By contrast, though Heartland's data processing center is in Texas, it does not appear that any substantive decisions regarding data security were made here.  Indeed, in stark contrast to the representations in its motion, Heartland publicly describes its Texas site as a mere "satellite office."[8]  Texas, therefore, has comparatively little interest in the conduct at issue.

---

[8]  *See* http://www.careerbuilder.com/Jobs/Company/C8E7L95YJHD1B0VGRM8/Heartland-Payment-Systems/?cbsid=1d8910941ecf4a67b6f9bed79609731b-311097344-VT-4&&ns_siteid=ns_us_g_HPS-Exchange&cbRecursionCnt=1.

*Finally*, Heartland's reliance on the initial MDL transfer order only underscores its misplaced emphasis on quantitative rather than qualitative contacts. The JPML (which based its decision on nothing more than Heartland's unsubstantiated assertion that documents and witnesses are located in Texas, docket congestion, this Court's MDL experience, etc.) was concerned with the *logistics* of maintaining a coordinated proceeding—a consideration that is of no moment to the applicable test.[9]  In short, the substantive connections relating to the **conduct** for which Heartland is liable all favor the application of New Jersey law over Texas law.[10]

**4.      The FIs' pleadings support the existence of a duty owed by Heartland to them**

**a.      The question of duty under New Jersey law requires development of a factual record and cannot be decided on the pleadings**

Asserting the absence of a legal duty, Heartland moves to dismiss the FIs' negligence claim under both New Jersey law and Texas law.  Under New Jersey law (pursuant to which the FIs plead their claims[11]), the question of whether a duty exists is one of fairness and policy that implicates many factors—with the foreseeability of harm a significant consideration.  *Carvalho v. Toll Bros. & Developers*, 675 A.2d 209, 212 (N.J. 1996).

While foreseeability alone does not establish a duty, it is "a crucial element" in determining whether a duty should be imposed.  *Id.* Once foreseeability is established, fairness and policy considerations govern whether the imposition of a duty is warranted.  *Id.*  This

---

[9]  And while the JPML transferred the financial institution and consumer cases to this Court for pretrial proceedings pursuant to 28 U.S.C. § 1407, it subsequently declined to include the securities fraud cases against Heartland in this MDL.  Instead, it transferred those cases to the District of New Jersey, where Heartland is headquartered.

[10]  That the FIs urge the application of New Jersey over Texas law at this stage does not mean that they would not ultimately accept a multi-state application of law to certain claims that might call for such an approach.  Again, however, this determination should not be made on the pleadings alone without the benefit of any discovery.

[11]  Because the FIs have not pled their claims under Texas law, they will not analyze them under Texas law here. Of course, should the Court ultimately proceed with a multi-state application of law, the FIs will analyze whether the Texas FIs' claims should be controlled by Texas law.

"involves identifying, weighing and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Id.* The New Jersey Supreme Court recently explained that the determination of whether a duty exists is "*very fact-specific and principled*" because it "must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct." *Brunson v. Affinity Fed. Credit Union*, 972 A.2d 1112, 1124-25 (N.J. 2009) (citing *Fox & Lazo Realtors*, 625 A.2d 1110 (N.J. 1993)).

As an initial matter, therefore, the fact-intensive nature of the duty inquiry renders Heartland's motion entirely premature. *See Wang v. Allstate Ins. Co.*, 592 A.2d 527, 534 (N.J. 1991) ("Of course, the legal determination of the existence of a duty may differ, depending on the facts of the case."); *J.S. v. R.T.H.*, 150, 693 A.2d 1191, 1193 (N.J. Super. 1997) ("The facts of a case inform the court in determining whether a duty exists."). Indeed, even Heartland's own cited authorities considered the issue only on summary judgment—not on a motion to dismiss. *See Carvalho*, 675 A.2d at 215-16; *Brunson*, 972 A.2d at 1127.[12] As with the choice-of-law determination, therefore, the decision of whether a legal duty exists should wait for a fully-developed factual record.

> **b.    The FIs' factual allegations amply support a finding that the Data Breach was a reasonably foreseeable result of Heartland's woefully inadequate system security**

Even if the Court were to consider the existence of a duty on the pleadings alone, it is easily demonstrated here with reference to Heartland's own authorities. For example, in *Carvalho*, the New Jersey Supreme Court found that a project engineer owed a legal duty to

---

[12]   The difference between motions for summary judgment and motions to dismiss under New Jersey rules are similar to those under the federal rules. *See Shu v. Butensky*, Case No. L-3167-07, 2009 WL 417265, at *4 (N.J. Super. Ct. App. Div. Feb. 23, 2009) (explaining that a summary judgment motion is ordinarily ripe for consideration after discovery has been completed whereas a motion to dismiss is filed by a defendant at the outset of the litigation process in lieu of a responsive pleading).

protect workers *despite* the absence of any contractual responsibility for the engineer to provide site safety.  675 A.2d at 214-15.  *Id.*  In that case, a workman was killed when unstable trench walls collapsed upon him.  *Carvalho*, 675 A.2d at 210-11.  The defendant was required to have an inspector at the site to monitor the work's progress, but *not* the work's safety.  *Id.* at 211.  In determining whether the defendant nonetheless owed a duty to the workman, the *Carvalho* court found the risk of worker injury was easily foreseeable under the circumstances—*i.e.*, the risk that deep trench walls could collapse and seriously injure workers.  *Id.*  For that reason, the defendant's contract provided for the specific possibility of unstable trench conditions, and prescribed contractual duties addressing those concerns.  *Id.* at 213-14.  Trenches in other areas of the site also had collapsed several times during the construction.  *Id.* at 214.

Just as a trench collapse injuring workers is foreseeable in the realm of trench digging, a security breach requiring financial institutions to re-issue Payment Cards and absorb fraudulent purchases is foreseeable in the realm of Payment Card processing.  *See id.* at 213*; see also Olivo v. Owens-Illinois, Inc.*, 895 A.2d 1143, 1149 (N.J. 2006) (finding Exxon owed a duty not just to workers on Exxon's premises who were exposed to asbestos, but also to their spouses who foreseeably were exposed to their spouses' asbestos-containing clothing); *Bahrle v. Exxon Corp.*, 652 A.2d 178, 194 (N.J. Super. Ct. App. Div. 1995) (concluding that area residents comprised a foreseeable class potentially harmed by negligent discharge from gas station).  Heartland cannot argue otherwise, as its executives have publicly discussed these risks at length.  *See, e.g.*, MC ¶¶ 4, 31, 45 and 56.

For example, before the Data Breach occurred, Heartland CEO Carr recognized that the bare-minimum PCI-DSS industry standards were insufficient to guard against an attack by sophisticated hackers.  *Id.* ¶ 56.  Heartland's (inaccurate) bragging regarding the robustness of its security precautions also implicitly acknowledges that high-level security is necessary to protect

18

merchants and their customers from data theft.  *Id.* ¶ 4.  Indeed, Heartland's website states, in pertinent part, that Heartland employs "layers of state of the art security, technology and techniques to safeguard sensitive credit and debit card account information . . . ." and that inadequately protected systems put "the millions of consumers who use credit and debit cards at risk . . . with possibly devastating consequences." *Id.* ¶48.  Heartland claims that "[r]obust security is a must—not an option." *Id.*

Heartland likewise cannot credibly argue that the injuries suffered by the FIs were not foreseeable results of the Data Breach.  According to Heartland, its job is to "facilitate the exchange of information and funds between merchants and *cardholders' financial institutions* . . . ." MC ¶¶ 30-33 (emphasis added).  Through its contracts with the banks which are members of the Visa/MasterCard networks, Heartland claims that it is able to utilize the networks to provide benefits to *cardholder financial institutions.  Id.* ¶ 33.  As a processor on the Visa and MasterCard networks, moreover, Heartland is *required* to conform to industry standards regarding data security.  *Id.* ¶ 53.  Heartland, therefore, was well aware that the FIs perform a key role in Payment Card transaction processing, and could easily foresee that the FIs would be damaged by insufficient security measures.  Indeed, Heartland's awareness that the FIs would ultimately bear the financial burden of Heartland's lack of proper security is best demonstrated by Heartland's website, which specifically instructs injured consumers to notify their card issuer (*i.e.*, the FIs) of any suspected unauthorized transactions on their Payment Cards.  *Id.* ¶ 72. Heartland cannot direct consumers to contact the FIs for redress while, at the same time, credibly disclaim foreseeing the injury the FIs have suffered as a direct result of the Data Breach.

Finally, the *Carvalho* Court found that foreseeability was strengthened by evidence of other trench collapses and equipment used by workers to protect themselves from trench collapses.  *Carvallho*, 675 A.2d at 212.  Likewise, Heartland was aware of (1) other computer

security breaches, (2) the danger that hackers could steal confidential information, (3) the existence of hundreds of thousands of attempted hacks every day, and (4) the layers of state of the art security, technology, and techniques necessary to safeguard payment card information. MC ¶¶ 48, 59.  Heartland also explicitly recognized that it needed to move beyond the lowest level of data security to a higher standard for processing secure transactions.[13]  *Id.* ¶ 56.

Taken together, the factual allegations detailed above more than adequately support the conclusion that Heartland could have (and should have) reasonably foreseen that its insufficient system security was likely to lead to a data breach injuring the FIs.

        c.        **Fairness and policy considerations create a duty of care here**

Once foreseeability is established, the analysis turns to fairness and policy considerations, including (1) the parties' relationship, (2) the nature of the attendant risk, (3) the opportunity and ability to exercise care, and (4) the public interest in the proposed solution.  *Carvalho*, 675 A.2d at 212.

Regarding the parties' relationship, New Jersey law plainly allows a legal duty to be imposed despite the absence of any direct relationship, contractual or otherwise.  *See Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Group, Inc.*, 638 A.2d 1288, 1294-95 (N.J. 1994) (stating that "[a] number of our [New Jersey] cases have recognized that lack of privity between the plaintiff and the alleged tortfeasor is no bar to recovery based on negligence"); *Barner v. Sheldon*, 678 A.2d 767, 768 (N.J. Super. Ct. Law Div. 1995) (stating that duty does not require a direct relationship); *Aronsohn v. Mandara*, 484 A.2d 675, 682-83 (N.J. 1984) (holding that lack of privity of contract between building contractor and third persons does not bar recovery for

---

[13]  In *Brunson*, the only other New Jersey opinion Heartland references to address the duty issue, the court simply rejected the appellate court's attempt to create a new cause of action for "negligent investigation" in a case where plaintiffs were found to be unable to meet the "intentionally difficult requirements" of a malicious prosecution claim. *Brunson*, 675 A.2d at 1125.  The court specifically cautioned that its opinion should *not* be read to prohibit a claim that a bank may have a duty of care to a third party harmed by the identity theft. *Id.* at 1125 n.13.

those injured by defendant's negligence).   As such, an injured party may recover for an economic loss resulting from a negligently performed service if the injured party was a known beneficiary of the defendant's undertaking.  *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 143 (N.J. 1983).

Without question, Payment Card issuers—such as the FIs—are direct, known beneficiaries of Payment Card processing.   In particular, Payment Card transactions on the Visa/MasterCard networks are processed through a merchant, an acquiring bank and an issuing bank—such as the FIs.  MC ¶ 28.  Although Heartland's direct contractual relationship may be with the merchant or acquiring bank, its self-described role is to "facilitate the exchange of information and funds between merchants and *cardholders' financial institutions* . . . ."  MC ¶¶ 30-33.  As detailed above, Heartland could have (and should have) foreseen that its lax system-security measures would cause the FIs to suffer damages.  Heartland's lack of direct contractual relationships with the FIs cannot eliminate its duty here.

A consideration of the responsibility for conditions creating the risk of harm likewise strongly weighs in favor of the existence of a duty on the part of Heartland.  In *Carvahlo*, the court found that even though safety matters only bore "indirectly" on the contractual responsibility for work supervision, the "circumstances demonstrate the interrelationship between safety and progress."  675 A.2d at 213-14.  Here, Heartland's duties did not merely "bear indirectly" on the security of the data it processed or "interrelate" to data security; its duty *was* to maintain the security.  In order to process transactions on the Visa/Mastercard Networks, Heartland was *required* to comply with industry standards regarding data security—although, as Heartland acknowledges, such standards constitute a bare minimum.  MC ¶¶ 27, 53, 56.  Heartland repeatedly acknowledged its role in safekeeping at-risk financial data (*id*. ¶¶ 45-46), and touted that its "exchange passed an independent verification process validating compliance

21

with VISA requirements for data security." *Id.* ¶ 46.  To date, Heartland maintains that it "is deeply committed to maintaining the security of cardholder data" and that it "will continue doing everything reasonably possible to achieve this objective." *Id.* ¶ 50.  Accordingly, Heartland was directly responsible for the conditions creating the risk and ultimately, the Data Breach.

Heartland also had the opportunity and ability to exercise care, as it had full control of its processing system and had full opportunity and capacity to avoid the risk of harm by using an appropriate encryption system.  *Id.* ¶¶ 45-50.  Heartland argues otherwise, by suggesting that it has no duty to protect the FIs from the criminal acts of third persons.  Yet, if one were to analogize protecting against criminal breaches of computer security to protecting against criminal breaches of physical security, New Jersey law unquestionably supports the existence of a duty.  In *Clohesy v. Food Circus Supermarkets, Inc.*, 694 A.2d 1017 (N.J. 1997), for example, the New Jersey Supreme Court found a business owner had a duty to protect its patrons from foreseeable criminal acts which occurred on its property, including the duty to provide security for the store's parking lot.  Similarly, in *Zepf v. Hilton Hotel & Casino*, 786 A.2d 154, 162 (N.J. Super. Ct. App. Div. 2001), the court found that where a defendant obtained an economic benefit from the plaintiff's work activities in defendant's casino, it owed a duty to the plaintiff who was attacked on a street bordering its property due to insufficient security.  Given Heartland's awareness that a data breach was the highly likely consequence of substandard security, Heartland cannot claim it had no duty when its inadequate security resulted in exactly what it expected.

Furthermore, the *Carvalho* court explained that the "existence of actual knowledge of an unsafe condition can be extremely important in considering the fairness in imposing duty of care."  675 A.2d at 214.  As detailed above, the MC is replete with allegations that Heartland was well aware of the risk of a security breach. *Id.* ¶¶ 27, 46-62. Following the Data Breach,

Heartland's President and Chief Financial Officer was reported saying that "there are a host of things we didn't go into that we're implementing, some larger, some smaller . . ." and "[c]learly we need to do more [to secure this information]." *Id.* ¶ 7.  Heartland was also aware that the FIs in particular would be harmed by a security breach since Heartland's website directs credit-card holders to their Payment Card issuers—*i.e.,* the FIs—for relief. *Id.* ¶ 72.[14]

**B.      The Economic Loss Doctrine Does Not Bar the FIs' Negligence Claims Under New Jersey Law**

Mindful that a duty exists, Heartland next argues that the economic loss doctrine bars the FIs' negligence claim.  Def. Mem. at 15 n.16 (citing *People Express Airlines, Inc. v. Consol. Rail Corp.*, 495 A.2d 107, 116 (N.J. 1985)).[15]  Far from barring recovery for economic loss resulting from negligence, the New Jersey Supreme Court in *People Express Airlines* actually held that "a defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury, to particular plaintiffs or plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct." *People Express Airlines*, 495 A.2d at 116.  Contrary to Heartland's contention, therefore, New Jersey law specifically allows the recovery of economic losses caused by negligence in circumstances like the instant case.  *Id.*

The *People Express Airlines* court identified the types of plaintiffs ineligible to recover their economic losses in negligence actions to include "members of the general public, or invitees such as sales and service persons at a particular plaintiff's business premises, or persons traveling on a highway near the scene of a negligently-caused accident, such as the one at bar,

---

[14]   Though Heartland fails to provide the Court with New Jersey authority precluding the FIs negligence *per se* claim, the FIs do not intend to pursue this claim.

[15]   As with its cases concerning duty, the New Jersey case cited by Heartland regarding the economic loss doctrine involved an appeal from a summary judgment, not a Rule 12 dismissal, and the court acknowledged that it must accept plaintiff's version of the facts as alleged.  *People Express Airlines*, 495 A.2d at 108.

who are delayed in the conduct of their affairs and suffer varied economic losses . . . ." *Id.* The court found that plaintiffs such as these would be present in the area of the accident fortuitously and "the particular type of economic injury that could be suffered by such persons would be hopelessly unpredictable and not realistically foreseeable." *Id.* The FIs, on the other hand, bear no resemblance to random members of the general public or salesmen who fortuitously happened to be in the area where an accident occurred. The FIs are analogous to the victims of the accident—because they are clearly the foreseeable victims of the accident (*i.e.,* the Data Breach).

The New Jersey Supreme Court explained that, "[a]n identifiable class of plaintiffs must be particularly foreseeable in terms of the type of persons or entities comprising the class, the certainty or predictability of their presence, the approximate numbers of those in the class, as well as the type of economic expectations disrupted." *Id.* Here, the FIs—the Payment Card issuers—and their participation in the transactions processed by Heartland were absolutely certain and predictable and could never be portrayed as "hopelessly unpredictable." Heartland's entire *raison d'etre* as a Payment Card processor hinges on the issuance of Payment Cards by the FIs. MC ¶ 30 (quoting Heartland statement that its role is to facilitate "the exchange of information and funds between merchants and cardholders' financial institutions").

It is indisputable that the FIs—the Payment Card issuers—are an integral part of the Payment Card processing systems in the United States. *Id.* ¶¶ 24-34. To consider them incidental, unpredictable, and fortuitous victims of the Data Breach would defy both logic and the indisputable facts of this case. *See id.* The approximate number of the FIs also is certain and predictable since Heartland necessarily knows the exact identity of the Payment Card issuers involved in these transactions (as such knowledge is required in order to process the transactions) and harmed by the Data Breach. Finally, the economic expectations disrupted here are certain and predictable because Heartland is well-aware that Payment Card issuers have policies in place

24

requiring them to absorb unauthorized transactions charged to their customers' Payment Cards, as well as to reissue new Payment Cards in the event of security breaches. *See id.* ¶ 72. The economic loss doctrine under New Jersey law, therefore, does not prohibit the FIs from recovering their economic damages caused by Heartland's negligence.

## III. THE FIs PROPERLY ALLEGE CLAIMS FOR INTENTIONAL AND NEGLIGENT MISREPRESENTATION

Heartland misconstrues the FIs' allegations and cites incorrect pleading standards in an effort to muster an argument that the FIs' intentional and negligent misrepresentation claims are not properly pled. To the contrary, the FIs directly meet the applicable pleading standards.

### A. The FIs' pleadings comply with Rule 9(b)

Rule 9(b) "requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) (quoting FED. R. CIV. P. 9(b)). What constitutes particularity for purposes of Rule 9(b) "necessarily differ[s] with the facts of each case and hence the 5th Circuit has never articulated the requirements of Rule 9(b) in great detail." *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, No. 03-10179, 115 F. App'x. 662, 667 (5th Cir. October 13, 2004). Depending on the elements of the claim at hand, a plaintiff may sufficiently "state with particularity the circumstances constituting fraud or mistake" without including all the details of any single court-articulated standard. *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009). In fact, courts allow "alternative means" to substantiate a claim of fraud when a plaintiff is not in the position to articulate details such as those that may relate to the "date, place and time," which details may be uniquely in the knowledge or control of a defendant. *See, e.g., Seville Indus.*

25

*Mach. Corp.*, 742 F.2d at 791; *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 595, 597-98 (D.N.J. 1997).

When, as here, the facts relating to the alleged fraud are peculiarly within the defendant's knowledge, the Rule 9(b) standard is relaxed, and fraud may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief. *U.S. ex rel. Russell v. Epic Healthcare Mgmt. Group,* 193 F.3d 304, 308 (5th Cir. 1999). "In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir.2004) (citing 2 JAMES W. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 9.03[1][b] at 9-18 through 9-19 (3d ed. 2003)).[16]

Regarding their negligent misrepresentation claim, the FIs specifically allege what was omitted, where the omitted information should have appeared, and how the omitted facts rendered Heartland's representations misleading. MC ¶¶ 45-51, 50, 56, 62, 78, 122-124. As to their intentional misrepresentation claim, the FIs specifically allege, among other things, that (1) Heartland made numerous affirmative representations about its successful, proper, "state-of-the-art" security measures (MC ¶¶ 3, 4, 27, 45, 47, 48,122); (2) Heartland intentionally withheld material information regarding the lack of internal system controls in place to protect financial information (MC ¶ 127); (3) Heartland knew its systems were insufficient to protect it from the Data Breach (MC ¶ 56), yet nonetheless explained on its website that robust security is a must—

_____

[16] In cases of concealment or omission, courts applying New Jersey law also have repeatedly applied a more relaxed standard. *See, e.g., Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (*citing Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983) (courts have cautioned that Rule 9(b) should be applied "with some flexibility and [courts] should not require plaintiffs to plead issues that may have been concealed by the defendants."); *Harper v. LG Elec., USA, Inc.,* 595 F. Supp. 2d 486, 491 (D.N.J. 2009); *Strzakowlski v. Gen. Motors Corp.*, 2005 WL 2001912, at *6 (D.N.J., Aug. 16, 2005); *see also True v. Am. Honda Motor Co., Inc.*, 520 F. Supp. 2d 1175, 1183 (C.D. Cal. 2007) (citations omitted).

not an option (MC ¶ 48); and (4) following the Data Breach, Heartland ultimately admitted that it did not utilize or possess the necessary skill or knowledge to safeguard the information it supposedly protected.  MC ¶ 7.

Thus, even a cursory review of the FIs' MC confirms that the FIs properly pled the omitted facts, where and when the facts should have appeared (prior to and after the Data Breach in Heartland's publicly disseminated statements touting its security measures), and why the facts were, in fact, misleading (they failed to inform recipients of the information that Heartland's system security measures were not sufficient to protect confidential personal and financial information as represented).

### B.      The FIs Properly Allege Negligent Misrepresentation

Under New Jersey law, "[a] cause of action for negligent misrepresentation may exist when a party negligently provides false information." *Karu v. Feldman*, 574 A.2d 420, 425 (N.J. 1990).  "[T]o prevail on a negligent misrepresentation claim, a plaintiff must prove that the defendant negligently made an incorrect statement, upon which the plaintiff justifiably relied." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 440 (D.N.J. 1998) (*citing H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334 (1983)).

Although there appears to be a difference of opinion, the better-reasoned cases hold that the FIs need only satisfy the notice pleading requirements of Rule 8(a) with respect to their negligent misrepresentation claim.  *See Am. Realty Trust, Inc.,* 115 F. App'x. at 667 (Rule 9(b)'s stringent requirements should not be extended to causes of action not enumerated therein so that negligent misrepresentation claim is subject to Rule 8 requirements); *Am. Realty Trust, Inc. v. Travelers Cas. & Surety Co. of Am.*, 362 F. Supp. 2d 744 (N.D. Tex. 2005);[17] *Dewey v.*

---

[17]  The holding in *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785 (N.D. Tex. 2009) does not compel a different result.  In *Berry*, the court found that the negligent misrepresentation claim was subject to Rule 9(b), stating

*Volkswagen AG*, 558 F. Supp. 2d 505, 529 (D.N.J. 2008). In *Dewey*, defendants' motion to dismiss was denied with respect to plaintiffs' negligent misrepresentation claim. The court held that Rule 8(a) was satisfied when plaintiffs alleged that defendant "negligently failed to disclose defects and continuously made negligent misrepresentations regarding defects in the class vehicles to plaintiff and members of the plaintiff class during the sale, lease or servicing of said vehicles." *Id.* Here, as in *Dewey*, the FIs allege that Heartland negligently failed to disclose material facts concerning its security system and that Heartland made incorrect statements concerning its security measures, upon which the FIs relied. MC ¶¶ 3, 4, 7, 4551,122, 123-125.

In addition to Heartland's express misrepresentations and omissions, the FIs also relied on Heartland's *implied representations* that it would protect the confidential personal and financial information entrusted to it. The FIs specifically allege that "[b]y accepting and agreeing to process the credit cards and/or debit cards issued by the FIs, Heartland impliedly agreed that it would adequately protect the sensitive information contained in these cards, as well as comply with applicable standards to safeguard data." MC ¶ 52.

Virtually identical allegations were determined to sufficiently state a claim in *TJX Companies Retail Security Breach Litigation*, 524 F. Supp. 2d 83 (D. Mass. 2007), another data breach case. There, the court upheld plaintiffs' claim for negligent misrepresentation, noting that "[e]ven if neither [defendant] had direct contact with the issuing bank plaintiffs, [the defendants] knew that the issuing banks were part of a financial network that relies on members taking appropriate security measures." *Id.* at 92. Similarly, at all relevant times, Heartland knew that it

---

that "Plaintiffs have effectively pled negligent misrepresentation as a lesser-included offense to their fraud claims. Although they correctly point out that they have labeled the claims separately as two different counts in the Complaint, the factual allegations underlying the claims are *verbatim.*" *Id.* at 799 (emphasis supplied). Since this is not a case where the claims are the same or based on precisely the same facts, Rule 9(b) does not apply to the negligent misrepresentation claim. However, even if Rule 9(b) does apply, as set forth in detail above, the FIs' negligent misrepresentation allegations properly state a claim under Rule 9(b) as well.

was entrusted with the confidential information of millions of customers whose Payment Cards were issued by the FIs and that the FIs would bear the financial burden of reissuing the Payment Cards if they were compromised.  *See, e.g.*, MC ¶¶ 30, 31.[18]  As such, the FIs' negligent misrepresentation claim is properly pled.

### C.    The FIs Properly Allege Material Falsity

The FIs properly allege that Heartland's statements were materially false.  For statements to be actionable, "the [p]laintiff must allege and ultimately show that [d]efendants had no intent on fulfilling their promises at the time they were made."  *Roll v. Singh*, No. 07-cv-04136 (FLW), 2008 WL 3413863, at *18 (D.N.J. June 26, 2008).  In *Roll*, the district court denied the defendant's motion to dismiss a plaintiff's misrepresentation claims, stating:

> However, a false representation of an existing intention, i.e., a false state of mind, with respect to a future event or action has been held to constitute actionable misrepresentation.  In other words, the defendant must have no intention at the time he makes the statement of fulfilling the promise. Defendant's lack of intention may be shown circumstantially by his subsequent acts and by subsequent events or by evidence that the statement was impossible to fulfill based upon contingencies or circumstances known to the promisor at the time of the statement but unknown to the promisee.

*Id.* at *18.

As alleged in the MC, Heartland made affirmative representations—not predictions—that it had "multiple layers of security to isolate our databases from unauthorized access," (*id.* ¶¶ 4, 45, 122), touted its "state-of-the-art" security measures and facilities, and claimed to "limit sharing of non-public personal information to that necessary to complete the transactions on

---

[18]  Curiously, Heartland relies on the First Circuit's decision in *In re TJX*, 564 F.3d at 494-495, which affirmed the district court's decision denying a motion to dismiss a negligent misrepresentation claim.  The other cases cited by Heartland at pages 25-26 of its brief—both of which were decided on a motion for summary judgment—are readily distinguishable.  The plaintiff in *Russell-Stanley Corp. v. Plant Indus., Inc.*, 595 A.2d 534, 549 (N.J. Super. Ct. 1991), put forth no evidence that it relied on any false statement.  Similarly, the plaintiffs in *CUMIS Ins. Soc'y, Inc. v. BJ's Wholesale Club*, No. 05-1158, 2008 WL 2345865, at *4 (Mass. Super. Ct. June 4, 2008), argued that the defendants' failure to comply with the Visa and MasterCard regulations, in and of itself, constituted a negligent misrepresentation, and also presented no evidence that the defendants made false direct representations to them.  *Id.* In contrast to these cases, the FIs allege that Heartland misrepresented the security of systems, these statements were specifically targeted to the FIs, and the FIs relied upon them to their detriment.  *See* MC ¶¶ 45-51.

behalf of the consumer and the merchant and [to the extent permitted by law]." *Id.* ¶¶ 4, 45, 47

122.  These representations constituted statements of then-presently existing facts. The FIs allege

that Heartland had no intention of fulfilling these representations, and that they were false and

misleading when they were made.  MC ¶¶ 3, 4, 7, 56, 68-77, 101-15, 117-118, 128.[19]

### D.      The FIs Are the Intended Recipients of Heartland's Statements

In processing Payment Card transactions, Heartland is entrusted with confidential

personal and financial information.  MC ¶¶ 1-3.  Notwithstanding numerous allegations about the

foreseeable reach of its activities, Heartland implausibly posits that the FIs were not the intended

or reasonably foreseeable recipients of Heartland's statements and, therefore, cannot state a

claim for negligent or intentional misrepresentation.  This is factually inaccurate, and wrong as a

matter of law: the FIs need not receive the misrepresentation directly from Heartland.  "[W]here

false representations are made to one person with the intent that they be communicated to others

for the purpose of inducing the others to rely upon them, they may form the basis of an action for

fraud by those others."  *Metric Investment, Inc. v. Patterson*, 244 A.2d 311, 314 (N.J. Super. Ct.

App. Div. 1968); *see also Judson v. Peoples Bank & Trust Co.*, 134 A.2d 761 (N.J. 1957);

*People Express Airlines*, 495 A.2d at 118.

In *Dewey*—which is not cited by Heartland—the District of New Jersey denied a

defendant's motion to dismiss a negligent misrepresentation claim that was premised on the

defendant failing to disclose (and making negligent misrepresentations about) defects in a

---

[19]  Heartland relies on *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1998), where a district court held, on a motion for summary judgment, that vague statements about future events (such as, "the relationship would be long lasting") were not actionable. *Id.* at 436. In contrast, Heartland's representations concerned matters within its knowledge *at the time they were made*.  *See* MC ¶ 128.  Heartland also asserts that the representations in its SEC filings should somehow be excluded as a result of disclaimer language in its filings.  However, *Deangelo v. Exxon Corp.*, 1999 WL 34014043, at *5 (N.J. Super. Ct. App. Div. Oct. 15, 1999) does not support this argument.  The court there found that there were no misrepresentations about the condition of a tract of property where there was a contract between the landowner and plaintiff (and other documents) that contained express disclaimers about the condition of the property.

vehicle. *Dewey*, 558 F. Supp. 2d at 529-531. And even if the FIs were not the direct recipients of Heartland's intentional and negligent misrepresentations—which they were (*see*, *e.g.*, MC ¶ 49)—a plaintiff need only allege that it is the intended recipient as the FIs have done here. *Port Liberte Homeowners Ass'n, Inc. v. Sordoni Constr. Corp.,* 924 A.2d 592, 601 (N.J. Super. Ct. App. 2007).

In *Port Liberte Homeowners Association*, a condominium association sued the manufacturer of a defective exterior moisture barrier used to construct the building. In analyzing plaintiffs' fraud claim, the court considered the intended end-users of products to which certain misrepresentations were made, and held that although misrepresentations about construction were not made directly to the homeowners or to the association, they were clearly intended end-users and recipients of the misrepresentations. *Id.* at 601-02. Similarly, the FIs were the end-users of Heartland's representations concerning its system security measures. *See* MC ¶ 25 ("Heartland is in the business of supplying information for the guidance of its merchant clients and third party entities—such as the FIs and Class members—which are members of the Visa and MasterCard Networks/Associations."). The FIs also allege that "Heartland's Bill of Rights is not limited to soliciting business from merchants. Rather, it expressly was designed to assure the public at large that, *inter alia*, Heartland had adequate security measures in place to protect the sensitive financial data entrusted to it." *Id.* ¶ 49.

Accordingly, the FIs sufficiently allege that they were the intended and foreseeable beneficiaries of Heartland's representations concerning its system security measures and that they relied on Heartland to employ such measures. *Id.* ¶ 123. More importantly, Heartland does not cite any authority for the notion that it must communicate the misrepresentations directly to the FIs in order for the misrepresentations to be actionable. Nor does Heartland cite any authority holding that misrepresentations made publically in SEC filings and/or on websites do

not constitute statements for which the FIs were the intended and/or reasonably foreseeable recipients.

### E.     The FIs Properly Allege Heartland's Duty to Them

Heartland argues that the FIs do not allege a sufficiently meaningful relationship between them and Heartland to create a duty to disclose.  This argument is unavailing.

Under New Jersey law, a negligent misrepresentation claim may be based on the defendant's silence, omission, or suppression of truth (as well as on an affirmative misrepresentation).  *Highlands Ins. Co. v. Hobbs Group, LLC*, 373 F.3d 347, 355 (3rd Cir. 2004).  A negligent misrepresentation claim also is not limited to situations involving special relationships—such as those involving transactions within explicit fiduciary relationships, transactions where a quasi-fiduciary relationship develops either through the express conduct of the parties or other circumstances particular to that individual transaction or transactions (such as insurance) whose nature inherently requires such a duty regardless of the parties' intentions.  *Id.* The required duty of disclosure may also arise in any situation called for by good faith and common decency.  *Id.*  Indeed, *Maertin v. Armstrong World Industries, Inc.*, 241 F. Supp. 2d 434, 461 (D.N.J. 2002), a case relied upon by Heartland, actually supports the FIs' position, confirming that "the required duty of disclosure may also arise in any situation called for by good faith and common decency."  *Id.*

In *Maertin*, the court found that no fiduciary duty exists between parties negotiating for a settlement because they are on different sides of the bargaining table.  *Id.*[20]  Here, the situation is

---

[20]  Heartland also cites *Green v. General Motors Corp.*, No. 2831-01T-5, 2003 WL 21730592, at *8 (N.J. Super. Ct. App. Div. July 10, 2003), which, as with *Maertin*, is factually different from this case.  In *Green*, no fiduciary duty between the customer and the manufacturer of the cars existed since defendant did nothing to encourage plaintiffs to have special trust in defendant's advice when selecting plaintiffs' vehicles.  Conversely, here, Heartland assured the FIs and "the public at large that, *inter alia*, Heartland had adequate system security measures in place to protect the confidential personal and financial data entrusted to it."  MC ¶ 49.

quite different.  Heartland is in the business of supplying information for the guidance of its merchant clients and third party entities—such as the FIs—which are members of the Visa/MasterCard networks.  MC ¶ 25.  The FIs allege that Heartland held itself out to the FIs and the public at large as having adequate system security measures in place.  MC ¶¶ 25, 33, 49, 127.  As such, the FIs properly allege that Heartland owed a duty to the FIs to disclose material information concerning the fact that such security measures were not in place.  *Id.* ¶ 127.

### F.    The FIs Properly Allege Reliance

Heartland half-heartedly argues that the FIs' reliance allegations do not satisfy Rule 9(b), are not "justified," and that the FIs do not allege that reliance on Heartland's misrepresentations is the proximate cause of their damages.  Each of Heartland's arguments is wrong.

Courts have routinely found reliance to be properly pled under New Jersey law in cases with allegations similar to those made in this case.  For example, in *In re Ford Motor Co. E-350 Van Products Liability Litigation*, No. 03-4558 (HAA), 2008 WL 4126264, at *18 (D.N.J. Sept. 2, 2008), the court denied defendants' motion to dismiss, holding that plaintiffs properly pled reliance on defendant's alleged misrepresentations and omissions by alleging that defendant's conduct "constituted acts of deception, fraud, false pretenses, false promises, misrepresentation and/or a knowing concealment, suppression, or omission of material facts with the intent that [p]laintiffs . . . would *rely* upon such concealment suppression, or omission in connection with the sale, marketing, advertisement and subsequently performance of the E350 van." *Id.* (emphasis in original).  Plaintiffs also asserted that Ford's conduct "ha[d] the capacity to, and did, deceive consumers into believing that they were purchasing a vehicle that could be used safely, legally and practically to accommodate and transport 15 passengers." *Id.*

Similarly, here, the FIs allege that they justifiably relied on Heartland's silence and incorrect statements, and that such reliance directly and/or proximately caused them to suffer

serious injuries.  MC ¶¶ 6, 25, 78, 125.  These allegations unequivocally state a claim under New Jersey law.

Heartland also argues that it is somehow unreasonable for the FIs to rely upon Heartland with respect to its system security measures.  Def. Mem. at 27.  As an initial matter, a number of courts have held that whether the plaintiffs' reliance upon defendants' misrepresentations is justifiable is simply not appropriate for resolution on a motion to dismiss.  *See, e.g., TJX*, 524 F. Supp. 2d at 91-92 ("Whether the issuing banks' reliance on the implied security assurances was justifiable is a factual issue inappropriate for resolution on a motion to dismiss."); *see also First Marblehead Corp. v. House*, 473 F.3d 1, 9-11 (1st Cir. 2006) (noting there is a strong preference that reliance, in the context of negligent misrepresentation claims, be determined by a jury).  In any event, it is not unreasonable for the FIs, as Payment Card issuers, to rely on Heartland's representations that Heartland had instituted appropriate system security measures to protect their customers' confidential information—especially since Heartland and the FIs all knew at the outset that if there was a data breach the compromised Payment Cards would have to be reissued.

The FIs properly plead their reliance.  *See, e.g.*, MC ¶ 123.  Heartland's cited cases involve decisions made on fully developed factual records—not decisions made in the context of a motion to dismiss—and are inapposite.  Heartland's argument on this point is without merit.

G.     **The FIs Properly Allege Scienter**

Heartland also argues that the FIs must allege scienter as an element of their intentional misrepresentation claim, which in fact, the FIs do.  *See, e.g.,* MC ¶¶ 7, 56 (Heartland executives were well-aware of the substandard and deficient systems in place at Heartland before the Data Breach); *id.* ¶ 127 (Heartland intentionally withheld material information regarding the lack of internal controls in place to protect the FIs' financial information).  These allegations are more than sufficient to allege scienter for an intentional misrepresentation claim under New Jersey law

34

given that the scienter element is satisfied by proof that a defendant acted with severe recklessness.  *See Prudential Ins. Co.*, 975 F. Supp. at 610-15; *see also Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993).

Here, both before and after the Data Breach, Heartland continued to assure the FIs that the confidential information entrusted to Heartland was secure.  MC ¶¶ 7, 45.  Heartland intentionally withheld information regarding the lack of system security measures in place to protect such information.  MC ¶ 127.[21]  Without question, the FIs properly allege scienter.

## IV.   THE FIs STATE CLAIMS FOR VIOLATIONS OF THE ASSERTED UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACTS

After arguing that Texas law should govern the FIs' negligence claims (Def. Mem. at 8-10), Heartland "accepts the FIs' allegation in Count VII that New Jersey's consumer protection statute is the governing consumer protection statute in this case."  Def. Mem. at 28.  Then, without explanation, Heartland assumes that "Counts VIII—X are pled in the alternative to Count VII," and completely ignores the statutory violations separately pled in those three counts.[22]  Heartland's arguments regarding the New Jersey Consumer Fraud Act ("NJCFA") fail for multiple reasons.

---

[21]  Heartland unconvincingly cites *Melder v. Morris*, 27 F.3d 1097, 1102 (8th Cir. 1994) on this point.  In *Melder*, a securities fraud case that had been unsuccessfully repled twice, the court affirmed dismissal of the third iteration of the complaint, holding that plaintiffs did not state specific facts supporting an inference of fraudulent intent and only alleged that defendants engaged in a conspiracy to inflate the stock's price.  Unlike *Melder*, the FIs specifically plead that, *inter alia*, Heartland executives knew that Heartland's system security measures were not adequate to protect the FIs' confidential personal and financial information.  MC ¶ 56.

[22]  The only place in the MC referring to Counts VIII—X as an alternative to Count VII is located under "CLASS ACTION ALLEGATIONS," which explains that, pursuant to Rule 23(c) (5), the FIs seek class certification of a nationwide class in the first instance, or alternatively, seek certification of separate sub-classes that consist of substantially identical statutes from multiple states.  *See* MC ¶¶ 80-82.  The statutory violations asserted in Counts VIII to X are *not* pled in the alternative to the NJCFA claim; indeed, they each incorporate the "preceding factual statements and allegations [in the MC]…by reference."  *See id.* ¶¶ 137, 140, 143.  And, even assuming *arguendo* that these claims are pled in the alternative to the NJCFA—which they are not—and further assuming that Heartland is correct that the NJCFA claim should be dismissed—which it should not be—then these claims would indeed still be viable in the alternative to the NJCFA count.  *See* FED. R. CIV. P. 8(d) (2).

35

### A.   By Its Plain Language, the NJCFA Is Applicable To the FIs

Even though it is cited in the MC (*id.* ¶¶ 131-33), Heartland's analysis of the NJCFA wholly

ignores the text of the statute.  The NJCFA provides a private right of action to *any person* who

suffers an ascertainable loss . . . ."  N.J. STAT. ANN. § 56:8-19 (emphasis added). The NJFCA

defines the word "person" to "include any natural person or his legal representative, partnership,

corporation, company, trust, business entity or association, . . . ."  *Id.* § 56:8-1(d).  Heartland

cannot credibly contend that the FIs do not fit within this broad definition.

### B.   The Compromised Data, Parties and Claims Relate To Consumer-Oriented Transactions

Heartland strains to argue that the FIs cannot avail themselves of the NJCFA because

they are not consumers and their claims "do not involve consumer transactions."  Def. Mem. at

29.  The cases cited by Heartland that examine the statutory text of the NJCFA, however,

acknowledge that "a corporation or other business entity is a 'person' entitled to sue under the

[NJCFA]."[23]  *See, e.g*, *BOC Group, Inc. v. Lummus Crest, Inc.*, 597 A.2d 1109, 1111-12 (N.J.

Super. Ct. Law Div. 1990).[24]  While several courts require an entity plaintiff to be involved in a

consumer-oriented transaction to have standing, entities have been considered "persons" under

---

[23]  The list of practices the New Jersey Division of Consumer Affairs has identified as running afoul of the NJCFA is not an exhaustive list and, therefore, has no bearing on whether the NJCFA is applicable to the conduct alleged herein.  *See* Def. Mem. at 29; N.J. ADMIN. CODE § 13:45A-1.1 ("Without limiting any other practices which may be unlawful under the [NJCFA], this rule makes unlawful thereunder. . . .").

[24]  To extent that the *BOC Group* court ultimately concluded that the plaintiff entity in that case lacked standing under the NJCFA, it is factually distinguishable.  *BOC Group* involved the sale of an idea for the design of a complex petroleum refining process, which the court observed was not capable of being sold to the public.  *BOC Group, Inc. v. Lummus Crest, Inc.*, 597 A.2d 1109, 1112 (N.J. Super. Ct. Law Div. 1990).  *BOC Group* also distinguished *Perth Amboy Iron Works v. Am. Home*, 543 A.2d 1020 (N.J. Super. Ct. 1988), *aff'd*, 571 A.2d 294 (N.J. 1990), where the NJCFA was found to apply to the claim of a corporation that had been misled by the seller of a yacht.  The *BOC Group* court squared these two cases by remarking that "[w]hile yachts are not bought by average consumers, yachts are still available to the public at large and sold in large quantities."  *BOC Group*, 597 A.2d at 1113.  This case is more analogous to *Perth Amboy* (involving a product/service made available to the public at large), than to *BOC Group* (involving a complex, multimillion dollar process for a single plant).  Moreover, the above-quoted language from *BOC Group* refutes Heartland's suggestion that the NJCFA only applies to goods or services "offered generally to consumers at large, or that a typical consumer would [] be expected to purchase."  Def. Mem. at 30.  The fact that the products or services are available to the public at large is sufficient.

the NJCFA in cases involving the purchase of tow trucks, computer peripherals and prefabricated wall panels.  *See J&R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (citing cases).

Regardless of whether a "consumer-oriented" requirement is properly read into the NJCFA, the consumer data compromised by the Data Breach included Payment Card information provided to merchants by consumers as part of a consumer purchase.  *See* MC ¶¶ 3, 5-6, 25, 28-32.  The injuries for which the FIs seek relief include the costs associated with re-issuing compromised Payment Cards, the costs to notify their consumer-customers (which Heartland shifted to the FIs), and absorbing unauthorized charges made on the compromised Payment cards.  *Id.* ¶ 8.  Such allegations are sufficient to bring the FIs within the scope of the NJCFA.  *See Homa v. Am. Express Co.*, 558 F.3d 225, 232 (3d Cir. 2009) (the NJCFA "was intended to be one of the strongest consumer protection laws in the nation," and "should be construed liberally.") (citations omitted).

Finally, Heartland contends that even if the FIs have standing to assert the NJCFA, they cannot do so because they are not "consumers" of Heartland's services.  Def. Mem. at 30.  This argument also is unavailing; as Heartland acknowledges, a NJCFA claim consists of only three elements: (1) unlawful conduct by the defendant, (2) ascertainable loss by the plaintiff, and (3) a causal relationship between the unlawful conduct and the loss.  *See* Def. Mem. at 31-32.  There is no direct privity requirement under the NJCFA.  *See Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 474 n.20 (D.N.J. 2007).  The statute prohibits fraudulent practices in connection with the sale or advertisement of any "merchandise," which is broadly defined to include "any objects, wares, goods, commodities, services or anything offered, *directly or indirectly* to the public for sale."  N.J. STAT. ANN. § 56:8-1(c) (emphasis added).  The MC allegations adequately meet this requirement.  *See, e.g.*, MC ¶¶ 24-26, 45-52 (describing the

37

services and equipment made available by Heartland to merchants and the FIs' and Heartland's related misconduct). Equally important, the cases cited by Heartland do not support a different result here.[25]   Indeed, the cases limiting the NJCFA's scope to "*bona fide* consumers" also hold that whether a plaintiff qualifies as such is a factual issue to be resolved at trial. *See Grauer*, 729 A.2d at 524.[26]

### C.    The FIs state a claim under the NJCFA

Heartland next challenges the merits of the NJCFA claim by arguing that the FIs failed to allege that Heartland engaged in any unlawful conduct prohibited by the NJCFA or that any damages were caused as a result of Heartland's alleged misconduct.[27]   Def. Mem. at 31-34. Neither of these arguments have merit.

### 1.    The FIs properly allege actionable misstatements

A court "adjudicating a [NJCFA] claim must approach dismissal of said claim with 'hesitation.'"  *Parker v. Howmedica Osteonics Corp.,* No. 07-02400, 2008 WL 141628, at *2 (D.N.J. Jan. 14, 2008).   An actionable unlawful practice under the NJCFA "may be an

---

[25]  In *Grauer v. Norman Chevrolet GEO,* 729 A.2d 522, 524 (N.J. Super. Ct. App. Div. 1998), the court explained that an allegedly misleading sign offering to lease a car does not create a cause of action for everyone who saw it (the "unaffected members of the general public"), but only for those who were actually *bona fide* consumers of the car.  Since there was a disputed factual question regarding whether the plaintiff was truly a *bona fide* consumer of the car, the court denied the defendant's motion for summary judgment on the NJCFA claim.  *Id.*  In *Directv, Inc. v. Marino,* No. 03-5606, 2005 WL 1367232, at *1 (D.N.J. June 8, 2005), defendant asserted a NJCFA counterclaim after being accused by plaintiff of purchasing a pirate access device to steal television services from plaintiff.  The counterclaim alleged that plaintiff violated the NJCFA by circulating inaccurate information regarding defendant's credit worthiness.  *Id.* at *3.  The court found there was no consumer transaction between the parties, noting that "this entire litigation is premised on the absence of a legitimate consumer transaction." *Id.* at *6.  In contrast to both of these cases, the FIs were not simply unaffected members of the public (they were directly injured by Heartland's misconduct), and this case is not premised on the *absence* of a consumer relationship.

[26]  It is also instructive that in the *TJX* appeal, the First Circuit held that there was a sufficiently close connection between the Payment Card issuer plaintiffs and TJX (as well as the acquiring-bank defendant) to allow the Massachusetts unfair trade practices claim to survive and proceed.  *In re TJX,* 564 F.3d 489, 497 (1st Cir. 2009).

[27]  Heartland does not contest the "ascertainable loss" element of the NJCFA.  *See* Def. Mem. at 31.

affirmative act, a knowing omission, or a regulatory violation."[28]  *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 524-25 (D.N.J. 2008) (citations omitted).  The FIs allege that Heartland violated the NJCFA by virtue of both its knowing omissions and material misstatements.  *See* MC at ¶ 135.

Heartland first argues that the MC does not adequately allege affirmative misstatements because it fails to "plead how Heartland's alleged misrepresentations were false or misleading, or how they induced Plaintiffs to engage in any conduct."  Def. Mem. at 32.  The MC, however, contains an entire section that describes numerous affirmative statements publically made by Heartland prior to the Data Breach regarding its "state-of the-art" network systems, its use of "secure transactions," the existence of "layers of security to isolate [Heartland's] data bases from unauthorized access," and the "significant emphasis" that it placed "on maintaining a high level of security in order to protect the information of our merchants and their customers."  MC ¶¶ 4, 45-52.  As set forth in the MC, these statements were false and materially misleading because Heartland did not, in fact, take adequate measures to safeguard the sensitive information compromised by the Data Breach.[29]  These allegations are sufficient under Rule 9(b) because they put Heartland "on notice of the 'precise misconduct with which [it is] charged.'"  *Harper v. LG Elec. USA, Inc.,* 595 F. Supp. 2d 486, 491 (D.N.J. 2009) (citation omitted).

### 2.       The FIs properly allege knowing omissions

Heartland also contends that the FIs fail to plead an actionable omission because the MC

---

[28]  Even though these violations are listed in the disjunctive, a NJCFA claim is still plausible if a plaintiff fails to adequately plead affirmative acts, but does allege sufficient intentional omissions.  *See Asp v. Toshiba Am. Consumer Prods., LLC*, 616 F. Supp. 2d 721,735 (S.D. Ohio 2008) (dismissing aspect of NJCFA claim based on affirmative misstatements, but allowing the claim to proceed to the extent it was based on intentional omissions).

[29]  Had the FIs been aware of the true facts (*i.e.,* Heartland's inadequate system security measures), they would have, at a minimum, alerted their customers to the increased risk of a data breach occurring.  *See, e.g.,* MC ¶¶ 122-25 (describing the reasonable reliance by the FIs on Heartland's statements).

"contains nary a reference to a specific act of omission committed by Heartland." Def. Mem. at

33. This is simply incorrect. In addition to the affirmative misstatements referenced above

(from which the true extent of Heartland's inadequate security measures were concealed), the

MC cites to a post-breach admission by Heartland's President that there were "a host of things"

not done to prevent the Data Breach, and "[c]learly we need to do more." MC ¶ 73. These facts

were knowingly concealed from the FIs prior to the Data Breach, and were only revealed in its

aftermath. *Id.* Heartland's argument is particularly unavailing because the facts concerning

Heartland's internal system security measures were solely within Heartland's possession; the FIs

are not required to plead such facts in order to state a NJCFA omission claim.[30] *See, e.g.*, *Asp*,

616 F. Supp. 2d at 736 (citing *Dewey*, 558 F. Supp. 2d at 527).

Heartland's contention that the MC does not plead actionable omissions is further

undermined by the recent decision in *TJX*, which is not cited in Heartland's discussion of the

FIs' consumer-protection claims. There, the financial institution plaintiffs argued that TJX

violated the Massachusetts unfair or deceptive practices act—which also is asserted by the FIs—

because the defendants' inadequate security measures constituted an unfair practice. *In re TJX*

*Cos. Retail Security Breach Litig.*, 564 F.3d 489, 496 (1st Cir. 2009). The First Circuit reversed

the district court's dismissal of this claim, remarking that "[k]nowing so little about the extent of

[the defendants'] fault at the complaint stage, we think that at best [the defendants'] argument is

one that would have to await discovery and perhaps a summary judgment motion." *Id.* at 497;

*see also Richardson v. DSW, Inc.*, No. 05-4599, 2006 WL 163167, at *2-3 (N.D. Ill. Jan. 18,

2006) (granting plaintiff leave to amend to assert a claim under the Illinois Consumer Fraud Act,

---

[30] Furthermore, the Rule 9(b) "heightened pleading standard allows essential elements of an omission under the NJCFA, such as intent, to be alleged generally, [although] such elements still need to be alleged." *In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.*, No. 08-939, 2009 WL 2940081, at *8 (D.N.J. Sept. 11, 2009) (citations omitted). *Accord, Borneo*, 2009 WL 2498596, at *5) (allegations about the condition of the mind, the defendant's knowledge of the truth, and intent to deceive can be pleaded generally under Rule 9(b)) (citations omitted).

which was premised on the theory that the defendant intentionally failed to adhere to its contractual obligations to safeguard sensitive information in order to save money).

### 3.   The FIs properly allege causation and damages

Without citing any authority, Heartland argues that the FIs fail to adequately plead "a causal relationship" between the FIs' losses and Heartland's improper conduct.  Def. Mem. at 34. This contention is specifically refuted by the MC allegations.   Indeed, the putative class is defined to include financial institutions which re-issued Payment Cards or were otherwise injured after receiving a Visa, MasterCard, or other alert notifying them that these cards were compromised by the Heartland Data Breach.  *See* MC ¶ 80; *see also* MC ¶ 20 (describing the security and "CAMS" alerts issued by Visa and MasterCard).  But for Heartland's misconduct, the FIs would not have suffered these injuries.  *See Debrah F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 365 N.J. Super. 520, 575 (N.J. Super. Ct. Law Div. 2003) (citing cases supporting a "but for" test of proximate cause in cases arising under the NJCFA).

Given the FIs' allegations of Heartland's numerous omissions, the motion to dismiss the NJCFA should be denied.

### D.   The FIs state claims under the statutes asserted in Counts VIII-X

Heartland's motion does not address any of the statutes asserted by the FIs in Counts VIII through X, and should be denied for this reason alone.  *See Gen. Dev. Corp. v. Binstein*, 743 F. Supp. 1115, 1130 (D.N.J. 1990) (declining to dismiss certain consumer fraud claims when the motion to dismiss was directed at fewer than all of the claims asserted in the complaint). Perhaps, however, there is a good reason why Heartland purposefully ignores these claims.  In *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass. 2008), for example, a district court certified classes asserting several of the unfair and deceptive trade practice act claims asserted in the MC.  The classes that were certified included third party

41

payors (many of which, like the FIs, were entities). *Id.* There is also ample authority for the proposition that many of the claims asserted in these counts can be raised by entities.[31]

As pled in the MC, these statutes prohibit either unfair acts or practices (Count VIII), false, misleading or deceptive acts or practices (Count IX), or unconscionable acts or practices (Count X). The MC alleges each of these types of misconduct by Heartland, including detailed factual support. *See, e.g.*, MC ¶¶ 4, 45-52. Accordingly, Counts VIII to Count X should not be dismissed—regardless of whether the Court dismisses the stand alone NJCFA count.

## V.       The FIs PROPERLY ALLEGE BREACH OF CONTRACT CLAIMS

### A.       The Master Complaint Properly States a Claim for Breach of the Contracts to Which the FIs Are Intended Third Party Beneficiaries

Heartland's contracts with its acquiring banks and merchants establish that the FIs are intended third party beneficiaries of these agreements. As pled in the MC, Heartland breached the agreements, and the FIs—as third party beneficiaries thereof—were injured as a result.[32] Heartland's analysis strategically ignores the relevant provisions of these contracts.

#### 1.       Heartland's contracts with its Acquiring Banks

Heartland attaches to its motion Exhibits 4 and 5, which it claims are the operative contracts with its two acquiring banks (the "ACs"). The FIs have had no opportunity to conduct any discovery, nor question the veracity, scope or applicability of these two agreements, which

---

[31] *See* list of states with Unfair Trade Practices/Consumer Protection Statutes That Allow Claims to be Asserted by Entity Plaintiffs, attached hereto as **Exhibit "A."** The FIs hereby withdraw their claims under the consumer fraud statutes of Hawaii, Missouri, the District of Columbia, Oklahoma, and Rhode Island.

[32] The FIs agree with Heartland that under each of the potentially applicable state laws, only intended (as opposed to incidental) third party beneficiaries may sue to enforce a contract to which they are not a party. Def. Mem. at 36-37, 42. Heartland, however, takes an overly narrow view of what constitutes an intended third party beneficiary by relying on the terms "donee beneficiary" and "creditor beneficiary." *Id.* at 36, n.35; 37-38; 42. These are antiquated phrases that "carry overtones of obsolete doctrinal difficulties," which were abolished when the Restatement (Second) of Contracts was adopted. *See* RESTATEMENT (SECOND) OF CONTRACTS ch. 14, intro. cmt. (1981). All that is required under the modern Restatement is a showing that the plaintiff is an intended third party beneficiary. *See id.*; RESTATEMENT (SECOND) OF CONTRACTS § 302, reporters notes. The FIs have so alleged. *See* MC ¶ 97.

were executed in April of 2002 and September of 2006.[33]   That said, to the extent the Court considers these documents in deciding Heartland's motion to dismiss,[34] they do not justify the dismissal of the FIs' intended third party beneficiary claims.

> **a.    The FIs are intended third party beneficiaries of Heartland's contracts with its Acquiring Banks**

The ACs contain several paragraphs that establish the FIs' status as intended third party beneficiaries.   Both contracts, under the subheading "Confidentiality," require Heartland to undertake appropriate measures to safeguard "all" data related to its acquirers' business—which necessarily includes data on Payment Cards issued by the FIs—thereby confirming that the FIs are intended third party beneficiaries.   *See* Exhibits 4 and 5 to Heartland's motion at § 4.3(b). Several other provisions in the ACs explicitly provide various rights to "affiliates" of the acquirers (such as the FIs); *see* § 1.2(e) (Heartland agrees to be responsible for certain losses to the acquirer or its "affiliates").   *See also* §§1.5(f), 4.5(a) (referring to "affiliates").

> **b.    The ACs do not disclaim the FIs' status as intended third party beneficiaries**

In support of its argument that the FIs' breach of contract claims are subject to "explicit disclaimers," Heartland cites to a single paragraph in the ACs.   *See* Def. Mem. at 38 n.37 (citing ¶ 1.1(f)).   This paragraph simply states that Heartland has "received, understands and agrees to comply fully with" the Visa and MasterCard bylaws and regulations.   *Id.*   Nowhere is there any indication that the claims of third party beneficiaries are disclaimed.

---

[33]   Indeed, Heartland did not produce the entire agreements.   For example, page 14 of the Acquirer MPA between Heartland and Heartland Bank (Exhibit 4) refers to an "attached HPS Underwriting Manual."   *See also id.* at §§1.2(a) and 1.2(c) (referring to an unattached "Schedule B"). No such manual and/or schedule was produced.

[34]   Pursuant to Rule 12(b)(6), as a general rule, a defendant may not submit matters outside the pleadings in support of a motion to dismiss unless the Court converts the pending motion into a summary judgment motion *and* provides the plaintiff with an adequate opportunity to conduct discovery necessary to oppose that motion.   *See* FED. R. CIV. P. 12(d).   The FIs have had no such opportunity to conduct discovery.

Heartland's reliance on the *TJX* decision illustrates this point. Def. Mem. at 38-39. In *TJX*, the agreement between the defendant and its acquirer unambiguously provided that "[t]his Agreement is for the benefit of, and may be enforced only by, Bank and Merchant . . . and is not for the benefit of, and may not be enforced by any third party." *In re TJX Cos. Retail Sec. Brach Litig.*, 564 F.3d at 499. Similarly, the court in *CUMIS* declined to grant intended beneficiary status to third party plaintiffs where the "parties expressly stated in the contract at issue their intent to preclude any third-party beneficiary claims." *CUMIS Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, No. 051158, 2005 WL 6075375, at *6 (Mass. Super. Ct. 2005). Heartland cannot point to any similar third party disclaimer language in the ACs *because such disclaimer language does not exist.* As such, *TJX* and *CUMIS* are inapposite, and there is no need to look beyond the ACs to the Visa/MasterCard regulations.[35]

### c. The ACs do not preclude the damages sought by the FIs

Heartland's argument that the FIs' claims based on the Acquirer MPAs are barred by the "limitation of damages clauses" (Def. Mem. at 40) is not persuasive. Heartland acknowledges that the ACs allow for the recovery of "general money damages in an amount not to exceed the actual damages," and further permit the recovery of "special, incidental, consequential, or exemplary damages" in the event a "willful breach" of the contract ensues. *Id.* (citing ¶ 4.7 of Exhibits 4 and 5). The MC alleges that Heartland "knowingly failed" to safeguard the sensitive financial information with which it was entrusted, thereby breaching its contractual obligations.

---

[35] And even if there was, the result would not change. Indeed, it is inconsistent for Heartland to argue that the FIs are bound by the Visa Operating Regulations and the punishments contained therein, yet when the FIs seek to enforce the rights conferred on them by the regulations—to which they are parties—Heartland argues that the regulations exclude the FIs as third party beneficiaries. *See* Def. Mem. at 38, 44-45. Heartland's argument creates an inherent conflict in the Visa Operating Regulations, which within the same paragraph state that the regulations apply to "financial institutions conducting Card issuing" (the issuing banks—*i.e.*, the FIs). *See id.* at 38, n.38. Moreover, Heartland's reliance on the *TJX* court's analysis of the Visa Operating Regulations is misplaced as no argument was made in *TJX regarding* this conflict within the regulations. Since there is a conflict within the regulations, it is inappropriate to resolve it at the pleadings stage without discovery.

44

MC ¶ 113.  As such, the FIs are entitled to their requested damages.  Moreover, even assuming *arguendo* that the FIs cannot demonstrate a "*willful* breach" of the ACs, pursuant to the above provisions, they are nevertheless still entitled to recover "money damages" in an amount not to exceed their actual damages.[36]  The MC specifically seeks recovery for these out-of-pocket damages.  *See* MC ¶ 8.

### 2.     Heartland's contracts with its Merchants

In support of its argument that the FIs are not intended third party beneficiaries of Heartland's agreements with its merchants, Heartland submits an "exemplar . . . version of [its] standard form dated September 11, 2007."  Def. Mem. at 41 n.42 (referencing Exhibit 6) (the "MPA").  As with the ACs, the FIs have not had an opportunity to conduct discovery to determine when this "exemplar" agreement is used, whether it has been modified since September 2007, or the circumstances under which it was created.  Nevertheless, when read in its entirety, the MPA does not support Heartland's motion to dismiss.

### a.     The FIs are intended third party beneficiaries of the MPAs

Heartland argues that the FIs are not intended third party beneficiaries of the MPAs because they are "barely mentioned" and "when they are mentioned it is only in passing."  Def. Mem. at 42.  Heartland, however, conveniently ignores the "Privacy Policy" prominently set forth at the end of its exemplar MPA (Exhibit 6 § 14.11), wherein Heartland makes broad commitments concerning its system security measures and the protection of confidential financial information.  Section 14.11 provides an expansive definition of the protected "confidential information," which includes "information regarding any other services used by our customers," and consumers' "personal financial information" (the very information

---

[36]  Under both Ohio and Missouri law, actual damages are measured by the extent of the injury or loss to the plaintiff. *See Moreland v. Columbia Mut. Ins. Co.*, 842 S.W.2d 215, 219 (Mo. Ct. App. 1992) (citations omitted); *Kovach v. Lazzano*, No. 1082, 1983 WL 6080, at \*3 (Ohio Ct. App. August 5, 1983) (citations omitted).

compromised by the Data Breach that required the FIs to reissue the compromised Payment Cards). Therefore, Heartland's contention that it "made no promises regarding data security in the Agreement [the MPA] that could form the basis of any breach-of-contract action" (Def. Mem. at 43) is simply not true.

### b. The MPAs do not disclaim the FIs' claims

In support of its argument that the MPAs expressly disclaim the FIs' intended third party beneficiary claims, Heartland selectively quotes the following language from § 8.8 of the exemplar MPA: "[Heartland] shall have no liability to Merchant or any other person for any loss, liability or damage arising directly or indirectly in connection herewith." Def. Mem. at 43. Heartland's memorandum, however, conveniently neglects to mention that this excerpt is from the end of a sentence that begins by disclaiming any express or implied "warranties" by Heartland, and concludes by stating that the Merchant acknowledges that Heartland "has no liability or responsibility for the actions of any Association, Card Issuer or Cardholder." MPA § 8.8. Reading this section in its entirety undermines Heartland's argument that the MPAs expressly disclaim the FIs' third party claims. Indeed, the MC does not assert claims for breach of the implied warranty of merchantability or breach of the implied warranty of fitness for a particular purpose. More importantly, the last sentence of § 8.8 disclaims Heartland's liability *to its merchants* "for the actions of any Association, Card Issuer or Cardholder." It does not disclaim any liability owed by Heartland *to Card Issuers—i.e.,* the FIs—for its wrongful acts. Accordingly, Heartland's reliance on this section is misplaced.

### c. The MPA's limitation of liability provisions are inapplicable

Heartland's citation to MPA §§ 8.5 and 8.7 (Def. Mem. at 44) also fails to provide a basis for dismissal. Both of these sections limit Heartland's liability *to merchants*. *See id.* § 8.5 (Heartland's "sole liability *to Merchant* hereunder shall be . . . ."); *id.* § 8.7 (Heartland "shall

46

have no other liability whatsoever *to Merchant* . . . .") (emphasis added).  Moreover, neither of these sections even addresses the intended third party beneficiary claims asserted by the FIs.

### 3.   The MC alleges that Heartland breached the ACs and MPAs, which inflicted financial injury on the FIs

Heartland argues that the MC fails to allege "adequately" that it breached the ACs and MPAs, and that the FIs were injured as a result.  *See* Def. Mem. at 39-40, 43.  The MC, however, is unmistakably clear—Heartland breached both agreements by "failing to adequately safeguard [the] sensitive financial information of the customers of the FIs . . . which directly and/or proximately caused the FIs . . . to suffer substantial damages."  MC ¶ 98.

### B.   The FIs Properly Allege A Claim for Breach of Implied Contract

Heartland's argument that the MC fails to state a claim for breach of implied contract is legally insupportable.  Heartland first contends that this claim should be dismissed because it is uncertain whether the claim is for unjust enrichment or for breach of an implied-in-fact contract.  Def. Mem. at 45-46.  Given that the MC does not plead the elements of an unjust enrichment claim, it is clearly the latter.  Heartland next incorrectly asserts that the MC fails to plead the elements required for a breach of implied contract claim.  Def. Mem. at 46-47.  Under New Jersey law, "an implied-in-fact contract is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been verbally expressed."  *S. Jersey Hosp., Inc. v. Corr. Med. Servs.*, No. 02-2619, 2005 WL 1410860, at *4 (D.N.J. June 15, 2005).  These elements can "be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing."  *Duffy v. Charles Schwab & Co.*, No. 98-4595, 2001 WL 1104689, at *5 (D.N.J. Sept. 4, 2001).  "Courts often find and enforce implied promises by interpretation of a promisor's word and conduct in light of the surrounding circumstances."  *Wanaque Borough Sewerage Auth. v. Twp.*

*of W. Milford*, 677 A.2d 747, 752 (N.J. 1996) (citing RESTATEMENT (SECOND) OF CONTRACTS §
4 cmt. a). "Whether the parties acted in a manner sufficient to create implied contractual terms is
a question of fact generally precluding summary judgment." *Troy v. Rutgers*, 774 A.2d 476, 483
(N.J. 2001).

Here, the MC alleges that the FIs' customers were required to provide Heartland with
data from their Payment Cards (which were issued by the FIs) in order to facilitate and complete
their Payment Card transactions.  MC ¶ 110.  By virtue of its agreement to accept and process
these transactions, Heartland impliedly agreed that it would take reasonable efforts to safeguard
the confidential personal and financial information of the FIs associated with the cards and
promptly notify consumers in the event the information was compromised.[37]  *See id.* ¶¶ 52, 110.
The MC cites to several instances where Heartland recognized this duty, and avers that it was
breached by Heartland.  *See id.* ¶¶ 45-51, 101-106, 110, 113.

Heartland's argument that its implied contractual obligations are too indefinite to enforce
is unavailing.  *See* Def. Mem. at 47.  Courts have recognized the existence of similar implied-in-
fact contracts in closely analogous situations involving data breaches.  In *Richardson*, 2006 WL
163167, at *2-3, the court found that a retailer had an implied contractual obligation to take
appropriate measures to protect the sensitive financial information with which it came into
possession from consumers who made purchases using a credit card.  The court reached its
conclusion by applying Illinois law which, like New Jersey law, recognizes that the only
difference between an express contract and an implied-in-fact contract is that regarding the latter,

---

[37] Since Heartland recognized a monetary benefit by processing transactions instituted with Payment Cards issued
by the FIs (*see* MC ¶ 32), its argument that the MC fails to point to any valuable consideration received by
Heartland is without merit.  *See* Def. Mem. at 47.

the agreement has not been committed to writing or stated orally in express terms.[38]  *Id.* at *5. The court further found that the plaintiff had pled a viable claim for breach of the implied contract when—like here—the information was accessed by an unauthorized third party.  *Id.* at *10.

Likewise, in *In re Hannaford Brothers Co. Customer Data Security Breach Litigation*, 613 F. Supp. 2d 108, 118 (D. Me. 2009), Judge Hornby denied the defendant's motion to dismiss the breach of implied contract claim of a consumer who allegedly experienced fraud following a data breach.[39]  Just like here, the *Hannaford* plaintiffs did not allege there was an express agreement between them and the defendant who specifically addressed the protection of the sensitive data.  *Id.*  Nevertheless, Judge Hornby concluded that "in a grocery store transaction where a customer uses a debit or credit card, a jury could find that there is an implied contractual term that Hannaford will use reasonable care in its custody of the consumers' card data . . . ."  *Id.* at 119.  Likewise, a reasonable jury could conclude that Heartland had an implied obligation to the FIs to take appropriate measures to prevent the Data Breach from occurring—particularly in light of Heartland's numerous public statements touting its system security measures.  *See* MC ¶¶ 45-52.  And, since the existence of any such duty is a question that should be left to the trier of fact, *Troy*, 774 A.2d at 483, Heartland's motion to dismiss this claim should be denied.

---

[38]   *Compare Richardson,* 2006 WL 163167, at *2-3 (citing *Overseas Development Disc Corp. v. Sangamo Construction Co.*, 840 F.2d 1319, 1330 (7th Cir. 1988)), *with* Def. Mem. at 46 (citing *Saint Barnabas Med. Ctr. v. Essex County,* 543 A.2d 34, 39-40 (N.J. 1988)).

[39]   The *Hannaford* court ultimately dismissed the breach of implied contract claim asserted on behalf of other consumer plaintiffs who did not suffer any out-of-pocket damages as a result of the data breach.  *In re Hannaford*, 613 F. Supp. 2d at 131-33.  Here, each FI has suffered actual financial injury as a result of the Data Breach.

## VI.    CONCLUSION

For the foregoing reasons, the FIs respectfully request that Heartland's motion to dismiss be denied.[40]

Respectfully submitted,

By:    /s/ Michael A. Caddell
Michael A. Caddell
Cynthia B. Chapman
Cory S. Fein
CADDELL & CHAPMAN
1331 Lamar, #1070
Houston TX 77010
713.751.0400 (phone)
713.751.0906 (fax)

By:    /s/ Richard L. Coffman
Richard L. Coffman
Texas State Bar No. 04497460
THE COFFMAN LAW FIRM
First City Building
505 Orleans St., Ste. 505
Beaumont, TX 77701
(409) 833-7700
(866) 835-8250 FAX

By:    /Joseph G. Sauder
Joseph G. Sauder
Matthew D. Schelkopf
Benjamin Johns
CHIMICLES & TIKELLIS, LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
(610) 645-4717
(610) 649-3633 FAX

*Co-Lead Counsel for the Financial
Institution Track Plaintiffs*

---

[40] In the event the Court grants Heartland's motion to dismiss, it should be without prejudice. *See, e.g., Borneo*, 2009 WL 2498596, at *5 ("When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.") (citations omitted).

50

Natalie Finkelman
**SHEPHERD, FINKELMAN, MILLER & SHAH, L.L.P.**
35 E State Street
Media PA 19063

R. Douglas Gentile
**DOUTHIT FRETS ROUSE GENTILE & RHODES, L.L.C.**
903 East 104th St, Ste 610
Kansas City MO 64131

Christopher G. Hayes
**LAW OFFICE OF CHRISTOPHER G. HAYES**
225 South Church St.
West Chester PA 19382

Jeffrey L. Kodroff
**SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.**
1818 Market St., Ste. 2500
Philadelphia PA 19103

Mitchell A. Toups
**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**
P.O. Box 350
Beaumont TX 77704

Gregory Weiss
**LEOPOLD~KUVIN, P.A.**
2925 PGA Blvd.
Palm Beach Gardens FL 33410

John R. Wylie
**DONALDSON & GUIN, L.L.C.**
300 South Wacker Drive, Ste. 1700
Chicago IL 60606

*FI Plaintiffs' Executive Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Financial Institution Plaintiffs' Memorandum of Law in Opposition to Defendant Heartland Payment Systems, Inc.'s Motion to Dismiss the Master Complaint was filed via the Court's ECF system on November 23, 2009 and thereby served on all counsel of record.

/s/ Michael A. Caddell
Michael A. Caddell