THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: Heartland Payment | § | |
| Systems, Inc. Customer Data | § | |
| Security Breach Litigation | § | |
| _____ | § | MDL No. 09-2046 |
| | § | |
| This filing relates to: | § | |
| | § | |
| CONSUMER TRACK LITIGATION | § | |

**MEMORANDUM AND ORDER**

This is a consumer class action certified under Federal Rule of Civil Procedure 23(b)(3) for settlement. The class is large—over one hundred million payment-card[1] holders—and dispersed across the country. Despite a vigorous notice campaign, only eleven valid claims have been filed. Damages are almost entirely in the form of cy pres payments to third-party nonprofit organizations whose work is related to class interests. This opinion addresses settlement-class certification, settlement approval, and attorneys' fees. As part of determining a reasonable fee award, the court discounts the value of the cy pres payments to reflect the fact that the benefit to the class is indirect.

In January 2009, Heartland Payment Systems, Inc. ("Heartland") publicly disclosed that hackers had breached its computer systems and obtained confidential payment-card information for over one hundred million consumers.[2] Lawsuits were filed in state and federal courts across the country. The Judicial Panel on Multidistrict Litigation transferred the federal cases to this court under 28 U.S.C. § 1407. (Docket Entry No. 1). Payment-card holders filed individual lawsuits and

---

[1]"Payment cards" refers to both credit and debit cards issued by issuer banks. *See In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.* ("*Heartland II*"), — F. Supp. 2d —, 2011 WL 6012598, at *1 & n.4 (S.D. Tex. 2011).

[2]The parties estimate that the data breach affected 130 million payment-card accounts.

class actions, claiming that Heartland had negligently failed to protect their personal financial information from disclosure.  Financial institutions that issued cards also sued Heartland, claiming that the data breach caused them to incur damages, including the costs of canceling and replacing payment cards.[3]  The cases proceeded on two tracks, one for the "Financial Institution Plaintiffs" and one for the "Consumer Plaintiffs."

In December 2009, the Consumer Plaintiffs and Heartland reached a settlement agreement ("Agreement").  (Docket Entry No. 57).  After a hearing, (Docket Entry No. 82), the court in April 2010 certified a nationwide settlement class and approved notice of the Agreement, (Docket Entry No. 85).  After an extensive notice campaign, eleven valid claims for losses and one objection have been filed.  The Consumer Plaintiffs have moved for final approval of the Agreement, for an award of attorneys' fees, and for incentive awards for certain plaintiffs.  (Docket Entry No. 107).  The Consumer Plaintiffs filed a supporting memorandum.  (Docket Entry No. 108).  Heartland filed a memorandum supporting the settlement but taking no position on the fees or incentive awards.  (Docket Entry No. 109).  The court held a final fairness hearing.  (Docket Entry No. 110).

Based on the memoranda in support of the proposed Agreement, the one objection, the parties' arguments at the preliminary and final fairness hearings, the remainder of the record, and the relevant law, this court: (1) reviews its preliminary certification of the settlement class; (2) approves the proposed settlement; (3) approves attorneys' fees in the amount of $606,192.50; (4) approves costs in the amount of $35,000; and (5) denies the proposed incentive awards.  The reasons

---

[3]Some of these financial institutions also filed a class-action lawsuit against two acquirer banks, Heartland Bank (unrelated to Heartland) and KeyBank, that had hired Heartland to process their merchants' payment-card transactions. *See In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.* ("*Heartland I*"), MDL No. 2046, 2011 WL 1232352 (S.D. Tex. Mar. 31, 2011).  That case recently was dismissed with prejudice. *See In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.* ("*Heartland III*"), MDL No. 2046, 2012 U.S. Dist. LEXIS 34067 (S.D. Tex. Mar. 14, 2012).

are explained in detail below.

## I.     The Litigation and Proposed Settlement Agreement

### A.     Background

Heartland is a payment-card processor.  It contracts with businesses to process their Visa and MasterCard transactions.   The Consumer Plaintiffs are payment-card holders.   The factual background can be briefly summarized:

> Beginning at least as early as December 2007, three hackers—an American, Albert Gonzalez, and two unknown Russians—infiltrated Heartland's computer systems.  The hackers installed programs that allowed them to capture some of the payment-card information stored on the Heartland computer systems.  In late October 2008, Visa alerted Heartland to suspicious account activity.  Heartland, with Visa and MasterCard and others, investigated.  Heartland discovered suspicious files in its systems on January 12, 2009.  A day later, Heartland uncovered the program creating those files.  That program provided the hackers with access to data on the systems.  On January 20, Heartland publicly announced the data breach.  The hackers obtained payment-card numbers and expiration dates for approximately 130 million accounts.  For some of these accounts, the hackers also obtained cardholder names.  They did not obtain any cardholder addresses, however, which meant that the stolen card information generally could be used only for in-person transactions.

*Heartland II*, 2011 WL 6012598, at *2 (internal citations omitted).

The Consumer Plaintiffs' suits assert claims for negligence, breach of contract, various state statutory violations, and violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (Docket Entry No. 3).  Aside from motions relating to appointing class counsel, the only motions filed in the Consumer Plaintiffs track were unopposed motions for extensions of time to file the master complaint.  (Docket Entry Nos. 31, 53).  The master complaint was to be filed by December 18, 2009.  (Docket Entry No. 55).  On that date, and before the Consumer Plaintiffs had filed a master complaint, the parties submitted the proposed settlement.  (Docket Entry No. 57).  No formal

discovery occurred.  Instead, the parties engaged in what Heartland's counsel termed "confirmatory discovery."  Heartland gave counsel for the Consumer Plaintiffs over 4,000 pages relating to the data breach and allowed counsel to interview Heartland's Chief Technology Officer.  (Docket Entry No. 111, at 9–10).

### B.   The Proposed Settlement Agreement

The proposed settlement binds "all Persons in the United States who had or have a payment card that was used in the United States between and including December 26, 2007 and December 31, 2008 (the 'Settlement Class Period'), and who allege or may allege that they have suffered and of the Losses defined herein."  (Docket Entry No. 57, ¶ 1.20).  The settlement excludes "Heartland and its officers and directors, and those Persons who timely and validly request exclusion from the Settlement Class."  (*Id.*)  By remaining in the class, each member gives up the right to bring any action "stemming from the Heartland Intrusion" against Heartland, KeyBank National Association, Heartland Bank, and any "Related Parties"[4] of those three entities.  (*See id.*, ¶¶ 1.16–.18).

Within ten days after preliminary court approval, Heartland had to deposit $1 million into an interest-bearing escrow account.  That sum was to "be used to reimburse Settlement Class Members who are determined to have submitted Valid Claims[.]"  (*Id.*, ¶ 2.1).  If the valid claims exceeded $1 million,  Heartland had to deposit into the account an additional $500,000; if that was exhausted, another $500,000; and finally an additional $400,000.  (*Id.*, ¶ 2.1(a)).  Heartland had to deposit at least $1 million and at most $2.4 million to fund the settlement.  If any unpaid balance remained on the initial $1 million (and interest) after all valid claims were paid, that balance was to

---

[4]The Agreement defines "Related Parties" as "an entity's past or present directors, officers, employees, principals, agents, attorneys, predecessors, successors, parents, subsidiaries, divisions and related or affiliated entities, and includes, without limitation, any Person related to such entity who is, was or could have been named as a defendant in any of the actions in the litigation."  (Docket Entry No. 57, ¶ 1.15).

4

"be transferred to a non-profit organization(s) dedicated to the protection of consumers' privacy rights, with emphasis on advancing the implementation of end-to-end encryption of payment card authorization transactions or similar security enhancements." (*Id.*, ¶ 2.1(b)).[5]

Under the Agreement, "[a] Valid Claim shall consist of only those 'Losses' . . . that a Settlement Class Member . . . proves by a preponderance of the evidence (i.e., more likely than not to be true), to have directly and proximately resulted from information relative to an Eligible Payment Card Account of such Settlement Class Member having been stolen or placed at risk as a result of the Heartland Intrusion[.]" (*Id.*, ¶ 2.2). The Agreement defines four categories of "Losses": (1) out-of-pocket expenses from card cancellations or replacements; (2) out-of-pocket expenses from unauthorized and unreimbursed account charges; (3) out-of-pocket expenses from identity theft; and (4) "a reasonable amount for time (calculated at $10 per hour up to five (5) hours)" spent on these three types of losses. (*Id.*, ¶ 2.2(b)). "Losses" specifically exclude "credit monitoring or insurance costs incurred by Settlement Class Members, attorneys' fees, attorneys' costs or attorneys' expenses incurred by Settlement Class Members, or losses resulting from any information having been stolen or placed at risk of being stolen from an entity other than from Heartland." (*Id.*).

The Agreement also creates a claims process. (*Id.*, ¶¶ 2.2(c)–(d)). Any claim must be submitted by August 1, 2011. (*Id.*, ¶ 2.2(c)). Reimbursement is capped at $175 for any valid claim not involving identity theft and at $10,000 for any valid identity-theft claims. Each household is limited to two valid claims. (*Id.*, ¶ 2.2(b)).

The Agreement requires Heartland to pay, "subject to Court approval," up to $725,000 for attorneys' fees and up to $35,000 for attorneys' costs and expenses. (*Id.*, ¶ 7.2). It also requires

---

[5]The Agreement provides that if all valid claims exceed $2.4 million, then each claim will be reduced proportionally. (*Id.*, ¶ 2.2(c)).

5

Heartland to pay, again "subject to Court approval," incentive awards of $200 to each Representative Consumer Plaintiff and $100 to all other Named Plaintiffs.  The Agreement includes the following disclaimer:

> The Settling Parties did not discuss attorneys' fees, costs, and expenses, or incentive awards to Representative Consumer Plaintiffs and Named Plaintiffs, as provided for in ¶¶ 7.2 and 7.3, until after the substantive terms of the settlement had been agreed upon, other than that Heartland would pay reasonable attorneys' fees, costs, and expenses, and incentive awards to Representative Consumer Plaintiffs and named Plaintiffs as may be agreed to by Heartland and Co-Lead Settlement Class Counsel, and/or as ordered by the Court, or, in the event of no Agreement, then as ordered by the Court. Heartland and Co-Lead Settlement Class Counsel then negotiated and agreed [to these provisions.]

(*Id.*, ¶ 7.1).

The Agreement explains how class members may object, (*id.*, ¶ 5.1), and how they may opt out of the class, (*id.*, ¶¶ 4.1–.2).

## C.    The Record

After the first fairness hearing, (Docket Entry No. 82), the court preliminarily certified the settlement class and approved class notice.  (Docket Entry No. 85).  According to Cameron Anzari, the Director of Notice for Hilsoft Notifications, the court-appointed company tasked with helping write the notices and designing and carrying out the notice campaign, the notices "reached at least 81.4% of potential Settlement Class Members an estimated 2.5 times through a combination of notice placements in newspaper supplements, consumer magazines and on selected websites." (Docket Entry No. 106, ¶ 6(a)).

One class member, Michael Kostka, filed a pro se objection.  He appears to suggest that the data breach did not actually harm most consumers in the class, making the settlement unfair to

6

Heartland.  (Docket Entry No. 100).

The Consumer Plaintiffs moved for final court approval of the settlement, fees, costs and expenses, and incentive awards.  (Docket Entry No. 107).  Under Federal Rule of Civil Procedure 23(e), this court held a final fairness hearing on the Agreement on December 13, 2010.  (Docket Entry No. 110).  Heartland advised that as of December 9, class members had filed 290 claims.  Heartland estimated that perhaps 11 of those claims were valid.  (Docket Entry No. 111, at 6).  Counsel for the Consumer Plaintiffs did not disagree with this estimate.[6]  Almost all of the $1 million Heartland committed to deposit in the settlement fund would be transferred to the designated nonprofit organizations under the Agreement's cy pres provision.  (*Id.*, at 4–5, 17).  The parties had agreed to divide the cy pres funds evenly among three nonprofit organizations: Smart Card Alliance, which promotes the use of chip-and-pin technology[7] in payment cards; the Secure POS Vendor Alliance, which promotes the implementation of end-to-end encryption and other security measures for payment cards; and the Financial Services Information Sharing Analysis Center, which notifies financial institutions about data intrusions and how to prevent them.  (*Id.*, at 17–22).

After the final fairness hearing, the Consumer Plaintiffs filed detailed reports showing their attorneys' time, costs, and expenses for this case.  (Docket Entry No. 113).  Heartland filed an affidavit explaining its previous contributions to the three organizations proposed as recipients of the cy pres payments.  (Docket Entry No. 114).  This affidavit also explained that any cy pres funds paid to these organizations would be in addition to Heartland's normal annual contributions to them.

---

[6]Neither Heartland nor the Consumer Plaintiffs have updated the court on any additional claims, valid or otherwise, filed since the final fairness hearing.

[7]According to Heartland, chip-and-pin technology is "used in every country in the world except for the United States, China and India" and "has been shown to dramatically decrease credit card fraud."  (Docket Entry No. 111, at 18).

(*Id.*, ¶ 4).

Class certification, settlement approval, and the fee and incentive awards are each analyzed below.

## II.    Class Certification

The Consumer Plaintiffs previously moved to certify a settlement class.  (Docket Entry No. 75).  The proposed class consisted of:

> all persons in the United States who had or have a payment card that was used in the United States between and including December 26, 2007 and December 31, 2008 (the "Settlement Class Period"), and who allege or may allege that they have suffered any of the Losses defined herein.  Excluded from the definition of Settlement Class are Heartland and its officers and directors, and those Persons who timely and validly request exclusion from the Settlement Class.

(Docket Entry No. 75, ¶ 7 (quoting Docket Entry No. 57, ¶ 1.20)).  After the preliminary fairness hearing, this court certified the class, noting that the evidence received at the final fairness hearing still had to be considered.  (Docket Entry No. 85, ¶ 4).  Reviewing the certification on the basis of all the parties' submissions and the final fairness hearing is appropriate.

Class certification requires a "rigorous analysis of Rule 23 prerequisites."  *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (internal quotation marks omitted) (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)).  The rigor required does not diminish in the settlement-class context. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  A district court may not "substitut[e] the fairness inquiry of Rule 23(e) for the certification requirements of Rule 23(a) and (b)."  *Thomas v. Albright*, 139 F.3d 227, 235 (D.C. Cir. 1998) (discussing *Amchem*).  "[T]he party seeking certification [] bears the burden of establishing that the requirements of Rule 23 have been met."  *Madison*, 637 F.3d at 554–55 (internal quotation marks omitted).  But "[t]he

8

fact that a settlement has been reached is, of course, relevant." *Smith v. Sprint Commc'ns. Co.*, 387 F.3d 612, 614 (7th Cir. 2004). A court need not determine under Rule 23(b)(3)(D) whether the proposed settlement class action would be manageable for trial. *Amchem*, 521 U.S. at 620.

The class-certification analysis may require consideration of the suit's underlying merits. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011).[8] A merits inquiry must be "limited to those aspects relevant to making the certification decision on an informed basis." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011) (en banc) (quoting FED. R. CIV. P. 23 Committee Notes (2003)); *see also Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 520 (5th Cir. 2008) (discussing the "limited inquiry" into the merits).

The Fifth Circuit has indicated that the preponderance standard applies to the Rule 23 determination. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228–29 (5th Cir. 2009) (per curiam). The Second and Third Circuits require the party seeking class certification to satisfy each Rule 23 requirement by a preponderance of the evidence. *See Novella v. Westchester Cnty.*, 661 F.3d 128, 148–49 (2d Cir. 2011) (citing *In re Initial Pub. Offerings Securities Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)); *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 262 (3d Cir. 2011) (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)). Other circuits state the standard less clearly. *See, e.g.*, *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010) ("The party seeking class certification bears the burden of proving Rule 23's requirements are satisfied."). In this case, the Consumer Plaintiffs have met their burden of establishing the Rule 23 requirements by a preponderance of the evidence.

---

[8]*See also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("More importantly, it is not correct to say that a district court *may* consider the merits to the extent that they overlap with class certification; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements.").

### A.      Rule 23(a)

Any proposed class must meet four requirements:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Dukes*, 131 S. Ct. at 2550 (internal quotation marks omitted).

### 1.      Numerosity

The proposed class encompasses at least one hundred million individuals, spread throughout the United States.  The numerosity requirement is satisfied.

### 2.      Commonality

Under previous Fifth Circuit precedent, commonality required "one common question of law or fact" to the class.  *James v. City of Dallas, Tex.*, 254 F.3d 551, 570 (5th Cir. 2001).  In *Wal-Mart Stores v. Dukes*, the Supreme Court held that the mere "raising of common 'questions' of law or fact" is no longer sufficient.  131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).  The *Dukes* Court explained that commonality requires classwide proceedings to have the ability "to generate common *answers* apt to drive the resolution of the litigation."  *Id.* (quoting Nagareda, *Class Certification*, 84 N.Y.U. L. REV. 97, 132 (emphasis in original)); *see also* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 2.02 cmt. a (2010) ["AGGREGATE LITIGATION"] (stating that "courts should consider whether aggregate treatment of a common issue by way of a class action will

10

materially advance the resolution of multiple civil claims by addressing the core of the dispute in a manner superior to other realistic procedural alternatives such that aggregate treatment would generate significant judicial efficiencies").

*Dukes* does not require that all questions of law and fact be common, *Ellis*, 657 F.3d at 981, or that each class member have "suffered a violation of the same provision of law," *Dukes*, 131 S. Ct. at 2551. Instead, "[t]heir claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Commonality "is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members[.]" *Sullivan*, 667 F.3d at 297. "The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence." *Id.* at 335 (Scirica, J., concurring).

Applying *Dukes*, two recent circuit cases have found commonality satisfied. In *Sullivan v. DB Investments*, plaintiffs filed class actions alleging that De Beers, "the dominant participant in the wholesale market for gem-quality diamonds throughout much of the twentieth century," had "exploited its market dominance to artificially inflate the prices of rough diamonds." *Id.* at 286 (majority opinion). These class-action lawsuits alleged that De Beers's conduct violated state and federal antitrust law and state consumer-protection statutes, and constituted unjust enrichment, unfair business practices, and false advertising under state law. The suits were transferred under MDL for pretrial management. The plaintiffs fell into two categories: those who bought directly from De Beers or a De Beers competitor, and those who purchased diamonds from a direct purchaser (such as consumers). De Beers reached settlements with both the direct- and indirect-purchasers

11

classes. *Id.* at 286–88. The district court, over substantial objections, certified the nationwide classes for settlement and approved the settlement. *Id.* at 290–91. On appeal, the Third Circuit reversed based on the fact that some of the states precluded any recovery for indirect purchasers, who nonetheless would recover under the settlement. The class successfully sought en banc rehearing. The main question before the en banc court was whether these state-law variations precluded finding predominance. A subsidiary issue was whether the proposed classes could demonstrate commonality. The en banc court addressed commonality and predominance together because, under Third Circuit precedent, "the Rule 23(a) commonality requirement [is] incorporated into the more stringent Rule 23(b)(3) predominance requirement[.]" *Id.* at 297 (internal quotation marks omitted). The court found both. The classes shared common questions of fact: whether De Beers engaged in anticompetitive activity, and whether that activity resulted in artificially inflated diamond prices. "These allegations are unaffected by the particularized conduct of individual class members, as proof of liability and liability itself would depend entirely upon De Beers's allegedly anticompetitive activities." *Id.* at 300. The classes also shared common questions of law: whether De Beers's anticompetitive activity violated federal and state antitrust law. *Id.* at 300 & n.23. "Evidence for this legal question would entail generalized common proof as to the implementation of De Beers's conspiracy, the form of the conspiracy, and the duration and extent of the conspiracy." *Id.* at 300 (internal quotation marks and alteration omitted). These questions, according to the en banc court, satisfied the *Dukes* mandate that the common questions result in common answers. "[T]he answers to questions about De Beers's alleged misconduct and the harm it caused would be common as to all of the class members, and would thus inform the resolution of the litigation if it were not being settled." *Id.* at 299–300.

12

In *Ross v. RBS Citizens, N.A.*, 667 F.3d 900 (7th Cir. 2012), a proposed class of over 1,000 current and former employees of Charter One, which operated over 100 banks in Illinois, alleged that the bank maintained an unofficial policy of denying overtime pay to its employees. The class asserted violations of the Fair Labor Standards Act and the Illinois Minimum Wage Law. *Id.* at 902–03. The district court certified the class for trial. *Id.* at 903. In finding that the class had demonstrated commonality, the Seventh Circuit distinguished *Dukes* because *Ross* involved a central, if unofficial, policy of denying employees' overtime pay. "This unofficial policy is the common answer that potentially drives the resolution of this litigation." *Id.* (citing *Dukes*, 131 S. Ct. at 2551); *see also McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, — F.3d —, 2012 WL 592745, at *7–8 (7th Cir. 2012) (holding that commonality was satisfied by the questions of whether Merrill Lynch's companywide "teaming" and account-distribution policies violated Title VII's prohibition on disparate-impact employment discrimination and distinguishing these policies from the policy of conferring discretion on each store's manager at issue in *Dukes*).

This case is more similar to *Sullivan*, *Ross*, and *McReynolds* than to *Dukes*. The common factual question in this case is what actions Heartland took before, during, and after the data breach to safeguard the Consumer Plaintiffs' financial information. As in *Sullivan*, "the answers to questions about [Heartland]'s alleged misconduct and the harm it caused would be common as to all of the class members, and would thus inform the resolution of the litigation if it were not being settled." 667 F.3d at 299–300; *see also Ross*, 667 F.3d at 908 ("To satisfy the commonality element, it is enough for plaintiffs to present just one common claim."). Questions of law common to all class members include whether Heartland's actions violated the Fair Credit Reporting Act.[9] Answering

---

[9]Whether this claim, or any of the others, has any merit is not the question at this stage of the litigation. *See Sullivan*, 667 F.3d at 308 ("[T]he Rule 23 inquiry does not, and should not, involve a Rule 12(b)(6) inquiry.").

the factual and legal questions about Heartland's conduct will assist in reaching classwide resolution.  Commonality is satisfied under the *Dukes* standard.

### 3.     Typicality

This element of Rule 23(a) "requires that the named representatives' claims be typical of those of the class."  *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007). Typicality, according to the Fifth Circuit,

> does not require a complete identity of claims.  Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class.  If claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.

*James*, 254 F.3d at 571 (quoting 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.24[4] (3d ed. 2000)).

The representative plaintiffs' Fair Credit Reporting Act claim is typical of the class claim. Whether Heartland's conduct violated the Act is common throughout the class.  Because this claim revolves around Heartland's conduct, as opposed to the characteristics of a particular class member's claim, no individualized proof will be necessary to determine Heartland's liability under the Act.

The state-law claims also meet the typicality requirement.  Although the parties did not present information about the applicable laws of the fifty states and the District of Columbia, presumably variations exist among them.  District courts are divided as to when variations in state law in a multistate class action defeat typicality.[10]  In *Stirman*, the Fifth Circuit held that significant

---

[10] *Compare, e.g., In re Panacryl Sutures Prods. Liab. Cases*, 263 F.R.D. 312, 322 (E.D.N.C. 2009) (concluding that typicality was not satisfied when the "Plaintiffs have not shown that the prospective class representatives' claims will take into account the substantive laws [of multiple states] governing every class members"); *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 460 (E.D. La. 2006) ("The applicability of multiple substantive laws also precludes a finding of typicality."); *with, e.g., Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 18–19 (D. Mass. 2010) (finding typicality despite variations in state law because the state-law claims "are recognized in some form in all jurisdictions and therefore available for all [class members]"); *Chemi v. Champion Mortg.*, No. 2:05-cv-l238 (WHW), 2009 WL 1470429, at *7

variations in state law may preclude a finding of typicality. "Given the differences among the state laws, it cannot be said that [the class representative]'s claims are 'typical' of the [multistate] class as it is currently defined[.]" 280 F.3d at 562. The variations in *Stirman* were similar to those in *Sullivan*: certain states did not recognize the claim that the class representatives asserted. *See id.* Such claim-dispositive variations are readily distinguishable from such differences as dissimilarities in specific claim elements that must be proven at trial, or differences in burdens of proof. As in *Overka*, the state-law claims that the Consumer Plaintiffs assert in this case—negligence, breach of contract, and violations of state consumer-protection laws—"are recognized in some form in all jurisdictions and therefore available for all [class members.]" 265 F.R.D. at 18–19. Despite possible state-by-state variations in the elements of these claims, they arise from a single course of conduct by Heartland and a single set of legal theories. *James*, 254 F.3d at 571; *see also Norwood v. Raytheon Co.*, 237 F.R.D. 581, 588 (W.D. Tex. 2006) (finding typicality met because "general causation and general negligence do not depend on the nature of individual class members' claims").

The typicality requirement of Rule 23(a) is satisfied.

### 4. Adequate Representation

"To meet Rule 23 requirements [for adequate representation], the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). Counsel must be both competent and zealous in representing class interests. *See, e.g.*, *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005). Class representatives "must satisfy the court that they, and not counsel, are directing the litigation. To do this, class representatives must show

---

(D.N.J. May 26, 2009) (similar).

themselves sufficiently informed about the litigation to manage the litigation effort." *Unger*, 401 F.3d at 321. Finally, "the Rule 23 adequacy inquiry also uncovers conflicts of interest between the named plaintiffs and the class they seek to represent." *Langbecker*, 476 F.3d at 314 (internal quotation marks omitted); *accord Amchem*, 521 U.S. at 625. "[I]ntraclass conflicts may negate adequacy under Rule 23(a)(4)." *Langbecker*, 476 F.3d at 315. According to the Third Circuit, adequacy of representation is the most important single factor in determining whether to certify a settlement class. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998) ("Indeed, the key to *Amchem* appears to be the careful inquiry into adequacy of representatives.").

The dual requirements of class counsel's competence and zeal are satisfied here. The three co-lead class counsel—Ben Barnow, Lance Harke, and Burton Finkelstein—each have extensive experience representing consumers, and other plaintiff classes, in class-action litigation. (*See* Docket Entry No. 9, Ex. A). Barnow and Finkelstein, in particular, also have experience representing consumer classes in similar data-breach cases. (*See id.*) The liaison counsel for the class, Harold Gold, also has significant experience serving as plaintiffs' counsel in class-action and multidistrict litigation. (*See id.*, Ex. B). Class counsel have been vigorous in representing the class, as demonstrated by their successful negotiation of a settlement with Heartland, which initially was reluctant to settle. (*See* Docket Entry No. 87, at 27–28).

Analyzing adequacy of the class representatives focuses on whether there are intraclass conflicts between the class representatives and those they seek to represent. *See Langbecker*, 476 F.3d at 314. A class representative must "possess the same interest and suffer the same injury as the class members." *Amchem,* 521 U.S. at 625–26 (internal quotation marks omitted). The class

representatives have the same interests, and assert the same type of injury, as the members they seek to represent. Neither Heartland nor any objector has raised any fundamental intraclass conflict, and the record discloses none. The definition of compensable "Losses" in the Agreement reduces differences in damages among class members and between the representatives and absent members.

Adequacy also implicates the class representatives' involvement in the litigation. In *Unger,* a securities class action, the Fifth Circuit stated that adequate representation requires the class representatives to "show themselves sufficiently informed about the litigation to manage the effort," given that they—not class counsel—must "direct[] the litigation." 401 F.3d at 321. The *Unger* court cited *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir. 2001), another securities class action. The Ninth Circuit has limited the so-called *Berger* requirement to securities cases. *See In re Cavanaugh*, 306 F.3d 726, 736–37 (9th Cir. 2002); *see also* 1 WILLIAM B. RUBENSTEIN ET AL., NEWBERG ON CLASS ACTIONS § 3.52 & n.15 (5th ed. 2011); 29A EDWARD K. ESPING ET AL., FEDERAL PROCEDURE, LAWYERS' EDITION § 70:374 (2012). The Fifth Circuit has not similarly limited *Berger*.[11] In another securities case, the Fifth Circuit interpreted *Berger* as "identif[ying] a generic standard for the adequacy requirement[.]" *Feder*, 429 F.3d at 129 (internal quotation marks omitted). The Eleventh Circuit agrees that this is a "generic standard." *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1254 n.3 (11th Cir. 2003).

Nonetheless, *Berger*'s "generic standard" has not been applied in the Fifth Circuit outside the securities context. Although some district courts in the circuit have extended it beyond the

---

[11] In *Berger*, the plaintiffs petitioned for rehearing, arguing that *Berger* had "created an additional, independent requirement for the adequacy standard for class certification under Federal Rule of Civil Procedure 23 by reading the provisions of the Private Securities Litigation Reform Act of 1995 ('PSLRA') into rule 23(a)(4)." *Berger v. Compaq Computer Corp.*, 279 F.3d 313, 313 (5th Cir. 2002) (per curiam). In denying the petition, the panel responded: "This we have not done, nor have we changed the law of this circuit for conducting a rule 23(a)(4) adequacy inquiry." *Id.*

securities cases, *see Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532 n.2 (N.D. Tex. 2005) (discussing the *Berger* requirement's applicability outside the securities context and citing cases), courts have not extended the *Berger* requirement to a negative-value consumer class action such as this case.[12] Courts outside this circuit do not demand *Berger*'s knowledge-and-direction requirement for consumer class actions such as this suit, instead focusing on the more traditional aspects of adequacy: ensuring no intraclass conflicts and class counsel's adequacy.[13] "Class counsel owe a fiduciary obligation of particular significance to their clients when the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf."

---

[12]*See generally* Jay Tidmarsh, *Rethinking Adequacy of Representation*, 87 TEX. L. REV. 1137, 1167–68 (2009) (defining negative-value suits).

There are recent district-court cases in the Fifth Circuit that have applied *Berger* outside of the securities context. *See Braud v. Transp. Servs. of Ill.*, Civ. A. Nos. 05-1898, 06-891, 05-1977, 05-5557, 2009 WL 2208524, at *10 (E.D. La. July 23, 2009) (environmental-torts class action); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, No. MDL 071873, 2008 WL 5423488, at *11 (E.D. La. Dec. 29, 2008) (mass-torts class action). None is a negative-value consumer class action.

[13]*See, e.g.*, *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 343–48 (3d Cir. 2010) (appeal of adequacy determination focusing on intraclass conflicts); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 36–37 & n.12 (1st Cir. 2009) (appeal focusing on class counsel's alleged conflict of interest); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 800–01 (3d Cir. 1995) (looking only to intraclass conflicts and adequacy of class counsel to determine whether adequacy requirement met); *In re M3 Power Razor Sys. Mktg. & Sales Practice Litig.*, 270 F.R.D. 45, 55 (D. Mass. 2010) (adequacy satisfied because no intraclass conflicts existed and class counsel could adequately represent the class). One treatise explains the basis for this approach in small-claim consumer cases:

> [I]n small claims cases [class representatives] have so little at stake that it would be irrational for them to take more than a tangential interest, while in all cases, including larger claim cases, class representatives generally lack the legal acumen to make key decisions about complex class action litigation, much less to monitor savvy class counsel. It has long been understood that class counsel control class actions, perhaps even selecting the class representatives themselves, thereby reversing, not inscribing, the standard attorney/client relationship. Put simply, class action attorneys are the real principals and the class representative/clients their agents.

1 RUBENSTEIN ET AL., NEWBERG ON CLASS ACTIONS § 3.52 (internal footnotes omitted).

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (Posner, J.); *see also generally In re Cmty. Bank of N. Va.*, 622 F.3d 275, 292 (3d Cir. 2010); *Pelt v. Utah*, 539 F.3d 1271, 1288 (10th Cir. 2008).

As is true in many consumer-class actions comprised of negative-value individual claims, no single class member here has a sufficient stake to be closely involved in the litigation. *See Creative Montessori*, 662 F.3d at 917. Given the minimal individual stakes, Heartland's general denial of wrongdoing, and the complexities of crafting a class-action settlement, individual class members cannot plausibly be expected to have significant involvement. Far more important to the determination of adequacy than the submission of perfunctory declarations or brief deposition testimony are whether class counsel can adequately represent the class (yes), and whether any intraclass conflicts make the class representatives inadequate representatives of the class (no). Given the nature of this case, the record as to class counsel, and the absence of intraclass conflicts, there is no basis to find inadequate representation merely because the Consumer Plaintiffs have not submitted evidence on the class representatives' involvement in the litigation and the settlement.

## B.      Rule 23(b)(3)

In addition to satisfying the Rule 23(a) requirements, "[t]he proposed class must also satisfy the requirements of Rule 23(b)(1), (2), or (3)." *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010). Under (b)(3), the Consumer Plaintiffs must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### 1.      Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *cf.* AGGREGATE LITIGATION § 3.06 cmt. a ("So long as there is sufficient commonality to establish that the class is generally cohesive, the propriety of a settlement need not depend on satisfaction of a 'predominance' requirement."). The Fifth Circuit recently compared this inquiry to the commonality question:

> The question of predominance is more demanding than the Rule 23(a) requirement of commonality. It requires the court to assess how the matter will be tried on the merits, which entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.

*Wilborn*, 609 F.3d at 755 (internal quotation marks, footnotes, and citation omitted).

A threshold issue is whether variations in state law "swamp any common issues and defeat predominance." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (internal quotation marks omitted). A district court's "[f]ailure to engage in an analysis of state law variations is grounds for decertification." *Id.*; *cf. Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ("Variations in state law do not necessarily preclude a 23(b)(3) action, but class counsel should be prepared to demonstrate the commonality of substantive law applicable to all class members." (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–23 (1985))). "[V]ariations in state law do not necessarily defeat predominance[.]" *Sullivan*, 667 F.3d at 297. In *Sullivan*, the question before the en banc Third Circuit was whether variations in state law that kept class members in certain states from recovering on the class claims defeated predominance. The original panel held that the case could not be certified for settlement because such variations in the applicable law meant that the claim did "not give rise to a legal right to recovery in all of the jurisdictions implicated by a nationwide class." *Sullivan v. DB Invs., Inc.*, 613 F.3d 134, 151 (3d Cir. 2010). On rehearing, the

20

en banc court explained that predominance was nonetheless satisfied. The fact that the *Sullivan* class was certified for settlement, rather than litigation, was "a particularly important point[.]" 667 F.3d at 303. The en banc majority found that those objecting to the predominance conclusion "seem to conflate the predicate predominance analysis for certification of a settlement class with that required for certification of a litigation class, relying exclusively upon cases implicating the manageability obstacles inherent in class litigation." *Id.*

One of the cases cited was the Fifth Circuit's decision in *Cole*, a nationwide class action arising from General Motors's voluntary recall of certain models due to airbag defects. Three affected owners sued the auto manufacturer for breach of express and implied warranties and sought to represent everyone in the nation who owned a recalled model. 484 F.3d at 718–20. General Motors argued that the state-law variations on reliance and recovery for a latent defect defeated predominance. *Id.* at 725. The Fifth Circuit agreed that the class could not be certified for the purpose of litigation:

> [M]any of the variations in state law raise the potential for the application of multiple and diverse legal standards and a related need for multiple jury instructions. For some issues, variations in state law also multiply the individualized factual determinations that the court would be required to undertake in individualized hearings.

*Id.* at 726. The Fifth Circuit decertified the class. The en banc court in *Sullivan* emphasized that because the certification was for settlement only, unlike in *Cole*, "the concern for manageability that is a central tenet of a litigation class is removed from the equation." 667 F.3d at 302. The *Sullivan* court continued:

> Because we are presented with a settlement class certification, "we are not as concerned with formulating some prediction as to how [variances in state law] would play out at trial, for the proposal is that there be no trial." *Ins. Broker.*, 579 F.3d at 269 (internal citations &

> quotations omitted). . . . Accordingly, . . . state law variations are
> largely "irrelevant to certification of a settlement class," *Warfarin*,
> 391 F.3d at 529.

*Id.* at 303–04 (internal footnotes omitted).  The court conceded that there may be some cases in which "variations in state laws are so significant so as to defeat commonality and predominance even in a settlement class action[.]" *Id.* at 304 n.30 (internal quotation marks omitted).  But when "the several common questions of law or fact aris[e] from a single central issue—namely, De Beers's alleged anticompetitive conduct and the resulting injury caused to each class member"—common issues clearly predominated over individual issues.  *Id.* (internal quotation marks omitted).

The present case is more like *Sullivan* than *Cole*, but the certification issue is much easier here than it was in *Sullivan*.  Like *Sullivan*, this class is certified for settlement.  Unlike *Sullivan*, in which numerous members objected, this proposed settlement drew only one objector.  Also unlike *Sullivan*, any state-law variations here do not approach the level of precluding the ability of class members in certain states even to state a claim.  Instead, any variations that might be present are well within the range of those affecting only trial manageability.  When "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems"—such as the need to present differing proof state-by-state or for the court to formulate differing jury instructions state-by-state—"for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

As in *Sullivan*, this case presents several common questions of law and fact arising from a central issue: Heartland's conduct before, during, and following the data breach, and the resulting injury to each class member from that conduct.  Given the settlement posture of this case and the

22

Fair Credit Reporting Act claim, the common questions predominate over individual issues.

### 2.    Superiority

Superiority examines whether a class action is a better vehicle for resolving a case than other possible methods, such as individual litigation or consolidation.  The Rule lists four nonexhaustive factors relevant to superiority:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).  Under *Amchem*, this fourth factor may be disregarded in a proposed settlement-only class.  521 U.S. at 620.

The predominance and superiority inquiries are closely related.  *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1184 (11th Cir. 2010).  "The most compelling rationale for finding superiority in a class action" is "the existence of a negative value suit[.]"  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).  The finding that common issues of law and fact predominate over individual issues, and the fact that this suit is a consumer class action comprised of negative-value suits, are important.  Superiority is satisfied.

### C.    Conclusion as to Rule 23 Requirements

The proposed class meets the Rule 23 requirements for certification as a settlement-only class action.  The motion for class certification, for the purpose of settlement, is granted.

## III.    Settlement Review

23

Federal Rule of Civil Procedure 23(e) requires court approval of a class settlement and establishes certain procedures:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
>
> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

FED. R. CIV. P. 23(e). The court addresses each of these five requirements, with the (e)(2) fairness requirement discussed last.

## A.    Notice

"There are no rigid rules to determine whether a settlement notice satisfies constitutional or Rule 23(e) requirements[.]" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005). Instead, "a settlement notice need only satisfy the broad reasonableness standards imposed by due process." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) (internal quotation marks omitted). Due process is satisfied if the notice provides class members with the "information reasonably necessary for them to make a decision whether to object to the settlement." *Id.*; *see also Wal-Mart Stores*, 396 F.3d at 114 (explaining that "the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the

24

options that are open to them in connection with the proceedings" (internal quotation marks omitted)); AGGREGATE LITIGATION § 3.04(a) ("The purpose of a notice of a proposed class settlement is to set forth the major contours of the proposal and to inform class members of their right to attend the fairness hearing and to lodge written objections by a prescribed date should they so desire.").

In moving for preliminary approval of the settlement, the Consumer Plaintiffs submitted proposed summary and detailed notices. (Docket Entry No. 76, Ex. 4). They also submitted the affidavit of Cameron Azari, the Director of Noticing for Hilsoft Notifications, a company that specializes in class-action notices with extensive experience in court-directed notice plans, (Docket Entry No. 76, Azari Aff.); Hilsoft's curriculum vitae, (Docket Entry No. 76, Ex. 1); Hilsoft's summary of the notice plan, (Docket Entry No. 76, Ex. 2); and a list of newspapers in which the notice would appear, (*id.*, Attach. B). After a preliminary fairness hearing, (Docket Entry No. 82), the court approved the proposed notice and notice plan as "the best notice practicable under the circumstances[.]" (Docket Entry No. 85, ¶ 12). Individual notice could not be provided through reasonable efforts. Heartland did not have the names and addresses of those affected by the data breach and could not reasonably request this information for 130 million accounts from the issuer banks. (Docket Entry No. 87, at 31–32). Consistent with prevailing standards, the court ordered the "Summary Notice" form to reach a minimum of 80 percent of the proposed class. (Docket Entry No. 85, ¶ 11).

The notice that has been given clearly complies with Rule 23(e)(1)'s reasonableness requirement. The plan proposed by Hilsoft Notifications, (*see* Docket Entry No. 76, Ex. 2), included summary notices placed in the two most popular Sunday newspaper supplements, *Parade* and *USA*

*Weekend*, as well as in four popular national magazines; Internet advertisements on *24/7 Real Media*, *Yahoo.com*, and *MSN.com*; and a press release submitted to nearly 4,500 major U.S. press outlets. (*Id.*, at 6).[14] Each of these published notices directed potential class members to "an easy to remember domain name (www.hpscardholdersettlement.com) where Settlement Class Members can obtain information and documents about the settlement, including the Detailed Notice, Claim Forms, and Settlement Agreement, as well as other documents and information deemed necessary." (*Id.*). Hilsoft Notifications analyzed the notice plan after its implementation and conservatively estimated that notice reached 81.4 percent of the class members. (Docket Entry No. 106, ¶ 32).

Both the summary notice and the detailed notice provided the information reasonably necessary for the presumptive class members to determine whether to object to the proposed settlement. *See Katrina Canal Breaches*, 628 F.3d at 197. Both the summary notice and the detailed notice "were written in easy-to-understand plain English." *In re Black Farmers Discrimination Litig.*, — F. Supp. 2d —, 2011 WL 5117058, at *23 (D.D.C. 2011); *accord* AGGREGATE LITIGATION § 3.04(c).[15] The notice provided "satisf[ies] the broad reasonableness standards imposed by due

---

[14]*See Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (Posner, J.) (explaining that, "[w]hen individual notice is infeasible, notice by publication in a newspaper of national circulation (here *USA Weekend*, a magazine that is included in hundreds of Sunday newspapers) is an acceptable substitute," but also noting that, in this age of digital communications, newspaper notice should be supplemented by Internet notice).

[15]The summary notice defined the class; explained what constituted "qualifying losses" and "identity-theft-related charges"; explained how to make a valid claim for such losses and charges; explained the recovery limits for such losses and charges; disclosed the requests for attorneys' fees and incentive awards; discussed when a hearing on approving the settlement would be, in which any class member could speak; and directed class members to the website (or to a toll-free phone number) where they could obtain or request further information about the settlement, including how to opt out or object. *See* AGGREGATE LITIGATION § 3.04(c). The detailed notice provided the same categories of information in a way that was more specific but still understandable. The detailed notice was subdivided and formatted to make it easy for a class member to get more information on a desired topic. The sections are: Basic Information, Who Is in the Settlement, The Settlement Benefits—What You Get If You Qualify, How to Get Benefits—Submitting a Claim Form If You Qualify, Excluding Yourself from the Settlement, The Lawyers Representing You, Objecting to the Settlement, The Court's Fairness Hearing, If You Do Nothing, and Getting More Information. (Docket Entry No. 76, Ex. 2, Attach. A).

process" and Rule 23. *Katrina Canal Breaches*, 628 F.3d at 197 (internal quotation marks omitted).

### B.    Side Agreements

Rule 23(e) requires "[t]he parties seeking approval [to] file a statement identifying any Agreement made in connection with the proposal." FED. R. CIV. P. 23(e)(3). This requirement does not concern disclosure of the basic settlement terms; "[i]t aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." *Id.* Committee Notes (2003). "The spirit of [formerly numbered] Rule 23(e)(2) is to compel identification of any agreement or understanding," written or oral, "that might have affected the interests of class members by altering what they may be receiving or foregoing." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.631 (2004) ["MANUAL"].

Aside from the general settlement terms, Heartland has agreed to pay class counsel up to $725,000 and $35,000 in attorneys' fees and costs, respectively; and to pay $200 and $100 to each representative plaintiff and named plaintiff, respectively, in incentive awards. (Docket Entry No. 57, ¶¶ 7.2–.3). The parties have stated that they did not discuss the specific amounts of attorneys' fees and costs and incentive awards "until after the substantive terms of the settlement had been agreed upon, other than that Heartland would pay" such reasonable fees, costs, and awards. (*Id.*, ¶ 7.1). All the amounts are subject to court review and approval. (*See id.*, ¶¶ 7.1–.3).

### C.    An Additional Opt-Out Opportunity

A certifying court may refuse to approve a settlement unless it provides an additional opportunity for class members to opt out. *See* FED. R. CIV. P. 23(e)(4); *Tardiff v. Knox Cnty.*, 567 F. Supp. 2d 201, 209 (D. Me. 2008). The 2003 amendments to the Federal Rules explain:

> Rule 23(e)(3) [now (e)(4)] authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

FED. R. CIV. P. 23(e)(4) Committee Notes (2003). Rule 23(e)(4) comes into play when the opt-out opportunity expired before the members received notice of a proposed settlement. It is inapplicable here.

### D.　Objections

Class members must be provided an opportunity to object to the proposed settlement. FED. R. CIV. P. 23(e)(5). The order preliminarily approving the settlement outlined the process for objecting. (Docket Entry No. 85, ¶ 19). Both the summary notice and detailed notice informed class members of their right to object. (Docket Entry No. 76, Ex. 2). Only one person objected. It appears that he believes that the settlement is unfair to Heartland because the breach actually did not harm most of the class members. (Docket Entry No. 100). The fact that only one objection was filed is itself significant.

### E.　Fair, Reasonable, and Adequate

Finally, "the court may approve [the proposed settlement] only after a hearing and on finding that it is fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). This court held a final fairness hearing on December 13, 2010. (Docket Entry No. 110). The lone objector informed the court that he did not intend to appear. (Docket Entry No. 100, at 2).

The Fifth Circuit lists six factors that a district court must consider in determining the fairness, reasonableness, and adequacy of a proposed settlement:

> (1) evidence that the settlement was obtained by fraud or collusion;
> (2) the complexity, expense, and likely duration of the litigation; (3)
> the stage of the litigation and available discovery; (4) the probability
> of plaintiffs' prevailing on the merits; (5) the range of possible
> recovery and certainty of damages; and (6) the opinions of class
> counsel, class representatives, and absent class members.

*All Plaintiffs v. All Defendants*, 645 F.3d 329, 334 (5th Cir. 2011) (internal quotation marks omitted).[16]  These six factors are known as the "*Reed* factors," after *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).  *See id.* at 172.  "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'"  *Wal-Mart Stores*, 396 F.3d at 116 (quoting MANUAL FOR COMPLEX LITIGATION, THIRD § 30.42 (1995)); *accord Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 650 (N.D. Tex. 2010 ("When considering the *Reed* factors, the court should keep in mind the strong presumption in favor of finding a settlement fair." (internal quotation marks and alteration omitted)).  This presumption notwithstanding, the settlement proponents bear the burden of demonstrating the settlement's fairness.  *See Katrina Canal Breaches*, 628 F.3d at 196.

"A proposed settlement need not obtain the largest conceivable recovery for the class to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein*, 705 F. Supp. 2d at 649.  At the same time, "a proposed settlement in which the class receives an insubstantial payment while the fees requested by counsel are substantial could raise fairness concerns."  AGGREGATE LITIGATION § 3.05 cmt. b.

---

[16]Other circuits use similar multifactor tests in determining a proposed settlement's fairness. *See, e.g.*, *Sullivan*, 667 F.3d at 319–20 (nine-factor test); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (eight-factor test).

The *Reed* factors are examined below.

### 1.   Evidence of Fraud or Collusion

"The Court may presume that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary."  *Klein*, 705 F. Supp. 2d at 651 (quoting *Liger v. New Orleans Hornets NBA Ltd. P'ship*, Civ. A. No. 05-1969, 2009 WL 2856246, at *3 (E.D. La. Aug. 28, 2009)). There has been no suggestion of any fraud or collusion.  Nor does the record support such a finding. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007) ("[T]here are no allegations or indications of fraud or collusion.").   Counsel for Heartland has described the arm's-length negotiations that resulted in this settlement.  (*See* Docket Entry No. 87, at 22, 27–28; Docket Entry No. 111, at 6).   The initial negotiations occurred over approximately one-and-a-half months, resulting in a memorandum of understanding outlining the proposed settlement.  (Docket Entry No. 87, at 27–28).  Negotiations continued for another two months.  (Docket Entry No. 111, at 9).  Given these representations, the lack of evidence showing any fraud or collusion, and Heartland's initial position that it would not settle, this factor supports a finding that the settlement is fair, reasonable, and adequate.

"It is common practice today for class counsel to negotiate a specific fee award after they have successfully negotiated the class's recovery." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 844 (E.D. La. 2007) (citing cases).  "Because the parties have not agreed to an amount or even a range of attorneys' fees, there is no threat of the issue explicitly tainting the fairness of settlement bargaining." *Id.* at 845; *see also In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997) ("Further, testimony was presented that the matter of attorneys' fees was not negotiated in conjunction with the settlement agreements but left for separate determination by the Court.").

30

Here, as in *Turner*, the parties negotiated and agreed to the proposed settlement before reaching the issue of attorneys' fees. Their agreement on attorneys' fees is subject to court review and approval. This factor supports approval of the settlement.

### 2.      Complexity, Expense, and Duration of Litigation

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Klein*, 705 F. Supp. 2d at 651 (citing *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004)). Although this case was settled less than four months after this court ordered a master complaint filed, (Docket Entry No. 21), and before dispositive motions, Heartland repeatedly denied its liability and planned to file a motion to dismiss. Likely motions would have raised choice-of-law issues and required resolving somewhat novel questions of state law. Litigating this case to trial would be time consuming, and "[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years." *Rodriguez v. West Pub'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *see also Wal-Mart Stores*, 396 F.3d at 118. This second factor supports approving the settlement.

### 3.      The Stage of Litigation and the Available Discovery

Under the third *Reed* factor, the key issue is whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369. "A settlement can be approved under this factor even if the parties have not conducted much formal discovery." *Klein*, 705 F. Supp. 2d at 653 (citing, for example, *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977)); *see also Union Asset Mgmt. Holding A.G. v. Dell,*

31

*Inc.*, — F.3d —, 2012 WL 375249, at *3 (5th Cir. 2012) (agreeing with district court's conclusion that "formal discovery is not a prerequisite to approving a settlement as reasonable").  The "[s]ufficiency of information does not depend on the amount of formal discovery which has been taken because other sources of information may be available to show the settlement may be approved even when little or no formal discovery has been completed."  *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 459 (W.D. Tex. 1999).  "The Court should consider all information which has been available to all parties."  *DeHoyos*, 240 F.R.D. at 292.

The parties engaged in what Heartland's counsel termed "confirmatory discovery": Heartland shared with counsel for the Consumer Plaintiffs over 4,000 pages about the breach and allowed an interview of its Chief Technology Officer.  (Docket Entry No. 111, at 9–10).  Class counsel drew on their previous experience in similar data-breach class-action litigation.  (Docket Entry No. 87, at 44).  The parties have shown that they possessed sufficient information to gauge the strengths and weaknesses of the claims and defenses.  Class counsel were able to determine the settlement's adequacy in relation to the probability of success on the merits were this litigation to continue.  The court is well aware of the parties' positions in this case, the legal issues, and the risks to the Consumer Plaintiffs should litigation continue.  *See Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 344 (N.D. Tex. 2011).  This factor favors approval of the proposed settlement.

### 4.    The Probability of Success on the Merits

The probability of success on the merits is the most important *Reed* factor.  *Smith v. Crystian*, 91 F. App'x 952, 954 n.3 (5th Cir. 2004) (per curiam) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)); *accord, e.g., Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*,

636 F.3d 235, 245 (6th Cir. 2011).  "In evaluating the likelihood of success, the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial."  *DeHoyos*, 240 F.R.D. at 287 (citing *Reed*, 703 F.2d at 172); *see also Poplar Creek*, 636 F.3d at 245 ("The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." (internal quotation marks omitted)).  At the same time, a district court "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial."  *Reed*, 703 F.2d at 172 (internal quotation marks and alteration omitted).  This factor favors approval of the settlement when the class's likelihood of success on the merits is questionable. *See In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1326–27 (5th Cir. 1981) (affirming district court's finding that this factor favored approving the settlement when the class faced major obstacles in establishing proof of liability and damages); *DeHoyos*, 240 F.R.D. at 290 ("Because the laws of numerous states may be relevant to individual class member claims, plaintiffs would apparently face a further significant challenge to certifying the class outside the settlement context."); *Combustion*, 968 F. Supp. at 1128 ("On the other hand, Plaintiffs will have very serious legal and evidentiary hurdles to meet in order to get their case to the jury.").

In this case, it is uncertain whether the Consumer Plaintiffs could succeed at trial, let alone reach it.  Heartland's counsel explained that they were planning to move to dismiss or, failing that, for summary judgment when counsel for the Consumer Plaintiffs "dragged us, perhaps kicking and screaming, to a settlement[.]"  (Docket Entry No. 87, at 46).  Heartland's dispositive motions would have raised legal issues difficult for the Consumer Plaintiffs to overcome.  For example, the Consumer Plaintiffs assert a cause of action for breach of contract, but they were not parties to those

contracts.  These allegedly breached contracts were between Heartland and merchants whose goods and services the consumers bought using payment cards.  The Consumer Plaintiffs would have to show that they were third-party beneficiaries to those contracts.  *See generally Heartland II*, 2011 WL 6012598, at *5–8 (dismissing the Financial Institution Plaintiffs' similar breach-of-contract claim).  The Consumer Plaintiffs also allege negligence.  The Consumer Plaintiffs would have to establish that Heartland owed them a duty of care that it breached by failing to exercise reasonable care in protecting its data from a determined and sophisticated hacker.  Even assuming a duty of care, a factfinder could have determined that Heartland's security measures were reasonable, given current technology and industry standards.

A similar problem arises with respect to the Consumer Plaintiffs' Fair Credit Reporting Act claim.  One of the Act's requirements is that "[a]ny person who maintains or otherwise possesses consumer information for a business purpose must properly dispose of such information *by taking reasonable measures* to protect against unauthorized access to or use of the information in connection with its disposal."  16 C.F.R. § 682.3(a) (emphasis added).  This regulation provides examples of "reasonable measures," including "[i]mplementing and monitoring compliance with policies and procedures that protect against unauthorized or unintentional disposal of consumer information."  *Id.* § 682.3(b)(4).  A factfinder could conclude that Heartland had implemented reasonable policies and procedures to protect against data breaches.  In sum, the Consumer Plaintiffs face numerous legal obstacles in establishing liability on the merits of their claims.

Class certification for litigation also presented uncertainties.  The Consumer Plaintiffs asserted claims under the laws of the fifty states and the District of Columbia.  Absent settlement, the state-law variations would have to be analyzed carefully to be sure they did not make trial

34

unmanageable. This would present "a further significant challenge to certifying the class." *DeHoyos*, 240 F.R.D. at 290 (citing *Castano*, 84 F.3d at 741).

Against these risks are the concrete benefits that the proposed settlement provides the Consumer Plaintiffs. For those class members with valid claims—whether for fraudulent charges, identity theft, or lost time—this settlement allows them to recover without the risks or delays of continued litigation. The amounts likely will not be significantly less than the amounts they would recover were this case to proceed to trial. Because of the class's sheer size, a claims process similar to the one called for in the proposed settlement would be required. That process would result in class members with valid claims recovering either the same or slightly more than the amount they would get under the settlement. But the settlement provides an efficient and certain result that outweighs slightly higher recovery, accompanied by significant risks of no recovery whatsoever and a certainty of delay.[17] The proposed settlement's cy pres provision confers an indirect benefit on the vast majority of the class members—those who have suffered no personal damages from the data breach or who simply did not file any claim and thus would otherwise recover nothing. In sum, this factor strongly supports settlement approval.

### 5. The Range of Possible Recovery and Certainty of Damages

This factor requires the district court to "establish the range of possible damages that could be recovered at trial and, then, by evaluating the likelihood of prevailing at trial and other relevant

---

[17]*See, e.g.*, *Stott*, 277 F.R.D. at 345 (explaining that approval of the proposed settlement "would avoid those costs and difficulties" and risks associated with motions practice, trial, and appeal and that "approving the settlement at this stage would provide an immediate and automatic benefit to the class" (internal quotation marks omitted)); *Vaughn v. Am. Honda Motor Co.*, 627 F. Supp. 2d 738, 746 (E.D. Tex. 2007) ("Review of the circumstances in this case demonstrates that the monetary benefit and the extensions of the warranty and lease periods far outweigh the plaintiffs' uncertain prospects of success were the case fully litigated."); *In re Enron Corp. Securities, Derivative & "ERISA" Litig.* ("*Enron I*"), 228 F.R.D. 541, 566 (S.D. Tex. 2005) ("The settlement at this point would save great expense and would give the Plaintiffs hard cash, a bird in the hand.").

factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir. 1983) (internal quotation marks omitted) (quoting *Corrugated Container*, 643 F.2d at 213). The district court's consideration of this factor "can take into account the challenges to recovery at trial that could preclude the class from collecting altogether, or from only obtaining a small amount." *Klein*, 705 F. Supp. 2d at 656. The question is not whether the parties have reached "exactly the remedy they would have asked the Court to enter absent the settlement," but instead "whether the settlement's terms fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits." *Id.* (internal quotation marks omitted).

A district court's failure or inability to establish the range of possible recovery is not necessarily error. In *Maher*, the parties did not "provide the court with an express estimate of the range of monetary recovery should plaintiffs prevail at trial." 714 F.2d at 460. Instead, the parties "provided the district court with their arguments and positions respecting the merits of the claims being asserted and compromised, the risks of litigation, and the benefits of the compromise." *Id.* Under such circumstances, and given the district court's otherwise "sufficient" analysis of the proposed settlement's fairness, the Fifth Circuit refused to overturn the settlement because the district court had not given an estimate. *Id.* at 461; *accord San Antonio Hispanic Police Officers' Org.*, 188 F.R.D. at 460.

In this case, estimating the range of possible recovery—in particular, the upper band of recovery—is difficult. As the analysis of the fourth *Reed* factor (probability of success on the merits) demonstrates, the lower band of the Consumer Plaintiffs' range of recovery is zero: a nationwide or multistate class perhaps could not be certified under Rule 23, or a judge or jury could

36

conclude that Heartland was not liable.  Although neither the Consumer Plaintiffs nor Heartland

provided this court with an estimate of the maximum amount of class recovery, the upper band is

likely to be far less than what the proposed settlement provides.  As of the final fairness hearing,

fewer than 300 class members had filed a claim.  Only 11 were valid.  (Docket Entry No. 111, at 6).

Given that the Consumer Plaintiffs' claims require each class member to prove individual damages,

even if a trial resulted in a liability finding, the damages exposure is not properly measured by taking

some number and multiplying it by the number of class members because there were so few claims

filed, even after the extensive notice campaign.

     The cy pres provision is essentially the damage award.  Because no cy pres payments are to

be made until class members had ample opportunity to file claims, the cy pres provision did not

divert funds that class members otherwise were entitled to recover.  The cy pres provision will

indirectly benefit not just the class members, but all payment-card holders.  *See DeHoyos*, 240

F.R.D. at 290 ("The undisputed record reveals the settlement will not only provide significant

benefits to members of the plaintiffs' class, but to policyholders throughout the country as well.").[18]

Based on the very small number of claims filed after an extensive settlement notice campaign, the

---

[18]The American Law Institute's *Principles of Aggregate Litigation* summarizes the law on cy pres provisions:

> [M]any courts allow a settlement that directs funds to a third party when funds are
> left over after all individual claims have been satisfied.  Subject to a narrow
> exception in subsection (c), this Section approves of that type of cy pres only when
> it is not feasible to make further distributions to class members and the third party's
> interests approximate those of the class members.

AGGREGATE LITIGATION § 3.07 cmt. a.  Subsection (c) states that the court should consider "the criteria set forth in subsections (a) and (b)."  *Id.* § 3.07(c).  One criteria listed in subsection (b) that the court can consider is whether "other specific reasons exist that would make such further distributions [to participating class members] impossible or unfair."  *Id.* § 3.07(b).  In this case, it clearly is impractical to distribute the $1 million to absent class members not filing claims.  It also is clearly inappropriate to divide $1 million equally among the very few class members—as few as 11—who have filed valid claims.  That would provide them a huge windfall.  Allowing those class members with valid claims to receive the amount of their valid claim and then spreading any remaining unclaimed funds between the three nonprofit organizations that focus on improving payment-card security seems a reasonable, and fair, approach.

upper band of recovery after trial likely would be much smaller, and almost certainly no higher, than

the upper amount offered in the settlement.  This factor favors approving the settlement.

### 6.   The Opinions of Class Counsel, Class Representatives, and Absent Class Members about the Settlement

"The endorsement of class counsel is entitled to deference, especially in light of class

counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate

the merits of the claims." *DeHoyos*, 240 F.R.D. at 292; *see also Stott*, 277 F.R.D. at 346 ("As class

counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement,

'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.'" (quoting

*Cotton*, 559 F.2d at 1330)).  But a court should not blindly defer to class counsel's opinion.  "Rather,

the Court must give class counsel's recommendations appropriate weight in light of all the factors

surrounding the settlement." *Turner*, 472 F. Supp. 2d at 852.

Class counsel have enthusiastically endorsed the settlement.  One of the co-lead class counsel

has called the settlement "excellent" because "it maximizes what could have been obtained for the

consumers, and it delivers a real remedy."  (Docket Entry No. 111, at 42).  Class counsel are

experienced not just in class-action litigation generally but in data-breach class-action litigation

specifically.  Their opinion is consistent with the results of analyzing the proposed settlement's

fairness under the other *Reed* factors.

Class counsel have not provided separate evidence on the opinions of the class

representatives or members, but of the millions of absent class members, only one has objected.

"Receipt of few or no objections 'can be viewed as indicative of the adequacy of the settlement.'"

*Enron I*, 228 F.R.D. at 567 (quoting 4 HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 1141

(4th ed. 2002)); *accord, e.g.*, *Sullivan*, 667 F.3d at 321.  This is particularly true when there has been

an energetic notice campaign.  *DeHoyos*, 240 F.R.D. at 293 (citing cases).  Heartland does not

dispute the estimate that approximately 81% of the class received notice of the proposed settlement.

(*See* Docket Entry No. 106, ¶ 6(a)).  Only one class member objected and did so not on the basis that

the settlement is unfair to the class members, but instead on the basis that the settlement is unfair

to Heartland because the data breach did not cause consumers harm.  (Docket Entry No. 100).  This

last *Reed* factor also favors approving the proposed settlement.

### 7. Result of the Reed Analysis

All six *Reed* factors favor approving the proposed settlement.  The court concludes that the

proposed settlement is fair, reasonable, and adequate under Rule 23(e).  The terms are approved.

## IV. Attorneys' Fees, Costs, and Incentive Payments

Rule 23(h) authorizes a district court to "award reasonable attorney's fees and nontaxable

costs that are authorized by law or by the parties' agreement."  FED. R. CIV. P. 23(h).  Courts,

including in the Fifth Circuit, "have encouraged litigants to resolve fee issues by agreement, if

possible."  *DeHoyos*, 240 F.R.D. at 322 (citing cases, including *Johnson v. Ga. Highway Express,*

*Inc.*, 488 F.2d 714, 720 (5th Cir. 1974)).  But "a district court is not bound by the agreement of the

parties as to the amount of attorneys' fees."  *Strong v. Bellsouth Telecomms., Inc.*, 137 F.3d 844, 849

(5th Cir. 1998) (internal quotation marks omitted).  A court must carefully review a proposed fee

award to ensure reasonableness.  *See id.*  Such scrutiny is necessary to "guard[] against the public

perception that attorneys exploit the class action device to obtain large fees at the expense of the

class."  *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008)

(internal quotation marks omitted).

One district court in this circuit has suggested that a presumption of reasonableness applies

39

when a requested fee award is independent from the class-recovery fund and the parties did not negotiate the fee until after they agreed on other terms. *See DeHoyos*, 240 F.R.D. at 322–23. For this proposition, *DeHoyos* cited two cases: *McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006), and *In re First Capital Holdings Corp. Fin. Prods. Securities Litig.*, MDL No. 901, 1992 WL 226321, at *4 (C.D. Cal. June 10, 1992). No Fifth Circuit case, however, supports a presumption of reasonableness for a fee award, even if the award was agreed to after the settlement terms were negotiated and is to be paid separate from the class recovery. In *Strong v. Bellsouth Telecommunications*, the Fifth Circuit expressly rejected class counsel's contention "that the district court's responsibility to address attorneys' fees is circumscribed when the parties agree to the amount of fees[.]" 137 F.3d at 849. BellSouth had agreed to a settlement in which it would deposit up to $64 million into a common fund and agreed to pay $6 million to class counsel for fees and costs. The district court, however, awarded $4.5 million in fees. *Id.* at 847–48. On appeal, the Fifth Circuit stated that

> a "district court is not bound by the Agreement of the parties as to the amount of attorney' fees." *Piambino*, 610 F.2d at 1328; *Foster v. Boise-Cascade, Inc.*, 577 F.2d 335, 336 (5th Cir. 1978). The court must scrutinize the agreed-to fees under the standards set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), and not merely "ratify a pre-arranged compact." *Piambino*, 610 F.2d at 1328 (holding that by summarily approving attorneys' fees presented in an unopposed settlement agreement, the district court "abdicated its responsibility to assess the reasonableness of the attorneys' fees proposed under a settlement of a class action, and its approval of the settlement must be reversed on this ground alone").
>
> That the defendant will pay the attorneys' fees from its own funds likewise does not limit the court's obligation to review the reasonableness of the agreed-to fees. Restricting the court's discretion to a perfunctory review in such a circumstance would disregard the economic reality that a settling defendant is concerned only with its total liability. *See In re GM Trucks*, 55 F.3d at 819–20

40

(requiring "a thorough judicial review of fee applications . . . in all class action settlements" because "'a defendant is interested only in disposing of the total claim asserted against it'" and "'the allocation between the class payment and the attorneys' fees is of little or no interest to the defense'") (quoting *Prandini v. National Tea Co.*, 557 F.2d 1015, 1020 (3d Cir. 1977)). Because the defendant's adversarial role with regard to the attorneys' fees is thus diminished, the court must strive to minimize the conflict of interest between the class and its attorney inherent in such an arrangement. *See Foster*, 420 F. Supp. at 687–88; *see also Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991) (explaining that when fees are paid from the defendant's own funds, a conflict results from "the danger that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees"); *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 266 (1985) ("Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations. And, in any event, there is an appearance of a conflict of interest.")

The court's review of the attorneys' fees component of a settlement agreement is thus an essential part of its role as guardian of the interests of class members. To properly fulfill its Rule 23(e) duty, the district court must not cursorily approve the attorney's fees provision of a class settlement or delegate that duty to the parties. Even when the district court finds the settlement agreement to be untainted by collusion, fraud, and other irregularities, the court must thoroughly review the attorneys' fees agreed to by the parties in the proposed settlement agreement.

*Id.* at 849–50.

In this case, class counsel have moved for $725,000 in fees and $35,000 in costs. (Docket Entry No. 107, ¶ 6). Heartland agreed to pay up to these amounts. (Docket Entry No. 57, ¶ 7.2). Class counsel has explained that they arrived at these amounts using a lodestar analysis, cross-checked by the *Johnson* factors. (Docket Entry No. 107, ¶ 6). According to the most recent fees-and-costs reports, class counsel billed over 1,960 hours on this case. Multiplied by the various hourly rates charged by class counsel, their lodestar fees exceeded $866,000 and actual costs totaled

over $43,000.  (Docket Entry No. 113, Ex. 2).  The requested award of $725,000 results from a 0.837 negative multiplier.  (Docket Entry No. 108, at 20).[19]  Class counsel's analysis of the *Johnson* factors, however, is inconsistent with any negative adjustment.  In any event, class counsel's fee request assumes that the value of the settlement to the Consumer Plaintiffs exceeds $4.85 million. (Docket Entry No. 107, ¶ 5).  The value was discussed at length during the final fairness hearing. (*See generally* Docket Entry No. 111).

With this background, this court carefully reviews the proposed fee award for reasonableness.

### A.    Methodology

In common-fund cases—in which class counsel is compensated from the general fund used to pay class members' damages and claims[20]—district courts generally award attorneys' fees using one of two methods:

> (1) the percentage method, in which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, in which the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in its discretion, applying an upward or downward multiplier.

---

[19]The court has slightly modified class counsel's calculation to account for the most recent fees-and-costs report, which postdated its motion for a fee award and supporting memorandum by one month.

[20]*See, e.g.*, *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 86 (2d Cir. 2010) ("It is well established that the common fund doctrine permits attorneys whose work created a common fund for the benefit of a group of plaintiffs to receive reasonable attorneys' fees from the fund."); *In re Cendant Corp. Securities Litig.* ("*Cendant II*"), 404 F.3d 173, 187 (3d Cir. 2005) ("The [common-fund] doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." (internal quotation marks omitted)); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043, 2051 (2010) ("In most cases, [class counsel's] fee awards came from proceeds that would otherwise go to class members.  These cases are often called 'common fund' cases, and class counsel are compensated from the fund on the theory that it would be unjust to enrich the class without also rewarding the counsel that created the class's enrichment.").  As with any fee award under Rule 23(h), class counsel must petition the court to receive a fee award directly from that fund.

*Dell*, 2012 WL 375249, at *6.  Under the lodestar method as applied in this circuit, the upward or downward adjustment is based on the court's review of the factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d at 717–19.  The twelve *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Dell*, 2012 WL 375249, at *6 n.25.  "The *Johnson* factors are intended to ensure 'a reasonable fee.'" *Id.* (quoting *Johnson*).[21]  In *Dell*, the Fifth Circuit confirmed that district courts have discretion to determine the proper fee award in common-fund cases by using either the percentage or lodestar methods, cross-checked with the *Johnson* factors.  *Id.* at *6.

Having two funds—one for the claimants, one for the attorneys—is a well-recognized variant of a common-fund arrangement.  "A variant on the traditional common-fund case occurs frequently in mass tort litigation—in both class actions and large consolidations—where a separate fund to pay attorney fees is created as a part of the settlement."  MANUAL § 14.11.  Such an arrangement is

---

[21]The *Johnson* multifactor test and its variations in other circuits, *see, e.g.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (six factors), have been criticized as "highly indeterminate." Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, *supra*, at 2046.  The Tenth Circuit reads the Supreme Court's recent decision in *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662 (2010), as "appear[ing] to significantly marginalize the twelve-factor *Johnson* analysis, which it discount[ed] as just '[o]ne possible method' that 'gave very little actual guidance' and, due to its 'series of sometimes subjective factors[,] . . . produced disparate results.'" *Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.*, 616 F.3d 1098, 1104 (10th Cir. 2010) (quoting *Perdue*, 130 S. Ct. at 1671–72).  Notwithstanding these criticisms, however, this court is bound by Fifth Circuit precedent to apply the twelve *Johnson* factors, whether the lodestar or percentage method is employed.  *See Dell*, 2012 WL 375249, at *6.

sometimes called a "constructive common fund."[22]  "Several courts have embraced the constructive

common fund approach, warning that 'private arrangements to structure artificially separate fee and

settlement arrangements' should not enable parties to circumvent the 25% benchmark requirement

on 'what is in economic reality a common fund situation.'"  *Bluetooth Headset*, 654 F.3d at 943

(quoting *In re Gen. Motors*, 55 F.3d at 821).  Courts recognize this approach even if they do not use

the common-fund label.  For example, in *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246

(8th Cir. 1996), the Eighth Circuit stated:

> The district court concluded that because the attorney fees were to be
> paid by the defendants separate and apart from the settlement funds,
> the fees did not come from a "common fund" belonging to the
> plaintiffs, and thus the percentage of the benefit approach was
> inappropriate.  We disagree.  Although under the terms of each
> settlement agreement, attorney fees technically derive from the
> defendant rather than out of the class' recovery, in essence the entire
> settlement amount comes from the same source.  The award to the
> class and the agreement on attorney fees represent a package deal.
> Even if the fees are paid directly to the attorneys, those fees are still
> best viewed as an aspect of the class' recovery.

*Johnston*, 83 F.3d at 245–46 (citing *In re Gen. Motors*).[23]  "If an agreement is reached on the amount

of a settlement fund and a separate amount for attorney fees and expenses, . . . . the sum of the two

amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the

agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel."

---

[22]*See, e.g.*, *Bluetooth Headset*, 654 F.3d at 943; *Gen. Motors*, 55 F.3d at 820; *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 77 (D.D.C. 2011); *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 382 n.2 (S.D.N.Y. 2005); Tiana S. Mykkeltvedt, Note, *Common Benefit and Class Actions: Eliminating Artificial Barriers to Attorney Fee Awards*, 36 GA. L. REV. 1149, 1170 (2002).

[23]*See also* Brian Wolfman & Alan B. Morrison, *Representing the Unrepresented in Class Actions Seeking Monetary Relief*, 71 N.Y.U. L. REV. 439, 504 (1996) (noting that even when fees are negotiated after agreement is reached on payment to the class and that negotiation results in the defendant paying fees separately from the fund created for class recovery, the defendant "has made at least a mental calculation of the total amount to be paid and then simply allocated a portion to the class and the rest to the plaintiff's attorneys' fees," and similarly arguing in favor of viewing "direct payments of fees from the defendant to the plaintiffs' lawyers as payments into the common fund").

MANUAL § 21.7.[24]

Many courts and commentators have concluded that the best approach is to use the percentage method in a common-fund or variant case with the lodestar method as a cross-check. This approach is particularly appropriate when the value of the judgment or settlement is uncertain.[25] In this case, the percentage method, cross-checked by the lodestar method, is the appropriate method for scrutinizing the proposed attorneys' fees award under Rule 23(h). The fact that a minuscule amount of the settlement fund was actually distributed to class members, and the vast majority instead paid to three nonprofit organizations for efforts to improve data security and privacy protection, makes the value of the benefit the class received uncertain. That uncertainty makes it appropriate to use the lodestar method as a cross-check. Using the percentage method, cross-

---

[24] *See also Gen. Motors*, 55 F.3d at 820 (noting that "the potential for conflict between the class and its counsel is not limited to situations meeting the strict definitions of a common fund," and that courts must continue to ensure that the fees are reasonable, in part to avoid the risk that class counsel may agree to a class settlement "in exchange for red-carpet treatment for fees[.]") (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)).

[25] *See* AGGREGATE LITIGATION § 3.13(b); *see also Victor*, 623 F.3d at 88 (2d Cir.); *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006); *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003); *Physicians of Winter Haven LLC v. Steris Corp.*, No. 1:10 CV 264, 2012 WL 406966, at *3 (N.D. Ohio Feb. 6, 2012) (explaining that "the best approach would be to employ both the lodestar and percentage of the fund methodologies so as to cross-check the results obtained by each and thereby ensure a more accurate and well-reasoned award"); *Altier v. Worley Catastrophe Response, LLC*, Civ. A. Nos. 11-241, 11-242, 2012 WL 161824, at *21 (E.D. La. Jan. 18, 2012) (using percentage method to cross-check "the Fifth Circuit's apparently preferred lodestar method"); *In re Wachovia Corp. ERISA Litig.*, Civ. No. 3:09cv262, 2011 WL 5037183, at *3 (W.D.N.C. Oct. 24, 2011) ("Even where the percentage method is used, however, the lodestar calculation may still be applied as a 'cross-check' in the determination of a reasonable percentage." (citing MANUAL § 14.121)); Eisenberg & Miller I, *supra*, at 32 (explaining courts' adoption of cross-checking the percentage method against the lodestar method).

There are cases in which courts should use the lodestar method rather than the percentage-of-fund approach. The lodestar is most appropriate in cases with a statutory provision for fee-shifting. In *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662 (2010), "the Supreme Court recently extolled [the lodestar method's] virtues and reaffirmed its dominant role in federal fee-shifting cases." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 641 (7th Cir. 2011) (citing *Perdue*, 130 S. Ct. at 1672); *see also, e.g., Sullivan*, 667 F.3d at 330; *Bluetooth Headset*, 654 F.3d at 941; *Spooner v. EEN, Inc.*, 644 F.3d 62, 67 n.3 (1st Cir. 2011); AGGREGATE LITIGATION § 3.13(c). And if a court specifically concludes that the percentage method would be unfair or inapplicable based on the specific facts and circumstances, such as when the percentage method would significantly undercompensate class counsel, the lodestar method may be appropriate. *See Sullivan*, 667 F.3d at 330; *see also Jeter v. Astrue*, 622 F.3d 371, 378–79 (5th Cir. 2010) (recognizing, in the social-security context, that using the lodestar method may undercompensate counsel); AGGREGATE LITIGATION § 3.13(c).

checked by the lodestar method, reduces the risk that the amount of the fee award either overcompensates counsel in relation to the class benefits obtained or undercompensates counsel for their work.  Under either method, a fee award is reasonable only if it is proportionate to the actual value created for, and received by, the class.  *See* FED. R. CIV. P. 23(h) Committee Notes (2003) ("One fundamental focus is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members.").[26]

This approach is consistent with the statements in another federal district court's opinion in a similar case.  In *In re TJX Companies Retail Security Breach Litigation*, 584 F. Supp. 2d 395 (D. Mass. 2008), consumers filed a nationwide class action after the same hackers in this case breached TJX Companies's computer systems and obtained access to 45 million payment-card accounts' information.[27]  Some of the class counsel in that litigation were the same as the co-lead class counsel in this case.  The parties reached a settlement agreement, under which TJX Companies agreed to reimburse consumers for valid claims.  Although caps were placed on certain categories of claims,

---

[26]*See* MANUAL § 21.71 ("Compensating counsel for the actual benefits conferred on the class members is the basis for awarding attorney fees."); AGGREGATE LITIGATION § 3.13(a) ("Attorneys' fees in class actions, whether by litigated judgment or by settlement, should be based on both the actual value of the judgment or settlement to the class and the value of cy pres awards[.]"); *see also Keene v. Coldwater Creek, Inc.*, No. C 07-05324 WHA, 2009 WL 1833992, at *2, 3 (N.D. Cal. June 23, 2009) (rejecting requested fee award as "far out of proportion to the actual benefit conferred on the class" and explaining that "[a] key consideration should be reasonableness in light of the benefits actually conferred"); *Sloop v. Ameritech Corp.*, No. EV 95-128-C H/L, 2003 WL 21989997, at *4 (S.D. Ind. Aug. 23, 2003) (stating the court's "concern[] with the proportion between the net benefits to the class and the fee for class counsel as an important factor in considering the reasonableness of any fee award, especially where class counsel have attempted to support their fee request based on the benefits to the class"); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 380 (D. Mass. 1997) (approving fee award in a manner that "will help ensure that the fee award is proportionate to the actual value created for the class").  *Cf. In re Philip Servs. Corp. Securities Litig.*, No. 98 Civ. 835(AKH), 2007 WL 959299, at *3 (S.D.N.Y. Mar. 28, 2007) (explaining that a lodestar positive multiplier is appropriate "as long as it does not exceed a proper proportion in relation to the total benefit produced to the class for whose benefits the services were rendered"); *cf. also Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 120 S. Ct. 2237 (2000) (O'Connor, J., concurring in denial of certiorari) (noting "several troubling consequences" in cases approving attorneys' fees where there lacks "some rational connection between the fee award and the amount of the actual distribution to the class").

[27]*See generally* James Verini, *The Great Cyberheist*, N.Y. TIMES (Magazine), Nov. 14, 2010, at MM44.

the parties did not place an overall cap on the settlement.  *Id.* at 400–01.  Class counsel used the lodestar method to reach their proposed fee award of $6.5 million.  The district court was greatly troubled by this award because it was disproportionately large in relation to the very small "value actually transferred to class members[.]"  *Id.* at 409.  Calling "the class action vehicle [] broken[,]" the court emphasized that "tying the award of attorneys' fees to claims made by class members is one step that judges can take toward repair."  *Id.* at 406.  The court nevertheless approved the fee request for two main reasons: first, the court valued the potential benefits of the settlement at $177 million, which could be used as a guidepost for measuring attorneys' fees; and second, the court "did not give class counsel any indication prior to the Fairness Hearing that its award of attorneys' fees might be made with reference to this criterion."  *Id.* at 409.  The court concluded with a cautionary note to class counsel: "In the future, however, plaintiffs' counsel can expect that this Court, when confronted with reversionary common fund or claims-made settlements, will award attorneys' fees *by reference to the value of benefits actually put in the hands of the class members.*"  *Id.* at 410 (emphasis in original).

In this case, class counsel had the benefit of the warning issued in the *TJX Companies* settlement.  Counsel also had the benefit of the guidance provided by the cases and authorities cited above.  In this case, unlike *TJX Companies*, class counsel were put on notice at the preliminary fairness hearing that the court was very concerned about the lack of "direct benefits" to class members under the proposed settlement.  (Docket Entry No. 87, at 56).  This court also noted that "the amount of fees . . . does not depend for its justification as reasonable entirely on the amount of money made either available or distributed directly, but also on the amount of work that the lawyers actually did and the reasonableness of those hours and hourly charges as well."  (*Id.*)  These

statements are consistent with using the percentage-of-fund approach, with a lodestar cross-check, to determine the reasonableness of the fee award sought, tied appropriately to the value of the benefits actually provided to the class.

### B.    The Percentage Method

"The first step under the [percentage] method requires determining the actual monetary value conferred to the class members by the settlement." *Bussie v. Allamerica Fin. Corp.*, No. Civ. A. 97-40204-NMG, 1999 WL 342042, at *2 (D. Mass. May 19, 1999).  The court then sets the benchmark percentage to be applied to this value.  After setting the benchmark, the district court in *In re Dell Inc.*, No. A-06-CA-726-SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010), applied the *Johnson* factors to determine whether a positive or negative adjustment of the benchmark was warranted. *Id.* at *13.  Affirming *Dell*, the Fifth Circuit approved of the district court's application of this "blended percentage method " or "hybrid percentage method."[28]  2012 WL 375249, at *6.

### 1.    Valuing the Settlement

"In cases involving a claims procedure or a distribution of benefits over time, the court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather, the fee awards should be based only on the benefits actually delivered."  MANUAL § 21.71. Class counsel's valuation of the benefits as exceeding $4.85 million includes:

> the reimbursement of Losses suffered by Settlement Class Members in connection with the Heartland Intrusion [$2.4 million], the anticipated costs of notice [$1.5 million], the anticipated costs of the dispute resolution process provided for resolving contested

---

[28]Other courts also use the blended method.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 651–52 (E.D. La. 2010) (citing cases within Fifth Circuit applying blended percentage method); *Klein*, 705 F. Supp. 2d at 674–75 (N.D. Tex.); *Ramah Navajo Chapter v. Norton*, 250 F. Supp. 2d 1303, 1316 (D.N.M. 2002); *cf. Faught v. Am. Home Shield Corp.*, — F.3d —, 2011 WL 7118832, at *7 (11th Cir. 2011) (explaining that the *Johnson* factors must be applied "[w]here the requested fee exceeds 25%").

> Settlement Class Member claims [$270,000], and the attorneys' fees [$725,000], costs[] and expenses [$35,000], and incentive awards being paid for by Heartland [$200 and $100 per qualified class representative].

(Docket Entry No. 107, ¶ 5).  The court discusses each component below.

### a.      Reimbursement of Losses

Class counsel values this component at $2.4 million.  Heartland deposited $1 million in escrow for reimbursing claimants.  Although Heartland agreed that it would deposit up to an additional $1.4 million into the fund (for a total of $2.4 million) if needed to pay the class claims, that proved wholly unnecessary.  (Docket Entry No. 57, ¶ 2.1(a)).  As of December 2010, class members had filed 11 valid claims for out-of-pocket expenses resulting from the breach.  (Docket Entry No. 111, at 6).  Neither counsel indicated that any of these claims were identity-theft-related.  Assuming that each of these claims received the maximum amount for out-of-pocket expenses ($175), that would amount to a total cash payment to class members of $1,925.  (*See* Docket Entry No. 57, ¶ 2.2(b)).

The deadline for filing claims, August 2011, has long passed.  (*See id.*, ¶ 2.2(c)).  Since the final fairness hearing held in December 2010, neither party has submitted information about any other valid claims submitted or paid.  Although $2.4 million was the maximum amount of direct benefits that the class could receive, the class received a negligible fraction of that amount in direct benefits.  Heartland will pay approximately $998,075—$1 million less the amount paid directly to class members who submitted valid claims, conservatively estimated to be $1,925—to the three organizations under cy pres.  (*See* Docket Entry No. 111, at 16–17).

The record is clear that $2.4 million was never distributed to the class, directly or indirectly.  Heartland deposited $1 million, and the Agreement capped its liability at that amount if the claims

did not exceed it.  That distinguishes this case from *TJX Companies*, in which the parties agreed to no cap on the possible settlement amount.

The answer to the first step is clear: the total amount Heartland made available to the class is $1 million.  It is also clear that only $1,925 of the $1 million has gone directly to the class members.  The issue is the value of the benefit conferred by the cy pres award of $998,075 paid to third-party organizations.

### b.        The Propriety and Value of the Cy Pres Payment

The cy pres payment is proper because the recipients "reasonably approximate [the interests] being pursued by the class."  AGGREGATE LITIGATION § 3.07(c); *see also, e.g.*, *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) ("*Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity."); *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474–75 (5th Cir. 2011) (explaining that "a *cy pres* distribution is designed to be a way for the court to put any unclaimed settlement funds to their next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class" in the class-action context only when it is infeasible to make further distributions to the class (internal quotation marks omitted)).  Cy pres distributions have been criticized for "violating the ideal that litigation is meant to compensate individuals who were harmed."[29]  Judge Posner, writing for a panel of the Seventh Circuit, has questioned whether such payments in fact benefit class members: "There is no indirect benefit to the class from the defendants giving the money to someone else.  In such a case the 'cy pres' remedy . . . is purely

---

[29] Alexandra D. Lahav, *Two Views of the Class Action*, 79 FORDHAM L. REV. 1939, 1957 (2011); Martin H. Redish, Peter Julian, & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 620–21 (2010).

punitive." *Mirfasihi*, 356 F.3d at 784.

Despite these criticisms, there is ample precedent for cy pres relief here.  Under *Klier*, the Fifth Circuit confirmed that cy pres awards in class actions might be appropriate under two circumstances: first, it must be infeasible to distribute further proceeds from the settlement fund directly to class members; and second, "the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated."  658 F.3d at 474–75 (quoting *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002)).  Both circumstances are present here. First, "it is not possible to put those funds to their very best use: benefitting the class members directly," *id.* at 475, because the vast majority of class members did not file claims, whether from lack of interest or the absence of losses.  The Agreement is organized so cy pres relief is triggered only after class members have  ample opportunity to file claims.  Cy pres is the only way to avoid having the unclaimed funds—$998,075—revert to Heartland, escheat to the government, or provide a huge windfall to the few who filed valid claims.  Second, the organizations class counsel selected to receive the cy pres distribution reasonably approximate the interests pursued by the class.  These organizations work to create more secure payment-card technology that will help prevent data breaches, and work to help financial institutions minimize the consequences if such breaches occur. The underlying basis of this class action is that Heartland should have had better policies, procedures, and technological measures to prevent this data breach.  The interests of class members, and other similarly situated payment-card holders, are served by distributing the unclaimed funds to these organizations.

Finding the cy pres provision appropriate does not determine its value for the purpose of

51

calculating attorneys' fees. The class benefit conferred by cy pres payments is indirect and attenuated. That makes it inappropriate to value cy pres on a dollar-for-dollar basis. "[B]ecause cy pres payments . . . only indirectly benefit the class, the court need not give such payments the same full value for purposes of setting attorneys' fees as would be given to direct recoveries by the class." AGGREGATE LITIGATION § 3.13 cmt. a; *see also* FED. R. CIV. P. 23(h) Committee Notes ("Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class."). Even when, as here, there is a valid relationship between the class interests and the recipients of cy pres funds, those funds do not provide a direct benefit to class members and should not be valued as equal to direct payments to the class members. Discounting the amount of the cy pres payment in determining its value to the class is consistent with the nature of the indirect benefit cy pres provides to the class.[30]

The question is how much to discount the $998,075 cy pres payment for the purpose of determining attorneys' fees. After careful consideration, the court has concluded that discounting the payment by 50% best values the benefit conferred on the class. Although the cy pres award will assist the three organizations in working on improved payment-card security, whether, when, and how much improvement will result are all speculative. Although the cy pres award is appropriate, the indirect, speculative, and deferred nature of the benefit strongly support valuing that benefit at one-half of the payment amount.

The benefit conferred on the class by the cy pres payment is valued at $499,037.50. Added

---

[30]Some courts appear to have valued cy pres payments the same way as money paid directly to class members, on a dollar-for-dollar basis. *See Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2012 WL 381202, at *5 (N.D. Cal. Feb. 6, 2012); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 816 (E.D. Wis. 2009); *Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 269 (E.D.N.Y. 2009). None of these courts, however, explained the reason for that valuation.

to the $1,925 paid directly to class members for valid claims, the value conferred on class members

by the $1 million fund the Agreement creates amounts to $500,962.50.

### c.     Notice Costs

Class counsel includes the approximately $1.5 million cost of implementing the notice

program in valuing the settlement.  When a (b)(3) class action is certified for trial rather than

settlement, the plaintiffs normally bear the notice costs.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S.

156, 178–79 (1974).[31]  When a (b)(3) class action is certified for settlement, "[t]he defendant, as the

party with the greatest interest in obtaining a res judicata effect for the settlement decree, should

normally bear the costs of settlement notice."  4 RUBENSTEIN ET AL., NEWBERG ON CLASS ACTIONS

§ 11:53; *see also* AGGREGATE LITIGATION § 3.04 cmt. a (reporters' notes) ("defendants typically pay

for the cost of notice as part of a class settlement").  Courts often include the costs of notice in

valuing a class-action settlement.[32]

The cost of notice here is $1.5 million.  A nationwide notice campaign intended to reach 80%

of a class of over 100 million individuals is expensive.  (*See* Docket Entry No. 85, ¶ 11).  Including

the notice costs in the value helps ensure that counsel work to make the notice effective and that

---

[31]*See also In re Mexico Money Transfer Litig.*, 267 F.3d 743, 746 (7th Cir. 2001); *Jones v. Diamond*, 594 F.2d 997, 1022–23 (5th Cir. 1979); 7AA WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1788 ("it now is clear that all notice costs must be borne by the plaintiffs").

[32]*See In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, — F.R.D. —, 2011 WL 5599129, at *18 (N.D. Ill. 2011); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 569 & n.8, 597 (N.D. Ill. 2011); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 645 (S.D. Cal. 2011); *Sauby v. City of Fargo*, No. 3:07-cv-10, 2009 WL 2168942, at *3 (D.N.D. July 16, 2009); *see also Sobel v. Hertz Corp.*, No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565, at *13 (D. Nev. June 27, 2011) (stating that "the only components with any determinate . . . value are the attorneys' fees, incentive payments and to some extent the costs of notice and administration"); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objects in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1544–45 (2004) (including "costs of notice or settlement administration paid by the defendant" in valuing the relief provided by a class-action settlement).  The Ninth Circuit has held that "where the defendant pays the justifiable cost of notice to the class—but not, as here, an excessive cost—it is reasonable (although certainly not required) to include that cost in a putative common fund benefitting the plaintiffs for all purposes, including the calculation of attorneys' fees."  *Staton*, 327 F.3d at 975.

such settlements are public and that damages are pursued.  On the present record and under current law, it is appropriate to include the $1.5 million figure in valuing the settlement.

### d.      Claims-Processing Costs

Class counsel includes the approximate cost of administering the claims process—$270,000—in valuing the settlement.  District courts routinely include such administrative costs in calculating attorneys' fees awards.  *See, e.g.*, *Amunrud v. Sprint Commc'ns Co.*, No. CV 10-57-BLG-CSO, 2012 WL 443751, at *2 (D. Mont. Feb. 10, 2012); *Gomez v. H&R Gunlund Ranches, Inc.*, No. CV F 10-1163 LJO MJS, 2011 WL 5884224, at *5 (E.D. Cal. Nov. 23, 2011); *Ky. Grilled Chicken*, 2011 WL 5599129, at *18; *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 419 (E.D. Pa. 2010).  The $270,000 cost is properly included in valuing the settlement.

### e.      Attorneys' Fees and Costs

Class counsel asks for attorneys' fees and costs of $760,000—the maximum amount of attorneys' fees and costs Heartland agreed to pay.  Because this settlement is a variation on a common fund, the fees and costs are properly included in the settlement valuation.  *See, e.g.*, *Johnston*, 83 F.3d at 245–46; MANUAL § 21.7.  "The award to the class and the agreement on attorney fees [and costs] represent a package deal.  Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."  *Johnston*, 83 F.3d at 246 (citing *Gen. Motors*, 55 F.3d at 821); *see also, e.g.*, *Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349, 364 (D.D.C. 2007) (explaining that "because the attorneys' fees are borne by defendants and not plaintiffs, they represent a valuable part of the settlement").[33]  Although only part of the fees

---

[33]"In those cases where the defendant makes the direct payment" of attorneys' fees as a part of the settlement, separate from the fund to be distributed to the class, the defendant "has made at least a mental calculation of the total amount to be paid and then simply allocated a portion to the class and the rest to the plaintiff's attorneys' fees." Wolfman & Morrison, *Representing the Unrepresented in Class Actions Seeking Monetary Relief*, *supra*, at 504.

and costs sought are approved, to be conservative, the requested figures are included in valuing the settlement.

### f.        Incentive Awards

Class counsel also includes the $200 and $100 incentive awards to the representative and named plaintiffs in calculating the settlement benefits.  As set out in more detail below, the record does not provide a basis for incentive awards.  Despite Heartland's agreement, the proposed incentive payments are not included in valuing the benefits the class received from the settlement because there is no basis in the record for approving those payments.

### g.        The Benefit Provided by a "Sense of Security"

During the final fairness hearing, class counsel argued that the settlement value should be enhanced to reflect a "sense of security" provided to the Consumer Plaintiffs.[34]   Counsel also characterized the settlement as providing what was in effect free credit monitoring for three-and-a-half years.  (Docket Entry No. 111, at 41–42).  Counsel, however, cited neither the "sense of security" value nor effective credit monitoring in calculating the $4.85 million settlement value. (*See* Docket Entry No. 107, ¶ 5).  Even had counsel done so, the record lacks any basis to increase the settlement's value based for either of these factors.

The settlement provided no credit-monitoring services.  The Agreement expressly excludes the costs of credit monitoring from what a class member may claim as a "Loss."  (Docket Entry No. 57, ¶ 2.2(b)).  The Consumer Plaintiffs received an opportunity to make valid claims for defined losses resulting from stolen payment-card information.  That is far different from credit monitoring

---

[34](Docket Entry No. 111, at 28; *see also id.*, at 30 (the settlement provides "peace of mind"), 31 (the settlement "provide[s] comfort to people that may otherwise be restless"); *id.*, at 41 (the settlement remedies a "feeling of insecurity")).

that would include alerts notifying the Consumer Plaintiffs of any problem, to minimize the potential harm caused by the data breach. Heartland did not agree to provide three-and-a-half years of free credit monitoring to the roughly one hundred million consumers in this class. That would have cost Heartland approximately $62.79 billion.[35]

There is no indication in the record that class members in fact received any "sense of security." The evidence is that the extensive nationwide notice campaign provided class members an opportunity to file claims for defined "Losses." Only 11 valid claims resulted. This paltry result suggests that the breach had a scant impact on the consumers whose data was compromised. The limited information the hackers obtained did not result in claims by those consumers in this case of identity theft or even of fraudulent payment-card transactions in any significant number. Neither a "sense of security" nor the value of credit monitoring is included in valuing the settlement.

### h.    Conclusion as to Valuation

The court values the settlement as follows:

- *Direct Relief to Claimants:* $1,925.00

- *Indirect Relief to Class through Cy Pres:* $499,037.50

- {*Total Relief to Class:* $500,962.50}

- *Notice:* $1,500,000.00

- *Administrative Costs for Claims Process:* $270,000.00

- *Requested Attorneys' Fees and Costs:* $760,000.00

---

[35]An example of credit monitoring is Experian's Credit Tracker Credit Monitoring Service, which costs $14.95 per month per individual. *See Credit Monitoring*, EXPERIAN, http://www.experian.com/consumer-products/credit-monitoring.html/(last visited Mar. 15, 2012). Even assuming a volume discount, actual credit monitoring for one hundred million people would be far more costly and a far different settlement than was achieved here. Moreover, the facts do not present any need for such monitoring.

- ***Total Value of Settlement:*** $3,030,962.50

### 2.    Calculating the Benchmark

The next step is to determine the appropriate percentage benchmark. "The 'majority of common fund fee awards fall between 20% and 30% of the fund.'" *Gooch v. Life Invs. Co. of Am.*, — F.3d —, 2012 WL 410926, at *15 (6th Cir. 2012) (quoting *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999)); *see also* MANUAL § 14.121 ("Attorney fees awarded under the percentage method are often between 25% and 30% of the fund."). The Ninth and Eleventh Circuit generally use a 25% benchmark for common-fund cases. *E.g.*, *Faught*, 2011 WL 7118832, at *8 (citing *Camden I Condominum Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774–75 (11th Cir. 1991); *In re Mercury Interactive Corp. Securities Litig.*, 618 F.3d 988, 992 n.1 (9th Cir. 2010). The Second and Third Circuits caution district courts not to use a rigid benchmark but instead to consider the particular circumstances of each case based on factors similar to this circuit's *Johnson* factors. *See Sullivan*, 667 F.3d at 333; *Goldberger*, 209 F.3d at 51–52. A benchmark may be used as a starting point and then adjusted up or down under the *Johnson* factors, or those factors can be applied as part of deciding the benchmark.

District courts increasingly consider empirical studies analyzing class-action-settlement fee awards[36] to set the appropriate percentage benchmark[37] or to test the reasonableness of a given

---

[36] *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811 (2010) ["Fitzpatrick"]; Theodore Eisenberg & Geoffrey Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010) ["Eisenberg & Miller II"]; Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUDIES 27 (2004) ["Eisenberg & Miller I"].

[37] *See Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1013–14 (E.D. Wis. 2010); *In re OCA, Inc. Securities & Derivative Litig.*, Civ. A. No. 05-2165, 2009 WL 512081, at *20 (E.D. La. Mar. 2, 2009); *Turner*, 472 F. Supp. 2d at 862–63 & n.28 (citing cases). *Cf. In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652–53 (E.D. La. 2010) (recognizing the usefulness of the empirical studies but determining that they were not helpful in that case given the

benchmark.[38]  "The tables included in the [Eisenberg and Miller] study are good indicators of what the market would pay for class counsel's services because the tables show what attorneys have been paid in similar cases, and thus what class counsel could have expected when they decided to invest their resources in this case."  *Lawnmower Engine Horsepower*, 733 F. Supp. 2d at 1014 (citing *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) and *Turner*, 472 F. Supp. 2d at 864 n.30).  Using these studies alleviates the concern that the number selected is arbitrary.

The most recent empirical study by Professors Eisenberg and Miller examined data from nearly 700 common-fund settlements between 1993 and 2008.[39]  A study by Professor Fitzpatrick sampled data from nearly 700 common-fund settlements in 2006 and 2007.[40]  As in *Turner*, the "class recovery" is this court's previous valuation of the settlement: $3,200,635.25.  *See* 472 F. Supp. 2d at 864.  This value falls into the third decile on the Eisenberg and Miller tables.  For this decile, the mean fee percentage is 26.4%, with a standard-deviation percentage of 9.8%.[41]  Eisenberg and Miller propose that

> fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee.  Fee requests falling within one and two standard deviations above or below the

unique nature of the Vioxx settlement).  *But cf. McDonough v. Toys "R" Us, Inc.*, — F. Supp. 2d —, 2011 WL 6425116, at *12 (E.D. Pa. 2011) ("The academy, however, is only one source of data, and lower medians do not preclude higher percentage awards for attorneys' fees."); *In re Cabletron Sys., Inc. Securities Litig.*, 239 F.R.D. 30, 37 n.12 (D.N.H. 2006) (explaining how uncritical reliance on the Eisenberg and Miller study can "lend itself to manipulation by counsel" because counsel can use the study's approach to request a fee award near the high end of one standard deviation above the mean).

[38]*See, e.g.*, *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010); *Loudermilk Servs., Inc. v. Marathon Petroleum Co.*, 623 F. Supp. 2d 713, 723–24 (S.D. W. Va. 2009).

[39]Eisenberg & Miller II, *supra*, at 251.

[40]Fitzpatrick, *supra*, at 817.

[41]Eisenberg & Miller II, *supra*, at 265.

> mean should be viewed as potentially reasonable but in need of affirmative justification. Fee requests falling more than two standard deviations above or below the mean should be viewed as presumptively unreasonable; attorneys seeking fees above this amount should be required to come forward with compelling reasons to support their request.[42]

The $3.2 million value in this case falls into the fourth decile in the Fitzpatrick table—which correlates with a mean percentage of 26.0% and a standard-deviation percentage of 6.3%.[43]

Both these studies also examined benchmarks for different types of class actions. For consumer class actions such as this case, Eisenberg and Miller found the mean percentage to be 25%[44]; Fitzpatrick found it to be 23.5%.[45] Fitzpatrick also organized the data by circuit. The mean for the Fifth Circuit was 26.4%.[46]

Data from the Eisenberg and Miller as well as the Fitzpatrick studies allow this court to set a more accurate benchmark by averaging their tables. *See In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7–12 Litig.*, 447 F. Supp. 2d 612, 630 (E.D. La. 2006) (setting the benchmark by averaging the mean fee percentages from two tables reported in Eisenberg & Miller I). Using the settlement value as the baseline, an average of the means from the second Eisenberg and Miller study and from the Fitzpatrick study results in a fee percentage of 26.2%. Averaging the means from the two studies for consumer class actions results in a fee percentage of 24.3%. Averaging those two fee percentages (26.2% and 24.3%) results in a fee percentage of

---

[42]Eisenberg & Miller I, *supra*, at 74.

[43]Fitzpatrick, *supra*, at 839.

[44]Eisenberg & Miller II, *supra*, at 262

[45]Fitzpatrick, *supra*, at 835.

[46]*Id.* at 836.

25.3%.  That percentage approximately reflects the prevailing market rate that both class members and class counsel could have expected when initiating the litigation.  *See Lawnmower Engine Horsepower*, 733 F. Supp. 2d at 1014.  It also is consistent with the mean fee percentage in the Fifth Circuit.

Using 25.3% as the benchmark, and before any positive or negative adjustment, the result is a fee award of $766,833.51.  This award is approximately $30,000 greater than that requested by class counsel.  Class counsel properly recognizes that a negative adjustment, using the *Johnson* factors, is appropriate to avoid a fee award that is disproportionately high in relation to the benefit the class received.

### 4.  Applying the *Johnson* Factors to the Benchmark

#### a.  The Time and Labor Required

Examining this factor under the lodestar method requires the court to determine the reasonableness of the hours billed by class counsel.  As the Fifth Circuit has explained:

> [P]laintiffs seeking attorney's fees are charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving that they exercised billing judgment.  Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant.  The proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment.

*Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006) (per curiam) (internal footnotes omitted).  The lodestar calculation, before the *Johnson* cross-check, accounts for billing judgment.  The percentage method, by contrast, does not account for billing judgment.  Billing judgment is appropriately considered in the cross-check, looking at whether the time and labor spent were required.  *See Dell*, 2010 WL 2371834, at *15 (considering "all time that is excessive,

duplicative, or inadequately documented" with respect to this factor (internal quotation marks omitted)).

According to the most recent fees-and-costs report submitted to this court, class counsel spent over 1,960 hours on this case—which, at each attorney's and staff member's billing rate, equals approximately $866,000 in attorneys' fees.  (Docket Entry No. 111, Ex. 2, at 5).  Counsel state that they "have devoted a significant portion of their available time to the investigation, prosecution, and settlement of this case on behalf of the Settlement class[.]" (Docket Entry No. 108, at 20).

The fees-and-costs reports do not show that counsel "wrote off" time in a way that shows billing judgment.[47]  For example, one day's entry for one co-lead counsel shows billed time for a call from one attorney about an expert's review, followed by billed time for a call to another attorney about the same review, followed by billed time for a call to those two attorneys about the same review. (Docket Entry No. 113, Barnow & Assocs. Ex., at 24).  Each lawyer billed all the time spent for each call.  On the current record, the court cannot conclude that the time spent by multiple lawyers on multiple calls on the same subject—calls that at a minimum appear to be duplicative—was reasonably spent or that billing judgment was used.  The billing summary is full of similar instances of time spent by multiple lawyers on the same subject, for vaguely summarized phone calls, emails, or "reviews."  (*Compare, e.g.*, Docket Entry No. 113, Finkelstein Thompson Ex., at 3; *with* Docket Entry No. 113, Barnow & Assocs. Ex., at 6–8).  Billing judgment requires adequate documentation of the hours spent and work done. *See, e.g.*, *Walker v. U.S. Dep't of Hous.*

---

[47]There is one exception, which is negligible: 11.2 hours spent by one attorney with Barnow and Associates. (Docket Entry No. 113, Ex. 2, at 1).  Otherwise, all the time spent appears to have been included in the fee-award submission.

*& Urban Dev.*, 99 F.3d 761, 769 (5th Cir. 1996). The fees-and-costs reports provide no basis for this court to discern billing judgment. (*See, e.g.*, Docket Entry No. 113, Barnow & Assocs. Ex., at 6 ("Calls and emails re: status of litigation"; Finkelstein Thompson Ex., at 3, 5 ("Telecon w/co-counsel/FTL attys Barnow re review"; "Research class definition and notice issues"); Sheller Ex., at 1 ("E-mails and blogs re clients and phone call")).

The court does not question the number of hours that class counsel spent. The issue is whether the time and labor were reasonable. Even recognizing that this case required confirmatory discovery, settlement negotiations, and class-action administration, the number of entries for similar work by different attorneys and the absence of any evidence of the exercise of billing judgment support a negative adjustment.

### b.    The Novelty and Difficulty of the Issues

Class counsel state that "[t]he issues presented by this litigation are novel and difficult" and that "liability, negligence, actual damages, and punitive damages created complex issues[.]" (Docket Entry No. 108, at 20). The case clearly presented risks of not succeeding. But none of these issues can be described as particularly novel for class counsel. Although data-breach litigation is itself relatively new, *see generally* Timothy H. Madden, *Data Breach Class Action Litigation—A Tough Road for Plaintiffs*, BOSTON BAR J., Fall 2011, at 27 (generally discussing data-breach litigation), class counsel previously litigated two very similar data-breach class actions: *In re Countrywide Financial Corp. Customer Data Security Breach Litigation*, No. 3:08-MD-01998, 2010 WL 3341200 (W.D. Ky. Aug. 23, 2010), and *TJX Companies*, 246 F.R.D. 389. And, most important, the early settlement in this case meant that counsel did not have to wrestle with the difficult issues that likely would have been presented had the litigation reached the dispositive-

motions stage.  This factor is at best neutral or supports some negative adjustment.

### c.      The Skill Required

"This factor is evidenced where 'counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution.'" *King v. United SA Fed. Credit Union*, 744 F. Supp. 2d 607, 614 (W.D. Tex. 2010) (quoting *Di Giacomo v. Plains All Am. Pipeline*, No. Civ. A. H-99-4137, H-99-4212, 2001 WL 34633373, at *12 (S.D. Tex. Dec. 19, 2001)).  Another "highly important" aspect is "[t]he trial judge's expertise gained from past experience as a lawyer and [her] observation from the bench of lawyers at work[.]"  *In re Enron Corp. Securities, Derivative & "ERISA" Litig.* ("*Enron II*"), 586 F. Supp. 2d 732, 789 (S.D. Tex. 2008) (quoting *Johnson*, 488 F.2d at 718).

In certifying the class and approving the settlement, the court has discussed the numerous obstacles facing this class action in litigation.  Class counsel's skill and experience with prior similar litigation clearly helped achieve an earlier resolution of this case.  But this case never proceeded to formal discovery, dispositive motions, or opposed class-certification motions.  This factor is neutral.

### d.      Preclusion of Other Legal Employment

Class counsel explain at greater length how this factor favors approval of its fee request:

> The efforts of Co-Lead Settlement Class Counsel in the management of this class action necessarily infringed upon the time and opportunity they would have had available to accept other employment.  The reality of complex cases is that work is not easily shifted to other attorneys in a firm not familiar with the matter, with the result that substantially less time becomes available to Co-Lead Settlement Class Counsel to attend to other matters.  Time devoted to this litigation and its resolution necessarily limited the time available for other litigation.

(Docket Entry No. 108, at 21).  This statement, though logically true, is incomplete, for there is no information about the "other employment."  As the district judge noted in *Dell*, "[T]here is no evidence, such as an affidavit, cited to support this claim.  There is no doubt that the attorneys did pass up other work in order to prosecute this case, but the Court cannot assume that legal work would have been more lucrative than this case without any evidence so indicating."  2010 WL 2371834, at *17.  The same is true here.  Moreover, much of the work in this case took place during relatively short periods.  This factor is neutral.

### e.      Customary Fees for Similar Work in The Community

In setting the 25.3% benchmark, the court already has discussed at length the empirical data supporting the reasonableness of that percentage.  The court also has noted the Fitzpatrick study, which shows the mean fee percentage award in the Fifth Circuit to be 26.4%.[48]  According to class counsel, "[t]he customary contingency fee for representation of many contingency cases within the same geographic area, in much less complex cases than this class action, often ranges from 33 1/3% to 40% of the gross award plus costs[.]"  (Docket Entry No. 108, at 21).  Class counsel cite a 1995 study on attorney compensation by the State Bar of Texas and a 1992 Seventh Circuit opinion, *In re Continental Illinois Securities Litigation*, 962 F.2d 566.  The empirical studies to which this court refers are much more recent; both were published in 2010.  And these empirical studies are more focused on the type of fee and fee analysis at issue here.  This factor supports the benchmark set by the court, not the higher benchmark that class counsel advocate.

### f.      Counsels' Preexisting Fee Agreement

"The fee quoted to the client or the percentage of the recovery agreed to is helpful in

---

[48]Fitzpatrick, *supra*, at 836.

demonstrating the attorney's fee expectations when he accepted the case." *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 824 (5th Cir. 1996) (internal quotation marks omitted).  District courts within this circuit have found upward adjustments appropriate if counsel took the case on a contingency basis. *See, e.g.*, *Klein*, 705 F. Supp. 2d at 678 (percentage); *DeHoyos*, 240 F.R.D. at 330 (lodestar).  But merely taking a case on a contingency basis does not merit an upward adjustment if the benchmark reflects the market rate.  *See Dell*, 2010 WL 2371834, at *17.  Although class counsel took this case on a contingency-fee basis, (Docket Entry No. 108, at 22), the benchmark reflects the market rate. This factor is neutral.

### g.      Time Limitations Imposed by the Client or by Circumstances

According to class counsel, "[t]his case has required significant attention by Co-Lead Settlement Class Counsel.  Frequently, issues requiring immediate attention arose, and such matters were attended to expeditiously and properly."  (Docket Entry No. 108, at 22).  This statement is unsupported by record evidence.  The record discloses no external time limitations or pressures outside of the complaint filing deadline, which was extended twice without Heartland's opposition. This factor supports a slight negative adjustment.

### h.      The Amount Involved and the Results Obtained

"The United States Supreme Court and the Fifth Circuit have held that the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Enron II*, 586 F. Supp. 2d at 796 (internal quotation marks omitted) (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998)).  Class counsel contend that they "negotiated a monetary settlement that represents an excellent result for the Settlement Class," listing the components to the settlement that class counsel valued at $4.85 million.  (Docket

65

Entry No. 108, at 21–22).  This court has valued the settlement as worth over $3 million, but that includes $2 million in indirect and attenuated benefits to individual class members: $500,000 through the cy pres distribution and $1.5 million in notice costs.  On the other hand, the settlement is a good result for the Consumer Plaintiffs given the legal and evidentiary hurdles litigation would have presented and given class members' lack of interest or losses.  Through the settlement and its claims-administration process, those class members who legitimately suffered losses as a result of the data breach, whether due to fraudulent charges or identity theft, were provided with an efficient avenue for compensation.  The cy pres payments will fund efforts toward better data protection, though the ultimate results are speculative.  The results obtained are a neutral factor.

### i.       The Experience, Reputation, and Ability of the Attorneys

The extensive experience and fine reputation and ability of class counsel are clear and unquestioned.  *See, e.g.*, *Dell*, 2010 WL 2371834, at *18; *Enron II*, 586 F. Supp. 2d at 797; *DeHoyos*, 240 F.R.D. at 331.  At the same time, these attributes are to be expected: Rule 23(g) requires them of lawyers appointed as class counsel.  *See* FED. R. CIV. P. 23(g)(1)(A); MANUAL § 21.271; *see also* AGGREGATE LITIGATION § 1.05 cmt. g.  This factor is neutral.

### j.       Undesirability of the Case

Class counsel explains at length why taking on this case was undesirable.  The reasons are typical of consumer class-action lawsuits: the defendant is a large corporation with substantial resources, financial and otherwise, for a vigorous defense; and the legal and factual issues presented risks to recovery absent settlement.  (*See* Docket Entry No. 108, at 23).  But there were a large number of lawyers who believed the case was attractive.  Many lawyers filed numerous class-action and individual suits based on the data breach.  (*See* Docket Entry No. 3).  This case was desirable

from the standpoint of many plaintiffs' lawyers. *See Dell*, 2010 WL 2371834, at *19; *Di Giacomo*, 2001 WL 34633373, at *12. This factor is neutral.

### k. The Relationship with the Clients

According to class counsel, all class members "were kept abreast of the developments in this litigation throughout its pendency and by way of the notice program, all as applicable and appropriate." (Docket Entry No. 108, at 22). This factor, however, appears to address factors other than notice to absent class members. Given the absence of any record evidence showing other communications between class counsel and representative or named plaintiffs, or any class members, this factor supports a slight negative adjustment.

### l. Awards in Similar Cases

"Courts often look at fees awarded in comparable cases to determine if the fee requested is reasonable." *DeHoyos*, 240 F.R.D. at 333 (citing *Johnson*, 488 F.2d at 719 & n.5). The empirical studies cited by the court provide helpful information. Specific cases also can be examined. Because class-action litigation involving data breaches is relatively new, there are few settlements to examine: three, to be precise. In one case, the court calculated fees using the percentage method, approving a requested fee award amounting to 7.7% of the fund. *In re TD Ameritrade Account Holder Litig.*, Nos. C 07-2858 SBA, C 07-4903 SBA, 2011 WL 4079226, at *16 (N.D. Cal. Sep. 13, 2011). In the two other settlements, the courts calculated fees using the lodestar method. *See Countrywide Fin. Corp.*, 2010 WL 3341200, at *9; *TJX Cos.*, 584 F. Supp. 2d at 408. Had these cases used the percentage method, the percentage would be lower than in this case. *See Countrywide Fin. Corp.*, 2010 WL 3341200, at *9 (approving lodestar award of $3.5 million, but noting that had the court used the percentage method, the $3.5 million fee award would be 20% of

the settlement's value); *TJX Cos.*, 584 F. Supp. 2d at 409–10 ($6.5 million (attorneys' fees awarded using lodestar) / $177 million (value of settlement) = 3.7%).  The present benchmark of 25.3%, if unadjusted, would stand as the highest percentage recovery of any of the data-breach settlements to date.  This factor supports a negative adjustment.

### 5. Adjustment of the Benchmark in Light of the *Johnson* Factors

The final step in applying the percentage method is to determine whether the benchmark —25.3%—should be adjusted in light of the *Johnson* factors.  Four of the factors support a negative adjustment.  Six support no adjustment.  One supports either a negative adjustment or no adjustment.  No factor favors a positive adjustment.  After careful consideration, the court concludes that a negative adjustment of the benchmark, to 20%, is appropriate.  A 5.3% negative adjustment accurately reflects the balance of the *Johnson* factors and results in a reasonable fee award to class counsel.  The resulting fee award under the percentage method, with the *Johnson*-factors adjustment, is $606,192.50.[49]

### C. The Lodestar Cross-Check

The lodestar cross-check is usually applied "to avoid windfall fees, i.e., to 'ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple.'" *Enron II*, 586 F. Supp. 2d at 751 (quoting *Cendant II*, 404 F.3d at 188); *accord, e.g.*, Eisenberg & Miller I, *supra*, at 39 ("The idea is that if the percentage fee grossly exceeds the lodestar amount, the attorney would be receiving a windfall, and the courts should adjust the fee downward to a more reasonable range.").  The purpose of the lodestar cross-check, however, is to verify the reasonableness of the award calculated under the percentage method, to avoid both over- and under-

---

[49]This award reflects a 16.4% negative adjustment from class counsel's $725,000 fee request.

compensation.

Applying the lodestar method can be an extraordinarily time-consuming process for a district court tasked with carefully reviewing counsel's billing records. Those circuits approving the lodestar cross-check have made it clear that district courts need not scrutinize counsel's billing records with the thoroughness required were the lodestar method applied by itself. *See In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005); *Goldberger*, 209 F.3d at 50.[50] Before *Dell* was decided, one district court within this circuit conducted what perhaps can be called a detailed spot check of class counsel's billing records, in addition to relying on the summaries provided by class counsel. *See Enron II*, 586 F. Supp. 2d at 753 ("The Fifth Circuit has never indicated that it would relax a lodestar calculation, so this Court has performed a detailed examination in spot checks of the records, though not exhaustive examination of each entry, relying also on the affidavits and declarations submitted by Class Counsel, and has used the *Johnson* factors endorsed by the Fifth Circuit."). In this case, the court has reviewed the fees-and-costs reports that counsel submitted and has examined many of the pages thoroughly. It has not taken the extraordinary amount of time needed, however, for a thorough examination of all the time and billing records that counsel generated for purposes of a standalone lodestar analysis.

The lodestar method requires the court to multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate and to apply an upward or downward multiplier if necessary. *Dell*, 2012 WL 375249, at *6. Under the most recent billing summary submitted, class

---

[50] District courts following this approach in other circuits agree. *See Key Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 469–70 (S.D.W. Va. 2010); *Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149 MMM (SHx), 2008 WL 8150856, at *9 n.35 (C.D. Cal. July 21, 2008); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 270 (D.N.H. 2007); *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 WL 951821, at *6 (N.D. Cal. Mar. 28, 2007); *Turner*, 472 F. Supp. 2d at 867; *In re Royal Ahold N.V. Securities & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006); *In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005).

counsel spent 1,963.60 hours on this action.  (Docket Entry No. 113, Ex. 2, at 5).  If this court had applied the lodestar as the primary method, as opposed to a cross-check, the number of hours reasonably spent would be reduced because the record does not adequately show billing judgment. Under Fifth Circuit precedent, "plaintiffs seeking attorney's fees are charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving that they exercised billing judgment."  *Saizan*, 448 F.3d at 799.  The lack of such evidence supports a 10% reduction in the number of hours used in a lodestar cross-check.

The hourly rates used are reasonable.  "An attorney's requested hourly rate is prima facie reasonable when he requests that the lodestar be computed at his or her customary billing rate, the rate is within the range of prevailing market rates[,] and the rate is not contested."  *Altier*, 2012 WL 161824, at *22 (citing *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995)); *see also High Sulfur Content*, 517 F.3d at 228 ("The district court must first determine the reasonable number of hours expended on the litigation *and the reasonable hourly rate for the participating attorney*." (emphasis added)).  In this case, the rates ranged from as high as $825 per hour for one the colead class counsel to as low as $90 per hour for a paralegal.  (Docket Entry No. 113, Ex. 2, at 1, 5).  The mean hourly rate was $400.81.[51]  The hourly rates are within the "prevailing market rates for lawyers with comparable experience and expertise" in complex class-action litigation and thus are reasonable.  *Altier*, 2012 WL 161824, at *22 (citing cases).

Multiplying the hours expended by class counsel (1,963.60) by each attorney's hourly rate results in total fees of $866,412.50.  (Docket Entry No. 113, Ex. 2, at 5).  Of course, the lodestar method does not take into account the settlement value to the class.  Attorneys' fees of $866,412.50

---

[51]This figure excludes the entry for the Barnow and Associates attorney who was not charged for 11.2 hours of work.  Were that entry to be added, the mean hourly rate would decrease to $395.86.

would equal 28.9% of the settlement's approximately $3 million value.  At face value, that figure does not appear unreasonable; in addition, it is within the standard deviation of both the Eisenberg and Miller and Fitzpatrick tables.  But when the 28.9% percentage is compared to the value of the $1 million fund made available to the claimants—whether directly or through cy pres—attorneys' fees of $866,412.50 would far exceed that fund's value of $500,962.30.  Class counsel, indeed, recognizes the unreasonable nature of this relationship in reducing the requested fee award in the settlement below the lodestar.

The $725,000 requested results from applying a 16.3% negative adjustment to the lodestar that counsel submitted.  Two things stand out.  First, most applications of the lodestar method result in a positive, not a negative, adjustment.[52]  Second, an adjustment is supposed to occur if the *Johnson* factors, on balance, support that result.[53]  Class counsel's approach—asking for a negative adjustment, but implicitly arguing for a positive adjustment under the *Johnson* factors—is inconsistent logically, with the record, and with the applicable law.

This court applied the *Johnson* factors as part of the percentage method and concluded that the balance supports a negative adjustment.  Although the analysis would differ slightly had the court applied the lodestar method and then the *Johnson* cross-check, *see, e.g.*, *Migis*, 135 F.3d at 1047 ("Some of these [*Johnson*] factors are subsumed in the initial lodestar calculation and should not be

---

[52]*See Prudential Ins. Co.*, 148 F.3d at 341 (recognizing that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied" (quoting 4 RUBENSTEIN ET AL., NEWBERG ON CLASS ACTIONS § 14:6)); Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings about "Reasonable Percentage" Fees in Common Fund Cases*, 18 GEO. J. LEGAL ETHICS 1453, 1472 (2005) ("In our informal review [of opinions evaluating a lodestar cross-check], the multipliers ranged from about 1.0 to over 5.0, with a substantial number of multipliers in the 3.0 to 4.0 range.").

[53]*Cf. High Sulfur Content*, 517 F.3d at 228 ("The district court may adjust the lodestar upward or downward after a review of the twelve factors set forth in *Johnson*."); *Saizan*, 448 F.3d at 800 ("After calculating the lodestar, the court may decrease or enhance the amount based on the relative weights of the twelve factors set forth in *Johnson*.").

double counted."), the result would not be significantly different.

The record and law support reducing the lodestar by a negative multiplier to avoid a windfall to class counsel, given the value of the settlement obtained. The issue is the amount of the multiplier. Class counsel's requested award of $725,000, which amounts to 28.9% of the settlement value, is disproportionately high. Under the lodestar cross-check, reducing the number of hours reasonably expended and applying a negative multiplier of 0.95 to account for the *Johnson* factors results in a fee award of $635,527.14.[54] That is reasonably close to the $606,192.50 figure calculated under the percentage method.

The lodestar cross-check, in this case, has confirmed the reasonableness of the fee award using the percentage method. Class counsel is entitled to be compensated for its successful efforts in representing the Consumer Plaintiffs and in negotiating a settlement. That compensation, however, must be reasonable based on the value of that settlement to the class. Awarding fees of $606,192.50, calculated and adjusted under the percentage method and *Johnson* factors, and through the lodestar cross-check, is reasonable.

## D.    Costs

Class counsel request an award of $35,000 for the costs expended in this action. (Docket Entry No. 107, ¶ 6). "In addition to being entitled to reasonable attorneys' fees, class counsel in common fund cases are also entitled to reasonable litigation expenses from that fund." *Radosti*, 760 F. Supp. 2d at 79 (quoting *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 8 (D.D.C. 2008)) (internal

---

[54]The record supports reducing the number of hours expended by 15% across the board to account for the absence of billing judgment and the lack of information provided, resulting in an approximate lodestar of $668,975.94. That amount is further reduced by the *Johnson* factors not subsumed within the lodestar analysis that support a negative adjustment: the absence of evidence of time limitations and relationship with clients, and, to some extent, the novelty and difficulty of the issues presented. Applying a 5% negative adjustment to that lodestar results in a fee award of $635,527.14.

alteration omitted).  In *Radosti*, the district court approved the costs requested because (1) class counsel provided the court documents showing the costs, (2) the court found the costs to be typical expenses, (3) no class member objected to the costs, and (4) the defendant did not object.  *Id.*  All four circumstances are present here.  Class counsel have provided this court with documentation supporting the costs.  The court has carefully reviewed those costs and finds them appropriate for a case of this nature.  There are no objections.  The costs requested are reasonable.

### E.    Incentive Awards

Finally, class counsel seek approval of incentive awards of $200 to the representative plaintiffs and $100 to the named plaintiffs.  (Docket Entry No. 107, ¶ 6).  During the preliminary fairness hearing, class counsel explained the rationale behind seeking these awards: "I am a believer in having people to come forward because they have time and expense and that there should be some reasonable incentive because they advanced society's interest in the truth of the matter in solving problems."  (Docket Entry No. 87, at 8).

"Courts 'commonly permit payments to class representatives above those received in settlement by class members generally.'"  *Turner*, 472 F. Supp. 2d at 870 (quoting *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 367–68 (S.D. Miss. 2003)).  That does not mean, however, that incentive awards are always merited.  "In deciding whether an incentive award is warranted, courts look to: (1) 'the actions the plaintiff has taken to protect the interests of the class'; (2) 'the degree to which the class has benefitted from those actions'; and (3) 'the amount of time and effort the plaintiff expended in pursuing the litigation.'"  *Ky. Grilled Chicken*, 2011 WL 5599129, at *15

(quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).[55]

The court agrees with class counsel's statement at the preliminary-fairness hearing about the purpose of incentive awards. They reward representative plaintiffs (and named plaintiffs) for their time and expenses spent advocating on behalf of the class. In this case, however, there is no evidence of such involvement, time, or expenses. For the court to approve the incentive awards—even if they are nominal, and even if the defendant does not object—there must be some evidence in the record demonstrating that the representative plaintiffs were involved. Absent such evidence, the court lacks an adequate basis to approve the incentive awards.

## V.   Conclusion

The Consumer Plaintiffs' motion for final approval of the settlement, for an award of attorneys' fees and costs, and for incentive awards, (Docket Entry No. 107), is granted in part and denied in part. The settlement class is certified. The proposed settlement is approved as fair, reasonable, and adequate. Attorneys' fees are awarded in the amount of $606,192.50. Costs are awarded in the amount of $35,000.00. Incentive awards to named and representative plaintiffs are denied.

SIGNED on March 20, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

[55] *Cf.* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303, 1310 (2006) (arguing that "incentive awards serve multiple goals": compensating representative plaintiffs for costs and superior service to the class).